## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| DEVI KHODAY and DANISE TOWNSEND, *individually and on behalf of the class they represent*, | Civil No. 11-180 (JRT/TNL) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| SYMANTEC CORP. and DIGITAL RIVER, INC., | |
| Defendants. | |

Douglas J. McNamara and Andrew N. Friedman, **COHEN, MILSTEIN, SELLERS & TOLL PLLC**, 1100 New York Avenue N.W., West Tower Suite 500, Washington, DC 20005; Richard Wentz, **THE WENTZ LAW FIRM**, 33 Via Ricardo, Newbury Park, CA 91320; Karen Hanson Riebel and Kate M. Baxter-Kauf, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for plaintiffs.

Patrick E. Gibbs, **LATHAM & WATKINS, LLP**, 140 Scott Drive, Menlo Park, CA 94025; Steve W. Gaskins, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for defendant Symantec Corp.

Charles Smith, Amy Van Gelder, and Jessica Frogge, **SKADDEN, ARPS, SLATE, MEAGHER & FLOM**, 155 North Wacker Drive, Chicago, IL 60606; and Steve W. Gaskins, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for defendant Digital River, Inc.

This is a class action lawsuit brought by named Plaintiffs Devi Khoday and Danise Townsend against Defendants Symantec Corp. ("Symantec") and Digital River, Inc.

("Digital River") (collectively, "Defendants").   Plaintiffs allege that Defendants sold download insurance products to consumers using misrepresentations that those products were the exclusive means by which customers could redownload software purchased from Defendants.   Plaintiffs bring claims against Digital River under Minnesota's Consumer Fraud Act, and against Symantec under California's Unfair Competition Law and Consumers Legal Remedies Act, as well as claims for unjust enrichment against both Defendants.

Plaintiffs move for class certification of all individuals in the United States that purchased the two download insurance products at issue during a certain period of time dictated by the statute of limitations.   The Court will certify Plaintiffs' proposed class under Federal Rule of Civil Procedure 23(b)(3) because it finds that Plaintiffs have satisfied the prerequisites for certification, and have also demonstrated that class issues will predominate and a class action is a superior method for adjudicating the claims against Defendants.

## BACKGROUND

## I.   SYMANTEC AND DIGITAL RIVER

Symantec is a California-based company that sells internet security software products under its Norton brand.   (Decl. of Patrick E. Gibbs, Ex. 1, Aug. 23, 2013, Docket No. 217;[1] Am. Compl. ¶ 2, Apr. 14, 2011, Docket No. 40; Symantec's Answer

---

[1] With the exception of deposition transcripts and items filed under seal, all citations to page numbers of exhibits refer to the CMECF pagination.

¶ 2, Apr. 11, 2012, Docket No. 85.)  Digital River is a Minnesota-based company that builds and manages e-commerce websites for online retailers.  (Second Decl. of Amy L. Van Gelder, Ex. 1 (Decl. of Andrew Carrane ("Carrane Decl.") ¶ 2), Aug. 23, 2013, Docket No. 215.)

In 2000, Symantec contracted with Digital River to manage Symantec's online storefront, through which it sold its Norton products.  (*See* Second Decl. of Douglas J. McNamara, Ex. 1 at 12:16-18, 15:3-20, June 26, 2013, Docket No. 183; *see also id.*, Ex. 2.)  Digital River managed the storefront until October 2009.  (Second Van Gelder Decl., Ex. 2 at 17:20-18:5.)  Although Digital River managed the storefront, Symantec dictated the content and offerings of the website, as well as the disclosures Digital River made to customers.  (Second McNamara Decl., Ex. 2 at DR-0054160-DR-0054172; Second Van Gelder Decl., Ex. 3 at 78:22-25.)  Between October 2009 and June 2010 Symantec began transitioning sale of its Norton products to a new online storefront managed by Symantec, and at the end of June 2010 Digital River ceased managing the sale of Norton products.  (Gibbs Decl., Ex. 4 at 38:15-39:3; *id.*, Ex. 5 at 21:24-22:7.)

## II.  THE DISPUTED PRODUCTS

### A.  Purchasing Downloadable Norton Products

During the relevant time period, a Symantec customer who purchased a downloadable Norton product online would receive access to a hyperlink that the customer could click to begin the software's automatic download.  (Gibbs Decl., Ex. 7 at 56-57; *id.*, Ex. 8 at 25.)  The customer's click would cause the software to automatically

be downloaded and installed upon the customer's computer.  (*Id.*, Ex. 8 at 60, 65.) During installation, the customer's unique "product key"[2] associated with the purchased software would be "injected" or added to the software – allowing the software to run on the customer's computer.  (*Id.*, Ex. 10 at 93:20-94:2; *id.*, Ex. 11 at 21:22-22:5; Second Van Gelder Decl., Ex. 9 at 86:11-16.)  After purchasing the product, a customer would have sixty days within which to download and install the product.  (Gibbs Decl., Ex. 14 at 62:9-12; *id.*, Ex. 15 at 53:11-13.)  During this sixty-day window, customers were able to redownload and reinstall the product an unlimited number of times by accessing their Norton account and reinitiating the automatic download process.  (*Id.*, Ex. 14 at 62:9-12.)

## B.   Downloading Extension Products

### 1.   Electronic Download Service

During the time period that Digital River was managing Symantec's online storefront, Symantec authorized Digital River to offer a product called Electronic Download Service ("EDS").  (Second McNamara Decl., Ex. 2 at DR-0054170; Digital River's Answer at 6, Apr. 11, 2012, Docket No. 86.)  EDS allowed customers to redownload the Norton software they had purchased after the original sixty-day period had expired.  (Second McNamara Decl., Ex. 10; Digital River's Answer at 3-4.)  If, for example, customers lost their Norton software through a computer crash or purchased a

---

[2] A product or license key is a 25-digit number used by Symantec to combat software piracy.  (Gibbs Decl., Ex. 10 at 93:20-94:2; *id.*, Ex. 11 at 21:22-22:5.)  The product key is "entered into the Norton . . . security product that's used to validate entitlement to the subscription to that product."  (Second Van Gelder Decl., Ex. 9 at 86:11-16.)

new computer, they could redownload their software using EDS for up to a year after their purchase.  (Gibbs Decl., Ex. 18 at 197:10-25.)  To activate EDS, customers would visit Symantec's online storefront and enter identifying information, which would bring them to a list of Norton products they had purchased.  (*Id.*, Ex. 20 at 86:10-20; *id.*, Ex. 21 at 136:10-137:1; Second Van Gelder Decl., Ex. 3 at 292:24-293:4.)  Products for which EDS had been purchased (as well as products that had been purchased less than sixty days prior to the site visit) would display download links.  (Gibbs Decl., Ex. 20 at 86:10-20; *id.*, Ex. 21 at 136:10-137:1.)  Clicking the download link would redownload and install the exact version of the software the customer had originally purchased, and the customer's unique product key would be automatically injected into the software.  (*Id.*, Ex. 19 at 134:12-135:6; Second Van Gelder Decl., Ex. 3 at 292:19-293:9.)

A representative of Digital River testified that the title EDS was carefully chosen to give customers a particular impression about the product, recognizing that "the title of EDS was probably more impactful than . . . the fine details."  (Second McNamara Decl., Ex. 16 at 94:22-25; *see id.*, Ex. 16 at 95:13-16 ("Again, people are more likely to pay attention to the title of a product versus all of the details of a product.").)

## 2.  Norton Download Insurance

In October 2009, when Symantec began selling its Norton products through its own online storefront, it offered customers a product similar to EDS called Norton Download Insurance ("NDI").  (*Id.*, Ex. 8; Gibbs Decl., Ex. 8 at 39.)  NDI operated almost identically to EDS, allowing customers to redownload previously purchased

software for up to one or two years depending on the license period selected.  (Gibbs Decl., Ex. 22 at 26:10-15; *id.*, Ex. 26 at 281:1-10.)   After a customer logged into her Norton account, she could click a download button that would automatically download and install a product key injected version of the software.  (*Id.*, Ex. 22 at 26:10-15; *id.*, Ex. 23 at 34.)  In contrast to EDS, which redownloaded the exact version of the product originally purchased, NDI would download the most recent edition of the product the consumer had originally purchased.  (*Id.*, Ex. 22 at 26:6-15; *id.*, Ex. 23 at 35.)  Symantec stopped selling NDI in the United States on March 10, 2011.  (*Id.*, Ex. 25 at 51.)

Because the class claims arising out of the sale of EDS and NDI are almost identical, the remainder of this Order discusses the facts surrounding the sale of these two products (collectively, "download insurance") holistically, unless otherwise noted.

### C.   Circumstances Surrounding Purchases of Download Insurance

When a customer purchased any Norton Product, download insurance was automatically added to the customer's shopping cart.  (*See* Gibbs Decl., Ex. 8 at 39; *id.*, Ex. 29 at 66.)  A customer who did not want to purchase the download insurance was required to "opt out" and remove it from the cart.  (Second Van Gelder Decl., Ex. 12 at 50:4-16; Second McNamara Decl., Ex. 2 at DR-0054171.)  Information about download insurance available to customers at the point of sale varied somewhat over time because Defendants changed the location, display, and content of the information to "improve" the online shopping experience.  (Second Van Gelder Decl., Ex. 4 at 19-20; *id.*, Ex. 7 at 34:1-15.)   For example, Defendants tested different names for download insurance

including "Download Backup Service," "Download Insurance," and "Download Protection Service." (*Id.*, Ex. 17.)  In the sections that follow, the Court sets forth details regarding the purchase of download insurance that form the basis of the parties' dispute regarding class certification.

### 1.      Pricing

Defendants charged between $4.99 and $16.99 for the download insurance products.  (Carrane Decl. ¶ 4; Second McNamara Decl., Ex. 25 at 138; *id.*, Ex. 6 at 20.) Download insurance was essentially "pure profit" for Defendants, as it cost almost nothing to provide the service.  (Second McNamara Decl., Ex. 5 at DR-0918108; *id.*, Ex. 6 at 20; Third Decl. of Douglas J. McNamara, Ex. 51 at 5, Oct. 4, 2013, Docket No. 228 ("NDI generates approximately $20M dollars a year for eCommerce with huge margins.").)[3]  Defendants did not price download insurance based upon what it cost to provide the customer with the service, but instead priced it based upon what "the consumer is willing to pay based on the value they perceive."  (Second McNamara Decl., Ex. 1 at 68:17-69:6; *see also id.*, Ex. 7 ("Depending on the incoming product (product the customer is purchasing) we have noticed that EDS attachment rates actually increase as the price of EDS increases. . . . By increasing the price of EDS to be more in-line with

---

[3] Plaintiffs filed a corrected set of exhibits to the Third McNamara Declaration that appear at Docket Number 235.  References to exhibits of the Third McNamara Declaration therefore refer to this corrected set of exhibits.

that of the product [the customer is] purchasing, the customer's perceived value of this product increases and so does the attachment rate.").[4]

## 2. The "What's this" Link

The download insurance displayed in a customer's shopping cart was typically accompanied by a "What's this" or "What is Extended Download Service" link.[5]  (Gibbs Decl., Ex. 8 at 39; *id.*, Ex. 29 at 66; Second Van Gelder Decl., Ex. 2 at 23:14-19.)  From 2004 to approximately August 2008, clicking on the "What's this" link revealed a pop-up description, (Second Van Gelder Decl., Ex. 7 at 95:17-25), stating, in relevant part:

> **What is the Extended Download Service?**
>
> When you order a downloadable product from the Symantec Store you are automatically granted a 60 day window in which your purchase can be redownloaded at any time.  After this 60 day window has passed your download will no longer be available unless the Extended Download Service is also purchased.  When this service is purchased, we will keep a backup copy of your file on our server for one full year after the date of purchase, meaning that you can redownload whenever necessary during that extended period.

(Gibbs Decl., Ex. 29 at 66).  In 2008, the description revealed by clicking the "What's this" link changed to:

---

[4] The attachment rate refers to the rate at which customers left the download insurance product in their carts and actually purchased the product.

[5] Screenshots in the record suggest that at times, or for some customers, a "What's this?" link may not have existed.  (*See* Second Van Gelder Decl., Ex. 14 at 24.)  Instead, a description of EDS was available in the shopping cart itself, which notified customers "When you buy the Extended Download Service, you may redownload your software for a period of one year after the date of purchase."  (*Id.*)

**What is the Extended Download Service?**

When you purchase downloadable software from Symantec's online store, Digital River, Symantec's authorized online retailer, automatically grants you 60 days from the date of purchase to download your software order.

If you add Extended Download Service to your downloadable software purchase order, Digital River will keep a backup of all the software on your order for ONE YEAR[.]  If you need to re-download your software, or access your Serial Key, it will be available 24 hours a day, 7 days a week for ONE YEAR from the date of purchase by going to www.findmyorder.com.

(Gibbs Decl., Ex. 29 at 67 (formatting omitted).)  A Digital River executive testified that these two descriptions conveyed "fundamentally the same message."  (Second McNamara Decl., Ex. 1 at 97:16-101:19.)

The description for NDI stated:

**Norton Download Insurance**

When you purchase downloadable software from the Norton Store you automatically receive the ability to download your software for 60 days from the date of purchase.  Norton Download Insurance extends the time you can access your downloadable software by providing you the freedom and flexibility to download or re-download your software for one year.

Gain flexibility and peace of mind!

If you decide to replace your PC or if your PC has problems, is damaged or stolen and you need to reinstall your software, with Norton Download Insurance you have the peace of mind of knowing you can re-download your software at anytime for one year.  Norton Download Insurance may be refunded within 60 days from the date of purchase.

(Second McNamara Decl., Ex. 15 at 45.)  Digital River employees believed that the description of EDS was "almost word for word" of the NDI description.  (*Id.*, Ex. 15 at 44.)

During the relevant time period, Defendants contend that some customers may have seen slightly different variations of the "What's this" message, as Defendants live-tested different versions of language on customers.  (*See, e.g.*, Gibbs Decl., Exs. 30-31; Second Van Gelder Decl., Ex. 4 at 19-20.)  For example, a different version of the description language stated:

> The Extended Download Service (also known as Download Warranty Service) is available for purchase on the payment page when there are downloadable items present in your shopping cart.  Upon payment of the specified fee, Digital River, Inc., agrees to provide to you a service that enables you to make multiple downloads of digital computer software products purchased by you in a single order and downl[oa]ded from Symantec's online store for a period of one year after the date of your purchase.

(Gibbs Decl., Ex. 30 at 70.)  Another stated:

> Save Time and Safeguard Your Purchase with EDS (Extended Download Service).
>
> Securely Back Up Your Software Online for One Year.
>
> Now purchasing software online is more convenient than ever.  Our Extended Download Service frees you from the time-consuming – but critical – chore of backing up your new software.
>
> Simply purchase EDS as part of your order.  We'll automatically store on our server a back-up copy of the software that you purchased and downloaded for one full year from the date of purchase.  System crash? Hard disk error?  No Worries!  You can re-download your files anytime during your extended protection period.

(Gibbs Decl., Ex. 31.)

Defendants did not track which of its customers clicked on the "What's this?" link.  Although there is no direct evidence that everyone clicked on the "what's this" link, in one product trial group consisting of twenty-two people, every single person clicked on

the link in the shopping cart because they did not understand why a product had suddenly appeared in the cart as part of their purchase.  (Second Van Gelder Decl., Ex. 11 at 7.)

### 3.    Information Available Through Customer Service

Customers could also contact customer service for more information about the download insurance products.  Digital River provided customer service for Symantec's online store until August 2006.  (Gibbs Decl., Ex. 32 at 19:8-13; *id.*, Ex. 33 at 19:12-20:25.)   While Digital River was providing Symantec's customer service, customer service representatives used a "knowledge base" or "internal data assistant" to help them answer customers' questions.  (*Id.*, Ex. 34 at 30:16-31:21.)   The internal data assistant was an online resource containing answers to frequently asked questions that had been drafted by Defendants.  (*Id.*, Ex. 34 at 30:4-8, 31:14-32:1.)   The customer service center was not, however "a scripted call center."  (*Id.*, Ex. 35 at 149:8-16.)  Each representative had the same internal data assistant information available, (*id.*, Ex. 35 at 33:10-13), but "each rep would have their own way of saying it.  It wasn't 100 percent consistent across the entire call center" (*id.*, Ex. 35 at 149:16-21).   Even so, a Digital River executive testified that with respect to EDS, customer service representatives would have a script with fundamentally the same information as that provided by the online descriptors. (Second McNamara Decl., Ex. 1 at 223:22-224:8, *id.*, Ex. 11 at 72:3-17, *id.*, Ex. 17 at 81.)  Customer service consistently told customers to purchase EDS if they wished to be able to download their software more than sixty days after purchase.  (*Id.*, Ex. 1 at 224:9-14.)

If a customer emailed customer service regarding the purchase of EDS, a customer service representative would respond with a form e-mail stating:

> Thank you for choosing Symantec store.  When you order a downloadable product from the Symantec store, you are automatically granted a 60-day window in which your purchase can be re-downloaded at any time.  After the 60-day window has passed, your download will no longer be available unless the Extended Download Service is also purchased.

(*Id.*, Ex. 11 at 116:9-117:10; *id.*, Ex. 18 at 93.)

In August 2006, Symantec switched from having Digital River provide its customer service and to using third party vendors.  (Gibbs Decl., Ex. 32 at 19:8-13; *id.*, Ex. 33 at 19:12-20:25.)  Symantec alleges that when it took over customer service operations, its representatives used an "entirely different" set of materials to answer questions about EDS and NDI.  (Symantec's Mem. in Opp'n to Mot. for Class Cert. at 10, Aug. 23, 2013, Docket No. 216.)  Symantec's customer service representatives used a knowledge base system in which a representative would have access to numerous documents, each providing content with information about a particular topic.  (Gibbs Decl., Ex. 36 at 22:5-16.)  The content and instructions to representatives about specific topics changed over time, as did representatives' responses to customer questions.  For example, one customer asked whether he was required to purchase EDS in order to download software outside the sixty-day window, noting that he had always been able to redownload outside the sixty-day period previously, even though he had not purchased EDS.  (*Id.*, Ex. 43.)  The customer service representative responded that "[i]f there is no extended download service, you will be able to download only within 60 days of the purchase," and indicated that this changed the previous policy of allowing for downloads

outside the sixty-day period through other, non-download insurance, means.  (*Id.*, Ex. 43 at 9; *see also id.*, Ex. 80 at 39 (describing customer solution center answers to questions about redownloading stating that "[t]o redownload the product you need to purchase the Extended Download Service").)  Some customer service representatives noted that the purchase of download insurance was optional, but did not alert customers to other mechanisms they could use to redownload their Norton product outside the sixty-day window.  (*See id.*, Exs. 44-45.)  Other representatives told customers that they could redownload their Norton product using trialware, and explained that the only advantage of purchasing download insurance was to save some time in redownloading the product. (*Id.*, Ex. 46.)  The record suggests that the general trend in customer service was to attempt to sell a customer EDS first, and then suggest trialware or another download alternative if a customer refused to purchase EDS.  (Second McNamara Decl., Ex. 11 at 81:24-82:6.)

### 4.    Information Available Through Other Sources

Defendants contend that information about the download insurance products, available from various sources, rendered disclosures in the shopping cart not misleading because consumers could learn that it was **not** a necessary product through these other sources.

A "FAQ" page on Symantec's website available beginning in November 2007 under the heading "I want to re-download my Norton product" provided customers with instructions on how to redownload their Norton product outside the sixty-day window

that did not involve using download insurance. (Gibbs Decl., Ex. 47.)  Additionally, Symantec created video tutorials available on YouTube to assist customers in downloading Norton products without purchasing download insurance. (*Id.*, Ex. 48.) Symantec also hosted Norton community discussion forums online, and would explain to customers how to access available alternatives to download insurance. (*Id.*, Ex. 49 (describing online chatroom advice given in 2010 and 2011).)

Information about alternatives to download insurance also existed in public fora that were not sponsored by Defendants. (*See id.*, Ex. 50 (describing Defendants' download insurance products and accompanying descriptions as "[u]nfair business practice" and advising consumers about their ability to always redownload their purchased software through other avenues).  Affiliate sites that sold Norton products also allegedly told customers not to purchase EDS, although the record is unclear as to how frequently or in what manner this information was communicated. (*Id.*, Ex. 51 at 58.) Additionally, it appears that upon learning of these practices Defendants took steps to have the domains of those affiliates terminated. (*Id.*, Ex. 51 at 57-58.)

### D.     Purchase Rates and Use of Download Insurance

Approximately half of the customers that bought Norton products also purchased some form of download insurance. (Second Van Gelder Decl., Ex. 4 at 87:4-88:11.) Defendants' data about the use of EDS reveals that 97% of download activity occurred during the first month following purchase of a North product, and 3% occurred in the second month – within the sixty-day window for download provided by purchase of the

original product.  (Third McNamara Decl., Ex. 57 at 124.)  There were "virtually no downloads for the remainder 10 months of the [EDS] service."  (*Id.*)

### E.     Contracts Potentially Governing Download Insurance

A customer purchasing EDS was bound by the terms and conditions of an Extended Download Warranty Service Agreement ("the EDS Agreement"), unless they unchecked a box at the end of the agreement.  (Second McNamara Decl., Ex. 10; *id.*, Ex. 11 at 53:23-54:15.)  The EDS Agreement contained a Minnesota choice of law clause with respect to claims against Digital River, providing that:

> Any and all claims or disputes relating to the Services shall be governed by the laws of the State of Minnesota.  For the purpose of resolving conflicts relating to the Service, [Digital River] and the End User agree that venue shall be in the State of Minnesota only, and, in addition, the End User hereby consents to the jurisdiction of the federal and state courts in the State of Minnesota.

(*Id.*, Ex. 10.)

Additionally, customers that accessed Symantec's website agreed to certain terms and conditions contained in a "Legal Notice" section of the website.  (*Id.*, Ex. 12 at 31.)  One of those terms was entitled "governing law and jurisdiction" which stated:

> You agree that all matters relating to your access to, or use of, this web site shall be governed by the laws of the state of California.  You agree and hereby submit to the exclusive personal jurisdiction and venue of the Supreme Court of Santa Clara County in California and the United States District Court for the Northern District of California, with respect to such matters.

(*Id.*, Ex. 12 at 34.)

Symantec has also identified a Symantec Software Service License Agreement ("Symantec License Agreement") that it contends may be relevant to the present dispute. (Gibbs Decl., Ex. 86.)   The Symantec License Agreement subheading says "Norton AntiVirus or Norton Internet Security," but states that it "governs any releases, revisions, updates or enhancements to the Software that Symantec may make available to You." (*Id.*, Ex. 86 at 40.)   The Symantec License Agreement also contains a California choice of law provision, stating:

> This License Agreement will be governed by the laws of the State of California, United States of America. . . . Notwithstanding the foregoing, nothing in this License Agreement will diminish any rights You may have under existing consumer protection legislation or other applicable laws in Your jurisdiction that may not be waived by contract.

(*Id.*, Ex. 86 at 43.)

## III.   ALTERNATIVES TO DOWNLOAD INSURANCE

The crux of Plaintiffs' argument is that the sale of download insurance was misleading, because Defendants represented that EDS and NDI were necessary purchases if a customer wanted to redownload purchased software more than sixty days after purchase.   Plaintiffs contend that, in fact, there were numerous free methods a customer could use to redownload the purchased software.   A representative of Symantec testified that in order to download purchased software beyond sixty days, customers "were required to purchase EDS," and there was "no other way to download software that Symantec offered to [its] customers."   (Second Van Gelder Decl., Ex. 3 at 53:7-17.)   But the record reflects that download insurance was not the only means to redownload a

product at any point during the class period, and in fact several other means were available, which the Court will discuss below.

### A.    Trialware

Trialware was a free version of Norton software that was available on the Symantec website and storefront.  (Second McNamara Decl., Ex. 20 at 15:23-17:8; *id.*, Ex. 24 at 132.)  Customers could click on the trialware link to download the Norton product, then enter their unique product key to activate the software.  (*Id.*, Ex. 22; *id.*, Ex. 4 at 199:1-204:1; *id.*, Ex. 23 at 240:2-241:20.)  The functionality of trialware with a unique product key was the same as if a customer had redownloaded software using a download insurance product.  (*Id.*, Ex. 4 at 199:1-204:1.)

A Symantec representative testified that trialware was designed for prospective customers to try Symantec's software, to determine whether they would like to purchase the product.  (Gibbs Decl., Ex. 52 at 51:16-21.)   The Symantec representative also testified that using trialware in order to redownload previously purchased software contravened Symantec's structured business model of allowing a customer to try the product before purchasing.  (*Id.*, Ex. 53 at 295:21-296:1.)  However, there is undisputed evidence in the record that Defendants knew that trialware was a viable alternative to download insurance.  An email from a Digital River employee stated that "Technically speaking someone who didn't ever buy [EDS] on retail could just download trialware and activate with the key they already have, in lieu of ever buying [EDS] . . . Shhhh!"  (Second McNamara Decl., Ex. 25; *see also id.*, Ex. 32 (statement by Symantec employee

that "The NDI item gives me the creeps since we are now doing it directly. I could sort of ignore it when DR was selling it."); *id.*, Ex. 26 at 141 (noting that trialware was an alternative to redownloading, but hesitating about promoting that method "given the risk to Download Insurance" which "is an antiquated concept and needs to go. We are just having a tough time moving away from it.").)

In October 2007, Symantec redesigned its customer support webpage to include trialware links for all post-2005 Norton products on a single page titled "I want to re-download my Norton product." (*Id.*, Ex. 24 at 132; *id.*, Ex. 20 at 35:15-40:24; *id.*, Ex. 27 at 149.) Digital River employees knew that this option "is usurping eds for sure" recognizing that "downloading the trialware and manually entering your key" would provide a customer with the same functionality as download insurance. (*Id.*, Ex. 29.) There is also evidence in the record that Defendants continued to offer download insurance for "revenue" reasons, even though "[i]t is cancerous to customer satisfaction" and "was not really adding a lot of value to customers." (*Id.*, Exs. 31, 34.)

Defendants allege that redownloading software through trialware was more inconvenient and riskier from a computer security standpoint, than redownloading using download insurance. (Second Van Gelder Decl., Ex. 5 at 33:6-19; Gibbs Decl., Ex. 55 at 212:19-213:1.) For example, the customer had to locate the correct (as opposed to fraudulent versions that were available on the internet through third parties) of Symantec's trialware, (Gibbs Decl., Ex. 56 at 33:3-24; *id.*, Ex. 57 at 38:3-11), locate the appropriate product and/or version, (*id.*, Ex. 52 at 291:2-17; *id.*, Ex. 58 at 34:2-11), and be able to access her unique product key, (*id.*, Ex. 52 at 290:8-22). Plaintiffs could

access their product key through purchase confirmation e-mails, the "find your order" page, their Norton account, or by calling customer service. (*Id.*, Ex. 47 at 8-9; *id.*, Ex. 63 at 87:15-88:18.)

Additionally, Defendants allege that trialware was not necessarily available to each class member. Sometimes trialware was not available because the customer had purchased a different version of the software than the trialware version that was currently being offered. (*Id.*, Ex. 59 at 81:3-18.) Defendants also contend that prior to approximately 2007 a customer's product key would active only the precise edition of the Norton product purchased. (*Id.*, Ex. 60 at 202:3-14.) Therefore, a customer that wished to redownload software in 2008 that was purchased in 2007 would be unable to activate the latest version of trialware with her existing product key. Only post-November 2007 products allowed a customer to use a unique product key to activate any version of the purchased software. (*Id.*, Ex. 60 at 291:2-8.)

Although Symantec provided direct links to trialware on its website, during the relevant time period Defendants did not provide information about trialware as an alternative to download insurance at the point of sale when the download insurance product was automatically added to the customer's cart. (Second McNamara Decl., Ex. 30 at 92:4-12.)

## B.      Purchasing Download Insurance Later

EDS could also be purchased by a customer after the original sale of the Norton product, making purchase at the point of sale unnecessary. EDS could be purchased at

any time during the duration of the download license.  (*Id.*, Ex. 37; *id.*, Ex. 40 at 70:11-21.)  The option to purchase EDS would appear on the "order look up" page or could be offered by a customer service representative.  (*Id.*, Ex. 11 at 41:12-42:2; *id.*, Ex 38; *id.*, Ex. 40 at 72:8-20.)  Defendants did not disclose to consumers at the time of sale that they could purchase EDS later in the event they needed to redownload.  (*Id.*, Ex. 1 at 228:19-229:11.)  NDI, however, was not available post-purchase. (Gibbs Decl., Ex. 73 at 53:13-25.)

### C.   Redownloading Through Customer Service

Customer service representatives also assisted customers in downloading products outside the sixty-day period, sometimes using trialware.  (Second McNamara Decl., Ex. 24 at 132; *id.*, Ex. 23 at 117:18-118:14; *id.*, Ex. 11 at 77:16-78:19.)  Customer service representatives, however, had discretion in determining whether to allow or disallow free redownloads without download insurance and outside the sixty-day window.  (Gibbs Decl., Ex. 68 at 86:13-87:20.)  Defendants contend that using customer service as an avenue to redownload software was inconvenient because wait times could be long.  (*Id.*, Ex. 70 at 294:17-295:3.)

### D.   Downloading on Symantec's Support Website

Customers could also redownload their Norton product after October 2007 by accessing Symantec's support website.  (Gibbs Decl., Ex 81 at 127:7-23.)  Symantec contends that downloading through this website was not a guarantee, as not all Norton products may have been available on the site at any given time. (Symantec's Mem. in

Opp'n to Mot. for Class Cert. at 16.)   Archives of Symantec's support website indicate that starting on November 20, 2007, Norton products were available for downloading that included at least the most recent versions of Norton Antivirus, Norton Internet Security, Norton Systemworks, Norton 360, Norton Utilities as well as different versions of each of these products – premier, standard, etc.   (Third McNamara Decl. ¶ 2; Second McNamara Decl., Ex. 12.)

### E.   Value of Download Insurance in Light of Alternatives

In a November 2010 email, a member of Symantec's Consumer Strategy & Emerging Business Development group discussed the relationship between sales of NDI and available alternatives, explaining:

> I believe selling NDI is near the border line of being unethical, **since the subscription model we adopted a few years ago includes all new versions during the term of the subscription.**  I have felt this way long before I joined Symantec.  I developed this view several years ago when I purchased some software (non-Symantec) from Digital River, and found (after the fact) that they had added 9.95 to the cart.  I felt screwed.
>
> I feel NDI violates our core Symantec values of Customers and Trust.
>
> I understand the issue of making the number.  I agreed with the decision to continue selling NDI through the December quarter in order to minimize our risk of a short-fall.

(Third McNamara Decl., Ex. 51 at 2 (emphasis added).)   Other Symantec representatives indicated that NDI did not provide much value to consumers.  (*See* Second McNamara Decl., Ex. 34 at KHOD0000353 ("He is looking to add more value to [NDI] in order to not just have the right to re-download the product (in line with DR's EDS offering, which I always thought was not really adding a lot of value to customers.)").)

Plaintiffs and Defendants both submitted expert reports that opined on the actual value of download insurance.[6]  Plaintiffs' expert, Steve Gaskin, considered the value of the convenience provided by download insurance due to the automatic injection of the product key.  (Third McNamara Decl., Ex. 55 at 32.)  Specifically Gaskin was asked

> to assume that customers who purchased Norton computer security software had the ability to re-download the software for free, but, if they did so, they were required to enter their product key during the installation process.  Alternatively, customers could purchase re-download insurance, a service that automatically injected the product key during the installation process.

(*Id.*)  Gaskin used a conjoint analysis – which asks respondents in a questionnaire to choose among products with different features – to perform a quantitative measurement of customer preferences.  (*Id.*, Ex. 55 at 33-34.)  During the analysis Gaskin showed customers sets of product profiles and asked them to select the product they preferred, assuming that the products displayed were the only ones available.  (*Id.*, Ex. 55 at 35.)  The conjoint analysis then used respondents' decisions about which product profiles they prefer to estimate the relative value of each described product feature.  (*Id.*, Ex. 55 at 34.)

Gaskin used product profiles that combined four different features – the number of times the software could be redownloaded, the redownload process (whether the product key was automatically injected), whether a computer security newsletter is provided, and price.  (*Id.*)  The redownload process feature was described to survey respondents as

---

[6] Defendants sought to admit their expert report after the motion for class certification had been fully briefed.  The Court granted their request at the hearing on the motion.  (Minute Entry, Nov. 5, 2013, Docket No. 246.)

> *Description:* In order to re-download your computer security software, you
> may be required to enter your product key, a unique identification number
> for your software product such as the example below:
>
> V78HYFT9P8G29FJB3CKVDTG37
>
> Your product key can be found on your software purchase confirmation
> email or by logging into your Norton account with your login and password
> or by contacting customer support.
>
> The re-download options will vary according to whether you need to enter
> the product key.  All of the options are available 24 hours a day, 7 days a
> week.

(*Id.*, Ex. 55 at 41.)  The different levels of redownload process features available for

survey respondents to choose between were:

> [1] Enter your Norton account login and password, find your software
> purchase in your Norton account, and click the download link
>
> [2] After locating the product key, go to the Norton customer support
> website, click the download link for your software, and enter the product
> key
>
> [3] Contact a Norton customer service representative by telephone or live
> chat to walk you through the re-download process.

(*Id.*)  Based on the results of the surveys Gaskin ultimately concluded that "the fair

market value of automatic product key injection offered in conjunction with the re-

download of Norton computer security software products is between $0.05 and $0.16 per

transaction.  (*Id.*, Ex. 55 at 33.)

Defendants submitted a rebuttal expert report from Kent Van Liere.  (Fourth Decl.

of Amy L. Van Gelder, Ex. A, Nov. 12, 2013, Docket No. 247.)  Liere critiques Gaskin's

findings because Gaskin "d[id] not study the specific products at issue" and his conjoint

study therefore did not "reasonably represent the product's features and prices as they

appeared in the marketplace." (*Id.*, Ex. A at 11.)  In particular, Liere notes that Gaskin's

model left out two important features of the download insurance services – the

availability of a "Download" button upon visiting the customer's Norton account webpage, and the convenience of knowing that the software accessed was "the exact software that the customer purchased, thereby eliminating the need for consumers to know the precise Norton product or version of the Norton product that they purchased." (*Id.*, Ex. A at 11-12.)  Liere also critiques, for example, Gaskin's failure to test how a consumer's willingness to buy a download insurance product changed depending on whether that purchase was at the point of sale with another product or what price the consumer had paid for the original software product.  (*Id.*, Ex. A at 17-18.)  Based on these and other criticism, Liere concludes that "Gaskin's failure to test consumers' willingness to pay for either EDS or NDI products with the features and prices as they appeared in the marketplace makes his survey incapable of answering the question of how much putative class members valued those products."  (*Id.*, Ex. A at 14.)

## IV.   NAMED PLAINTIFFS

Plaintiffs Devi Khoday and Danise Townsend both purchased download insurance products from Defendants during the class period.  Townsend bought EDS from Digital River on several occasions, including on June 7, 2006.  (Second McNamara Decl., Ex. 41 at SYMC-KHOD-000003.)  Townsend purchased Norton Antivirus 2006 for $39.99 and paid $8.99 for EDS, which was automatically added to her shopping cart.  (*Id.*; *id.*, Ex. 42 at 46:2-4.)  Townsend testified that she probably clicked on the "What's this" link, and purchased EDS because without it she would be required to repurchase the original software if her computer crashed.  (*Id.*, Ex. 42 at 44:18-45:1, 46:2-11.)  Townsend further

testified that had she known she could purchase EDS at a later time or use trialware to redownload her software in the event of a computer crash, she would not have purchased EDS on June 7, 2006.  (*Id.*, Ex. 42 at 184:4-23.)  Townsend was unaware of whether trialware was available for her purchase.  (Gibbs Decl., Ex. 19 at 117:10:14.)  Townsend testified that she understood her duty as class representatives.  (Second McNamara Decl., Ex. 2 at 92:9-93:8.)

Townsend had previously declined on one occasion to purchase EDS when purchasing Norton products.  (Second Van Gelder, Ex. 19 at 100:6-19.)  Townsend was struggling with the purchase, called customer service, and eventually had the customer service agent remove EDS.  (*Id.*, Ex. 19 at 69:7-71:24.)  Townsend also once purchased a Norton product along with EDS and returned both purchases.  (*Id.*, Ex. 23.)

Khoday purchased NDI in February 2010 along with her purchase of Norton 360.  (Second McNamara Decl., Ex. 43 at 60:3-61:18.)  Khoday paid $59.99 for Norton 360 and $6.99 for NDI.  (*Id.*, Ex. 44 at KHOD000001.)  Khoday clicked on the "What's this?" link and purchased NDI because she did not want to have to repurchase the Norton 360 software if something happened to her computer outside the sixty-day download window.  (*Id.*, Ex. 43 at 60:8-9, 61:4-18.)  During her deposition, Khoday was given a computer exercise, and successfully redownloaded her Norton product using free trialware.  (*Id.*, Ex. 43 at 17:13-25:3.)  Khoday testified that she may or may not have purchased NDI if she had been fully apprised of all the possible redownload alternatives.  (*Id.*, Ex. 82 at 147:1-149:15.)

## V.    CLASS CLAIMS

On January 24 2011, Plaintiffs, on behalf of themselves and all others similarly situated, filed a complaint against Defendants.  (Compl., Jan. 24, 2011, Docket No. 1.)  In an amended complaint, Plaintiffs bring class action claims against Defendant Symantec for violations of California's Unfair Competition Law ("UCL") and California's Consumers Legal Remedies Act ("CLRA").  (Am. Compl., ¶¶ 36-58, Apr. 14, 2011, Docket No. 40.)  Plaintiffs bring class action claims against Defendant Digital River for violations of Minnesota's Consumer Fraud Act ("CFA").  (*Id.* ¶¶ 59-69.)  Finally, Plaintiffs bring claims for unjust enrichment against both Defendants.  (*Id.* ¶¶ 74-78.)[7]

Plaintiffs' claims rely generally upon the contention that Defendants  - through material misrepresentations and omissions – induced customers to pay for download insurance that was represented as a necessary purchase in order to redownload Norton software outside the sixty-day download window.  In fact, Plaintiffs contend, the service was unnecessary because customers could use multiple alternative avenues to redownload purchased Norton products.

## ANALYSIS

Plaintiffs seek certification of a class under Federal Rule of Civil Procedure 23(b)(3).  Plaintiffs define the class as:

---

[7] The Court previously granted Defendants' motion to dismiss Plaintiffs' declaratory judgment claim.  *See Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1019 (D. Minn. 2012).

All persons in the United States who Purchased Extended Download Service ("EDS") for Norton products or Norton Download Insurance ("NDI") between January 24, 2005 and  March 10, 2011.

**January 24, 2005 – October 26, 2009** – Claims against Digital River under the Minnesota Consumer Fraud Act and False Statement in Advertising Act, or Unjust Enrichment;

**January 24, 2007 – March 10, 2011** – Claims against Symantec under California Unfair Competition Law, or Unjust Enrichment;

**January 24, 2008 – March 10, 2011** – Claims against Symantec under California Consumer Legal Remedies Act.

(Pl.'s Mem. in Supp. of Class Cert. at 14, June 26, 2013, Docket No. 182.)  In their reply brief, Plaintiffs agreed with Defendants that the CLRA only applies to consumer claims, and accordingly propose limiting the class definition for CLRA claims to those customers that "purchased EDS or NDI for personal, family, or household purposes."  (Pl.'s Corrected Reply at 17 n.7, Oct. 18, 2013, Docket No. 234.)

# I.    STANDARD FOR CLASS CERTIFICATION UNDER RULE 23

Under Federal Rule of Civil Procedure 23, "[p]laintiffs requesting class certification must satisfy both 'implicit' and 'explicit' legal requirements." *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 351 (D. Minn. 2012).  "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005).  "[A] party must not only 'be prepared to prove that there are **in fact** sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by

Rule 23(a).  The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (emphasis in original) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)).  Additionally, plaintiffs must "establish that a defined class exists and that the class representatives fall within that class."  *City of Farmington Hills*, 281 F.R.D. at 351.

Plaintiffs bear the burden of showing that a class action is appropriate, and that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551-52. Frequently, a court's determination of whether to certify a class "will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.* at 2551; *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (explaining that class certification "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case").  "Nonetheless, the district court does not conduct a mini-trial to determine if the class 'could actually prevail on the merits of their claims.'"  *Johns v. Bayer Corp.*, 280 F.R.D 551, 555 (S.D. Cal. 2012) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).  "When the court must determine the merits of an individual claim to determine who is a member of the class, then class treatment is not appropriate."  *Id.*  Additionally that the amount of damage suffered by each class member may be an individual inquiry does not defeat class action treatment.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011).

The Court has "broad discretion" to determine whether class certification is appropriate.  *See Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012).  "When a question arises as to whether certification is

appropriate, the court should give the benefit of the doubt to approving the class." *City of Farmington Hills*, 281 F.R.D. at 352.  Furthermore, "[c]lass action certifications to encourage compliance with consumer protection laws are desirable and should be encouraged." *Johns*, 280 F.R.D. at 555 (internal quotation marks omitted).

## II.    RULE 23(a) PREREQUISITES

To be certified as a class, plaintiffs must first satisfy the prerequisites in Federal Rule of Civil Procedure 23(a).  Rule 23(a) requires plaintiffs to demonstrate that:

> (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*In re St. Jude Med., Inc.*, 425 F.3d at 1119 (citing Fed. R. Civ. P. 23(a)).  Class certification is appropriate only if the Court is satisfied, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 133 S. Ct. at 1432 (internal quotation marks omitted).

### A.    Numerosity

Defendants do not dispute that Plaintiffs have satisfied the numerosity requirement.  Defendants sold download insurance more than 15 million times in the United States during the relevant time period.  (Second McNamara Decl., Ex. 45.)  This number makes joinder impractical.  *See Wiener v. Dannon Co.*, 255 F.R.D. 658, 664 (C.D. Cal. 2009) (finding the numerosity requirement satisfied in a consumer fraud action where the class would include "several million plaintiffs").

- 29 -

**B.     Commonality**

Rule 23(a)(2) requires that "'there are questions of law or fact common to the class.'" *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2549 (quoting Fed. R. Civ. P. 23(a)(2)).  The claims "must depend upon a common contention" that is "capable of classwide resolution."  *Id.* at 2551.   In the past, courts have found that the threshold for commonality is low, and requires only that the legal issue "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (internal quotation marks omitted).   The Supreme Court's recent opinion in *Wal-Mart* heightened the requirement of commonality. *See Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 279 (D. Conn. 2013) ("*Wal-Mart* upped the ante on 'commonality' under Rule 23(a)(2) . . . .").   In *Wal-Mart*, the Supreme Court explained that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury[.]" *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 (internal quotation marks omitted).   In other words, the Supreme Court held that class

> claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.*  Thus, when examining commonality, a court looks to "the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation." *Id.* (emphasis in original) (internal quotation marks omitted).    For purposes of the

commonality requirement, the relevant inquiry is not whether those common issues predominate, but only whether there is at least a single common contention that satisfies the above criteria.  *Id.* at 2556-57.

Digital River argues there is no commonality here because class proceedings will not answer common questions given the dissimilarities in customer purchasing experiences and any attendant injury.  The Court finds that Digital River's argument goes primarily to whether common issues predominate, not whether there are common issues in the first instance, and accordingly will address these arguments more fully below.  *See Johns*, 280 F.R.D. at 556 (addressing overlapping issues of commonality and predominance in the predominance analysis); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010) ("Defendants contend that individual issues of motivation and damages defeat the commonality required under Rule 23(a)(2).  Those arguments focus more on the question whether the common issues predominate under Rule 23(b)(3) . . . .").  Here there is at least one common question of law and fact that could generate class wide answers: whether Defendants' representations about the necessity of download insurance were likely to mislead or deceive class members.  *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (finding commonality where "common questions exist as to whether Honda had a duty to disclose or whether the allegedly omitted facts were material and misleading to the public" even though defendants argued that the question of "which buyers saw or heard which advertisements" was not susceptible to common resolution (emphases omitted)).  That all of Defendants' representations regarding download insurance were not identical or that

some consumers may have purchased the product even if they had known it was unnecessary does not negate Plaintiffs' showing of commonality.  *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("[V]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality."); *Chavez*, 268 F.R.D. at 378 (finding commonality even though plaintiffs' claims arose "out of the allegedly false statement, worded in several variations").

## C.    Typicality

Typicality requires that "there are other members of the class who have the same or similar grievances as the plaintiff." *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 262 (D. Minn. 2001) (internal quotation marks omitted).  The typicality requirement seeks to determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), "and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Stearns*, 655 F.3d at 1019 (alteration and internal quotation marks omitted). Factual variations amongst plaintiffs will not normally preclude class certification "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525,

1540 (8th Cir. 1996).  "When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012).

Plaintiffs seek to bring class claims against Symantec for its direct sale of NDI as well as its role in authorizing and supporting Digital River's sale of EDS.  The class certification sought by Plaintiffs includes claims against Symantec under the UCL for consumers purchasing products between January 24, 2007 and March 10, 2011, and under the CLRA for consumers purchasing download insurance between January 24, 2008 and March 10, 2011.  Townsend purchased EDS in June 2006, which is outside of the statute of limitations for claims against Symantec, and Khoday purchased NDI, not EDS.  Symantec argues that the named Plaintiffs' claims are not typical because they are not members of the class that they are purporting to represent.  Specifically, Symantec argues that neither named Plaintiff purchased EDS during the time period for which Symantec can be held liable based upon the statute of limitations, and therefore no class action should be certified against Symantec with respect to claims arising out of the purchase of EDS.

But the Court finds that the failure of either named Plaintiff to specifically purchase EDS after January 2007 or 2008 does not prevent these Plaintiffs from being typical of other class members because EDS and NDI are substantially similar for purposes of Plaintiffs' class claims.  *See DeBoer*, 64 F.3d at1174-75 ("The burden of

demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff. . . . This typicality is not altered by the different mortgage instruments held by class members.  The relief sought in the action is the same regardless of the amount of overage in any particular account.").  This is not a case "where evidence needed to prove the named plaintiff's claims is not probative of other class members' claims."  *See Wiener*, 255 F.R.D. at 665-66 (finding that typicality was not satisfied where the named plaintiff had purchased only one of three kinds of yogurts at issue where the allegedly false health claims made by Dannon were different – one improved the immune system and one aided digestion – for the different kinds of yogurt).  Instead, the evidence needed to prove that Symantec's marketing of NDI was misleading will also be probative of whether EDS was misleading, because both products used almost identical descriptive language and were subject to a similar set of alternative redownloading options during the class period.  *See Marcus*, 687 F.3d at 599 (finding typicality even though "different tire models and sizes, and different vehicles, have different performance characteristics, compositions, designs, purposes, and uses" because the problems alleged with the Bridgestone RFTs that formed the basis of the lawsuit "that they are highly susceptible to road hazard damage, unrepairable, expensive, difficult to purchase, and that a vehicle cannot be converted for use of conventional tires – are uniform and apply to all 2006-2009 BMW vehicles equipped with Bridgestone RFTs").  For Townsend and Khoday to prevail they will have to establish that download insurance products were not the only means to redownload Norton software and that Defendants'

representations indicated the opposite.   Accordingly, the Court finds that the named Plaintiffs satisfy the typicality requirement.

### D.     Adequacy

Finally, Plaintiffs must establish that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To demonstrate adequacy of representation a plaintiff must show that "(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *City of Farmington Hills*, 281 F.R.D. at 353; *see also Johns*, 280 F.R.D. at 557.   "Challenges to adequacy are not relevant unless they bear on the existence of conflicts among class members or plaintiffs' ability to vigorously prosecute their case." *Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 578 (E.D. Ca. 2012).

Both Plaintiffs have stated that they want to vindicate the rights of those who purchased download insurance from Defendants and both Plaintiffs have also been involved in the litigation – reading the complaint, giving depositions, participating in discovery, and communicating with class counsel.  (Second McNamara Decl., Ex. 42 at 92:23-93:8; *id.*, Ex. 43 at 30:13-15.)  Additionally, attorneys for the proposed class have presented substantial evidence that they are competent and capable of prosecuting this action on behalf of the class.  (*See* Mem. in Supp. of Unopposed Mot. to Appoint Interim Lead Counsel, May 9, 2011, Docket No. 47; Second McNamara Decl., Exs. 46-47.)

Symantec contends that Khoday is an inadequate representative because she has relied on counsel to apprise her of the basis of her claims and that although she knew about settlement mediation, she was not consulted in connection with that mediation. (*See* Gibbs Decl., Ex. 92 at 35:19-24.)  Specifically, Symantec argues that Khoday is not an adequate representative, because counsel for the class, not Khoday, is the real driving force behind the litigation.  (*See* Symantec's Mem. in Opp'n to Mot. for Class Cert. at 43-44 (citing *Bodner v. Oreck Direct, LLC*, Civ. No. 06-4756, 2007 WL 1223777, at *2-3 (N.D. Cal. Apr. 25, 2007)).  In *Bodner*, the court found the named plaintiff to be an inadequate representative "[i]n light of plaintiff's undeniable and overwhelming ignorance regarding the nature of this action, the facts alleged, and the theories of relief against defendant," where the plaintiff became the named plaintiff by responding to an advertisement by plaintiff's counsel, met his attorney in person for the first time the day before his deposition, did not read the complaint before it was filed, and had no knowledge of the matter that had not come from his attorneys.  *Bodner*, 2007 WL 1223777 at *1-2.  Additionally, the court noted that plaintiff's counsel had previously tried to bring a similar class action in a different district which was dismissed for failure to timely move for class certification.  *Id.*

The facts of this case are readily distinguishable from *Bodner*.  Here, Symantec does not dispute that both named Plaintiffs actively participated in depositions and discovery, reviewed the complaint, maintain frequent contact with class counsel, and have demonstrated a "willingness and ability to play an active role in and control the litigation and to protect the absent class members." *Stanich v. Travelers Indem. Co.*, 259

F.R.D. 294, 316, 318 (N.D. Ohio 2009) (internal quotation marks omitted) (finding representation adequate where "[i]t appears that Lonardo's interaction with his attorneys to date has been typical of the usual attorney-client relationship – he has participated in discovery, reviewed the amended complaint, and talked to his counsel about the duties of a class representative").  Even if Khoday's deposition could properly be interpreted as an indication that she was unaware of settlement negotiations, this alone is insufficient to demonstrate her inadequacy.  *See Christman v. Brauvin Realty Advisors, Inc.*, 191 F.R.D. 142, 147 (N.D. Ill. 1999) (finding that concerns about whether class counsel was adequately consulting the Named Plaintiffs regarding settlement were "insufficient to find that the Named Plaintiffs and their counsel are inadequate to represent the class").  Additionally, the Court finds that Khoday's reliance on counsel to apprise her of the nature of her legal claims is appropriate, and the record does not demonstrate that any such reliance will prevent her from vigorously prosecuting the action in the best interest of absent class members or that a conflict of interest exists.  *See In re Napster, Inc. Copyright Litig.*, MDL No. 00-1369, Civ. No. 04-1671, 2005 WL 1287611, at *6 (N.D. Cal. June 1, 2005) (finding that allegations of the "named plaintiffs' ignorance of the details of both the initial round of Napster litigation and the ongoing proceedings" did not "suggest[] that the degree of deference that the named plaintiffs have conferred upon counsel falls so far outside the bounds of an ordinary attorney-client relationship that it would have the effect of depriving the absent class members of adequate

representation"). Therefore, the Court concludes that named Plaintiffs and their attorneys satisfy the adequacy requirement of Rule 23(a).[8]

## III.    CERTIFICATION UNDER RULE 23(b)(3)

In addition to satisfying the prerequisites of Rule 23(a), a class may be maintained under Rule 23(b)(3) only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### A.    Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *AmChem Prods., Inc. v. Windsor*, 521 U.S. 591 623 (1997).  "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved."  *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 662-63 (S.D. Cal. 2010) (internal quotation marks omitted)).  The central issue is whether defendant's liability as to all plaintiffs can be established by common evidence.  *Avritt v. Reliastar Life Ins. Co.*, 615

---

[8] Additionally, Digital River argues that Townsend is an inadequate class representative because she lacks standing and because the statute of limitations has run on any claims she could bring under Florida law (her home state).  (*See* Digital River's Mem. in Opp'n to Mot. for Class Cert. at 32-33, Aug. 23, 2013, Docket No. 214.)  Because the Court concludes, under the predominance analysis, that each member of the proposed class has standing and that Minnesota law applies to class claims against Digital River, these arguments do not establish that Townsend is an inadequate class representative.

F.3d 1023, 1029 (8th Cir. 2010).   Therefore, "[t]he predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013).   "'Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.'" *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. at 663 (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

### 1.    Choice of Law

Defendants argue that common issues of law will not predominate because each class member will be governed by the consumer protection laws of his or her state of residence.   In making this argument, Defendants contend that the choice of law clauses contained in the various agreements related to the purchases of download insurance are not applicable to the proposed class claims.

"In determining whether a choice of law provision in the parties' agreement will be given effect, a federal court sitting in diversity looks to the choice of law principles of the forum state, in this case Minnesota." *Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003); *see also Cotton v. Commodore Express, Inc.*, 459 F.3d 862, 863 (8th Cir. 2006).   Minnesota courts generally enforce choice of law clauses and apply the substantive law agreed to by the parties.   *See Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007); *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980).   "In some

circumstances, choice of law clauses can control which jurisdiction's law will govern [statutory or] tort claims in addition to breach of contract claims arising out of the agreements of which the clauses are a part." *Superior Edge, Inc. v. Monsanto Co.*, Civ. No. 12-2672, 2013 WL 4050790, at *7 (D. Minn. Aug. 9, 2013) (applying contractual choice of law provision to tort claims as well as statutory claims for deceptive trade practices and misappropriation of trade secrets).   In considering the scope of a choice of law clause's application, the Court applies ordinary principles of contract interpretation. *See Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683 (8th Cir. 2001) (construing the language of a choice of law clause to determine whether it was "broad enough" to govern choice of law for a tort claim); *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997) (applying a choice of law clause to claims that "f[e]ll within the ambit of the express agreement").   In an unambiguous contract, the plain and ordinary meaning of the contract controls. *Bus. Bank v. Hanson*, 769 N.W.2d 285, 288 (Minn. 2009).

### a.      Digital River's Choice of Law Clause

The relevant language with respect to the claims against Digital River arising out of the purchase of EDS is contained in the EDS Agreement, stating: "Any and all claims or disputes relating to the Services shall be governed by the laws of the State of Minnesota."  (Second McNamara Decl., Ex. 10.)  Digital River contends that this choice of law provision does not govern the consumer statutory claims brought here because the claims will not require the Court to interpret the EDS Agreement in order to adjudicate

Plaintiffs' claims. But courts have limited the application of a choice of law clause only when the choice of law clause at issue expressly limits it application to the interpretation or construction of the contract itself, not any claims based on the services provided pursuant to the contract, as the clause does here. *See, e.g., Nw. Airlines, Inc.*, 111 F.3d at 1392 (construing a choice of law clause providing that the "Agreement shall be deemed entered into within and shall be governed by and interpreted in accordance with the laws of the State of Minnesota" to apply to claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment only because those claims were "closely related to the interpretation of the contracts"); *Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1104, 1106 (D. Minn. 2010) (finding a clause stating that the "Agreement will be construed in accord with the laws of Mississippi" governed only those statutory and tort claims that were "closely related to the contract's terms").

Unlike these clauses, the choice of law provision in the EDS Agreement is broad, and covers "any and all claims or disputes relating to the Service." (Second McNamara Decl., Ex. 10.) The agreement itself does not limit the application of the choice of law clause to claims that involve interpretation of the agreement. Instead, claims based on representations made or information omitted regarding the necessity of the EDS service are certainly related to Digital River's offered download insurance service, and therefore fall within the ambit of "any and all claims or disputes relating to the Service." *See Barton v. RCI, LLC*, 2011 WL 3022238, at *3 (D.N.J. July 22, 2011) (finding that a choice of law clause which governed a "Reservation System" operated by defendant

applied to all statutory and tort claims arising out of misrepresentations regarding aspects of that system explaining that only "where a choice of law provision is narrowly drafted to apply only to the construction and enforcement of an agreement" will the provision "**not** apply to all claims arising out of the parties' relationship" (emphasis in original) (alterations and internal quotation marks omitted)); *Saulic v. Symantec Corp.*, 596 F. Supp. 2d 1323, 1329 (C.D. Cal. 2009) (finding that Digital River's choice of law clause at issue here would apply to claims for violation of the Song-Beverly Credit Card Act based on defendants' use of a particular credit card form for sales arising out of purchases of EDS); *Cal-State Bus. Prods. & Servs., Inc. v. Ricoh*, 16 Cal. Rptr. 2d 417, 423 (Ct. App. 1993) (construing a forum selection clause providing that "any case or controversy arising under or in connection with the Agreement[s]" as including claims based on "allegedly false promises made in the course of the negotiations"). Accordingly, the Court finds that the class claims fall within the scope of Digital River's choice of law clause.

Digital River next argues that even if the choice of law clause would call for the application of Minnesota law, the clause cannot be applied because consumers cannot waive their rights under the consumer protection laws of their home state. Courts typically refuse to apply choice of law provisions to consumer protection claims when application of the choice of law clause will limit or deprive the consumer of a remedy provided by his or her home state. *See, e.g.*, *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1038, 1042 (N.D. Cal. 2010) (refusing to enforce a Maryland choice of law clause which had "the effect of waiving legal protections that are afforded

by California law," specifically the ability to recover punitive damages); *Millett v. Truelink, Inc.*, Civ. No. 05-599, 2006 WL 2583100, at *4 (D. Del. Sept. 7, 2006) (refusing to enforce a Delaware choice of law clause that would have insulated defendant "from liability against all statutory consumer fraud claims" arising out of conduct occurring outside of Delaware, in violation of Kansas public policy).  But Digital River has identified no rights or remedies available under the consumer protection laws of other states that are not available under Minnesota law.  Additionally, courts have refused to allow a defendant to avoid class certification by "circumvent[ing] the broad choice of law clause in its own form contract" by "trying to garner protection of a statute intended to protect its adversaries."  *Pro v. Hertz Equipment Rental Corp.*, Civ. No. 06-3830, 2008 WL 5218267, at *6 (D.N.J. Dec. 11, 2008).  Therefore, the Court concludes that, at least at this stage of the litigation, Digital River's choice of law clause can be applied to the class claims.

Finally, Digital River argues that Minnesota law cannot constitutionally be applied.[9]  "'[F]or a State's substantive law to be selected in a constitutionally permissible

---

[9] Although the Court considers whether the law chosen by the choice of law clause may constitutionally be applied, it does not address Digital River's arguments regarding Minnesota's better law choice of law doctrine because where, as here, "the parties['] express contractual provisions have designated that the laws of a particular state shall govern disputes arising under the agreement, Minnesota courts have applied the substantive law of the designated state without reference to the [better law] factors."  *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 679 (citing *Medtronic, Inc. v. Gibbons*, 684 F.3d 565, 567-68 (8th Cir. 1982)).  Because a choice of law clause governs the class claims, the Court need not undertake its own choice of law analysis.  *See Ceres Envtl. Servs., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 866 (D. Minn. 2012) (applying New York law due to a choice of law clause without undertaking a choice of law analysis); *Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004,

(Footnote continued on next page.)

manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *In re St. Jude Med., Inc.*, 425 F.3d at 1120 (alteration in original) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). "When considering fairness in this context, an important element is the expectation of the parties." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985).

Here, Digital River has its headquarters and principal place of business in Minnesota. Additionally, Digital River does not dispute that EDS was developed, marketed, and sold from Minnesota, and that Digital River kept copies for EDS purchases on Digital River's premises. (*See* Gibbs Decl., Ex. 19 at 148:13-19.) Digital River's website also lists contact information for its corporate headquarters in Minnetonka, Minnesota. This set of facts is sufficient to establish that Minnesota has significant contacts and a significant state interest such that Minnesota law can constitutionally be applied to the class claims. *See Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 535 (D. Minn. 2007) (finding application of Minnesota law to be constitutional where "Allianz is incorporated and headquartered in Minnesota, Allianz created and distributed the allegedly fraudulent marketing materials from Minnesota, the policies were prepared and issued from Minnesota, Allianz received premium payments in Minnesota, and Allianz's Consumer Brochures list the address and telephone number of

_____
(Footnote continued.)

1014 (D. Minn. 2003) (applying Florida law due to a choice of law clause without undertaking a choice of law analysis).

Allianz's Minnesota home office."); *Schlesinger v. Superior Court*, No. B224880, 2010 WL 3398844, at *6 (Cal. Ct. App. Aug. 31, 2010) (finding California law was constitutionally applied in part because "Ticketmaster has its headquarters and principal place of business in California").[10]   Furthermore Digital River required each customer purchasing EDS to explicitly agree that Minnesota law would apply to any and all disputes related to EDS.   Therefore, unlike *Phillips Petroleum* in which there was "no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control," 472 U.S. at 822, here there is no element of unfairness based upon the expectations of the parties.[11] Accordingly, the Court will apply the Minnesota choice of law provision to claims arising out of the sale of EDS by Digital River.

### b.    Symantec's Choice of Law Clauses

The relevant language with respect to the claims against Symantec comes from two choice of law provisions.   The first is a legal notice on Symantec's website stating

---

[10] For similar reasons, the Court rejects Digital River's argument that application of Minnesota law violates the Commerce Clause by transforming Minnesota's consumer protection statutes into a nationwide regulatory scheme.   *See Mooney*, 244 F.R.D. at 535 (rejecting Commerce Clause argument because "Minnesota has a substantial interest in policing the conduct of its corporations so as to 'prevent[] the corporate form from becoming a shield for unfair business dealings'" (alteration in original) (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987)).

[11] The choice of law clause distinguishes this case from those cited by Digital River in its brief for the proposition that a defendant's headquarters and misrepresentations in a particular state are insufficient to establish significant contacts.   (*See* Digital River's Mem. in Opp'n to Mot. for Class Cert. at 40.)

that "You agree that all matters relating to your access to, or use of, this web site shall be governed by the laws of California."   (Second McNarama Decl., Ex. 12 at 34.) Additionally, Symantec's License Agreement, which governs a customer's purchase and use of Norton software as well as "any releases, revisions, updates or enhancements to the Software that Symantec may make available to You," contains a California choice of law clause providing that the agreement "will be governed by the laws of the State of California."  (Gibbs Decl., Ex. 86 at 40, 43.)  Symantec argues that the choice of law clause on Symantec's website does not apply to the proposed class claims because the claims "have nothing to do with access and use of Symantec's website; they have to do with the purchase of a specific product."  (Symantec's Mem. in Opp'n to Mot. for Class Cert. at 23-24.)

Symantec's choice of law clause contained in the legal notice on its website, like Digital River's, is broad in scope.  To purchase Norton products and accompanying download insurance customers accessed and used Symantec's website.  Additionally, many of the representations at issue were displayed on Symantec's website.  To access their Norton accounts that allowed them to actually activate any purchased download insurance product, customers also visited Symantec's webpage.  Therefore, the Court finds that the class claims at issue relate to a customer's access or use of Symantec's website, and therefore fall within the scope of the choice of law provision.  *Cf. Kennedy v. ITV Direct, Inc.*, Civ. No. 08-6244, 2009 WL 1272098, at *2 (D. Minn. May 4, 2009) (explaining in the context of an arbitration clause that "the phrase arising out of or relating to has been interpreted broadly to encompass all claims, however labeled, which

had their genesis in, arose out of, and related to the contract" (alteration and internal quotation marks omitted)).[12]

Even if the legal notice was not seen by all purchasers of download insurance, the Licensing Agreement also contains a choice of law provision indicating that California law "governs" the Agreement, which in turn governs software purchases as well as "releases, revisions, updates or enhancements," such as download insurance. Symantec's only argument with respect to the Licensing Agreement choice of law clause is that it is not binding if application of California law would deprive a customer of rights or remedies under the consumer protection laws of his or her home state. As explained above, however, like Digital River, Symantec has not shown that California law will deprive potential class members of rights or remedies. Accordingly, the Court finds that Symantec's choice of law clauses requiring the application of California law apply to the class claims.

### 2.      Common Issues of Law and Fact

Defendants argue that class certification is inappropriate because individual inquiries into reliance under the various consumer protection statutes Plaintiffs are suing

---

[12] Symantec also appears to argue that the choice of law clause in the legal notice on Symantec's website is not binding because it also contains a venue selection provision which would require this case to have been filed in California. But venue provisions can be waived by a party that fails to timely object to improper venue. *See Steward v. Up N. Plastics, Inc.*, 177 F. Supp. 2d 953, 958 (D. Minn. 2001). Symantec has identified no authority for the proposition that waiver of a venue provision acts as a waiver of an accompanying choice of law clause. Accordingly, the Court finds that the Plaintiffs' filing of the present lawsuit in Minnesota does not affect the validity and enforceability of the California choice of law clause.

under will predominate over common questions in the litigation. In particular, Defendants argue that adjudication of each class member's claim will require inquiry into what specific information the customer viewed prior to completing the purchase of download insurance, what other alternatives for redownloading software were available to the customer at the time of purchase, and whether the customer would have purchased the download insurance anyway, even knowing about the availability of alternatives.

### a.   California's Unfair Competition Law

Plaintiffs allege that Symantec violated the UCL by using unlawful, unfair, and fraudulent business practices in inducing customers to believe that download insurance was required to redownload Norton products after sixty days, concealing that Norton products were available for redownload without purchasing download insurance, and requiring customers to affirmatively remove download insurance from their shopping carts in order to avoid purchasing the product. (Am. Compl. ¶¶ 39-40.) Plaintiffs further allege that in making these representations "without further disclosing the fact that consumers could re-download the software without charge at any time from Symantec's website was 'likely to mislead' within the meaning of California Civil Code Section 1710, and gave rise to a duty to disclose such fact." (*Id.* ¶ 40.)

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; *see In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 336 (Ct. App. 2010). "The focus of the UCL is 'on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of

protecting the general public against unscrupulous business practices.'" *Id.* (quoting *In re Tobacco II Cases*, 207 P.3d 20, 30 (Cal. 2009)).  To be considered unfair competition, a defendant's business practice need only be unlawful, unfair, or fraudulent – and is not required to meet all three criteria.  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 310 (Ct. App. 1999).

With respect to unlawful business practices "[t]he UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *Rossi v. Whirlpool Corp.*, Civ. No. 12-125, 2013 WL 1312105, at *6 (E.D. Cal. Mar. 28, 2013) (internal quotation marks omitted).  A business practice "is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 186 (Ct. App. 2007) (internal quotation marks omitted).  A fraudulent business practice is one which is likely to deceive the public. *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002).  A claim under the UCL for a fraudulent business practice "may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 239 (Ct. App. 2006) (internal quotation marks omitted).  Additionally, failure to disclose other relevant information where "[a] perfectly true statement [has been] couched in such a manner that it is likely to mislead or deceive the consumer" is actionable under the UCL. *Id.*  "The determination as to whether a business practice is

deceptive is based on the likely effect such practice would have on a reasonable consumer." *Id.*

Prior to November 2004, California courts held that liability could be imposed against a defendant under the UCL without any individualized proof of causation or injury. *See In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d at 336. Instead the plaintiff was only required "to show that the defendant engaged in a practice that was unlawful, unfair, or fraudulent and that the defendant may have acquired money or property by means of that practice." *Id.* Pursuant to Proposition 64, adopted by California voters in November 2004, the UCL was amended to provide that a cause of action for relief may be maintained only if the plaintiff "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see Pfizer Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 798 n.2 (Ct. App. 2010). The new standard, although requiring a class representative to show "injury in fact and causation," "decidedly did not change the California rule 'that relief under the UCL is available without individualized proof of deception, reliance and injury.'" *Stearns*, 655 F.3d at 1020 (quoting *In re Tobacco II Cases*, 207 P.3d at 35).

In interpreting the new standard, the California Court of Appeals has held that "a person is entitled to restitution for money or property '**which may have been acquired**' by means of the unfair or unlawful practice." *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, 82 (Ct. App. 2010) (emphasis in original) (quoting Cal. Bus. & Prof. Code § 17203)). "Although this standard focuses on the defendant's conduct and is substantially less stringent than a reliance or 'but for' causation test, it is not meaningless. . . . [T]he UCL

. . . still require[s] some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief." *Id.* Thus, in assessing whether class certification is appropriate under the UCL, California courts examine the exposure of class members to those representations. *See Mazza*, 666 F.3d at 595 (declining to certify a class because "the misrepresentations at issue here do not justify a presumption of reliance. This is so primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited"); *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 486 (S.D. Cal. 2013) (noting that class certification under the UCL requires "that class members at least have been exposed to the misrepresentation"); *Davis-Miller v. Auto. Club of S. Cal.*, 134 Cal. Rptr. 3d 551, 565 (Ct. App. 2011) ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class.").

Where alleged misrepresentations differ substantially or there is no evidence that a majority of class members would have seen the misrepresentations, California courts have declined to certify classes under the UCL, finding that individual issues will predominate. In *Pfizer Inc. v. Superior Court*, for example, the California Court of Appeals considered a class action regarding allegedly misleading advertising of Listerine. 105 Cal. Rptr. 3d at 798. Named plaintiffs brought claims under the UCL alleging that Pfizer had marketed Listerine in a misleading manner by representing that use of Listerine could replace the use of dental floss in reducing plaque and gingivitis. *Id.* The

court found that the class sought to be certified – all purchasers of Listerine in California over a six month period – was overbroad "because it presumes there was a class-wide injury." *Id.* at 804. Specifically, the court determined that there was insufficient evidence that all class members were exposed to the alleged misrepresentations:

> The record reflects that of 34 different Listerine mouthwash bottles, 19 never included any label that made any statement comparing Listerine mouthwash to floss. Further, even as to those flavors and sizes of Listerine mouthwash bottles to which Pfizer did affix the labels that are at issue herein, not every bottle shipped between June 2004 and January 2005 bore such a label. Also, although Pfizer ran four different television commercials with the "as effective as floss" campaign, the commercials did not run continuously and there is no evidence that a majority of Listerine consumers viewed any of those commercials. Thus, perhaps the majority of class members who purchased Listerine during the pertinent six-month period did so not because of any exposure to Pfizer's allegedly deceptive conduct, but rather, because they were brand-loyal customers or for other reasons.

*Id.* at 803.

Similarly, the court denied class certification in *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, where plaintiffs could not establish that most of the class members had seen the misrepresentations at issue. The named plaintiff in *Sevidal*, brought class claims under the UCL, alleging that Target's website had incorrectly identified certain items of clothing as "Made in the USA," although the products were, in fact, made outside the country. *Id.* at 71. The named plaintiff sought to certify a class of all persons who purchased imported goods from Target's web site that were incorrectly identified as having been made in the United States. *Id.* Target argued that individual issues predominated because the class included people that may never have seen the "Made in the USA" representation. *Id.* at 73. Customers could only see the misrepresentation in

question if they clicked on a "View Details" button or an "Additional info" tab in their shopping cart. *Id.* As a result, customers could purchase the items from Target.com without ever seeing whether it had been identified as made in the United States. *Id.* The court concluded that the proposed class was overbroad because "most class members never selected the 'Additional Info' icon" and there was no allegation that "Target was legally required to inform consumers of the product origin information." *Id.* at 84; *see also Campion v. Old Republic Home Protection Co.*, 272 F.R.D. 517, 536 (S.D. Cal. 2011) (finding that individual issues would predominate a class claim where "the proposed class members may have seen some, all or none of these statements prior to the purchase of their home warranty plans due to the varying ways in which they acquired their plans").

Where exposure to a misrepresentation is uniform amongst class members, however, California courts have presumed reliance on the part of purchasers who encounter the misrepresentation, and have certified classes finding that individual issues of reliance would not predominate. *See Konik v. Time Warner Cable*, Civ. No. 07-763, 2010 WL 8471923, at *8 (C.D. Cal. Nov. 24, 2010) (finding that reliance could be presumed based on uniform exposure to misrepresentations where the materials at issue were sent to all subscribers); *In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d at 337-39; *Chavez*, 268 F.R.D. at 376-77 (applying a presumption of reliance where "the allegedly false statement, worded in several variations, [was] made on every Blue Sky container"). "In order to invoke a presumption of reliance . . . a plaintiff must show that all of the members of the putative class were exposed to the same representation and

were likely to have been deceived by it." *Red v. Kraft Foods, Inc.*, Civ. No. 10-1028, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011).  For example, in *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, the Ninth Circuit found that a presumption of reliance was appropriate where appellants alleged that various website presentations and practices on Ticketmaster's website were "designed to lull and induce people, who really only intended to purchase tickets from Ticketmaster, into inadvertently becoming committed to purchasing EPI's services, which they neither expected, nor wanted, nor used." *Id.* at 1017.  Additionally, to be entitled to the presumption of reliance, the misrepresentations identified must be misrepresentative with respect to the entire class.  *Konik*, 2010 WL 8471923 at *9 (finding that class certification was inappropriate because "a large component of the proposed class did not experience any raises in price or deprivations in service").

### i.      Uniformity of Misrepresentations

Here, Plaintiffs allege a combination of omissions and affirmative misrepresentations that collectively misled consumers into believing that they were required to purchase download insurance at the point of sale if they wished to be able to redownload their Norton software after the original sixty-day download period expired, when, in fact, numerous alternative routes existed that allowed consumers to redownload their products for free.  The Court concludes that this course of conduct falls within the line of cases for which a presumption of reliance is appropriate because class members were uniformly misled.  *See Cole v. Asurion Corp.*, 267 F.R.D. 322, 329-30 (C.D. Cal.

2010) (concluding that a combination of misleading statements and omissions which concealed from consumers that they would receive replacement phones of lower value under a phone insurance policy constituted a "centrally orchestrated strategy" that gave rise to a presumption of reliance under the UCL (internal quotation marks omitted)).

Here, Symantec began by automatically placing the download insurance products into customers' carts, which was a uniform practice, and could itself give rise to a duty to disclose that the product was not actually necessary in order to ensure the ability to later redownload the purchased Norton products.  Plaintiffs also argue that the names of the download insurance products – which were seen by all class members – were themselves misleading because they implied that the products were necessary purchases at the point of sale if the customer wished to be able to redownload software outside the sixty-day window.  *See Ebin v. Kangadis Food Inc.*, Civ. No. 13-2311, 2014 WL 737960, at *7 (S.D.N.Y Feb. 25, 2014) ("[B]ecause 100% Pure Olive Oil is the name of the product itself . . . , class members necessarily had to rely on it when shopping.").  Therefore, the automatic placement of the product in the customer's cart combined with the title of the products is likely sufficient to establish predominance among class members, regardless of other representations class members were exposed to.  *See Johns*, 280 F.R.D. at 558 (finding that class issues predominated where "Bayer contends that reliance cannot be presumed, since the reason for purchasing the Men's Vitamins is an individual issue, and exposure to advertising would vary by consumer depending on the mix of television, radio, or print advertisements each consumer may have viewed.  But at a minimum, everyone who purchased the Men's Vitamins would have been exposed to the prostate

claim that appeared on **every package** from 2002 to 2009.  This is the predominant issue, not whether or not consumers also saw television or print advertisements." (emphasis in original)).

Symantec focuses heavily on the fact that not all class members clicked on the "What's this?" link, and therefore argues that this case is analogous to the Listerine bottles in *Pfizer* or the "made in the USA" disclosure in *Sevidal*.  But these cases are distinguishable.  First, as explained above, because in this case every consumer that purchased download insurance had the product affirmatively placed in his or her cart, and was exposed to titles that uniformly gave the impression that these products were necessary to ensure the ability to later redownload, a common misrepresentation already exists.  Additionally, Plaintiffs are not required to demonstrate that each class member **in fact** viewed a particular misrepresentation if there is "evidence that a majority of [class members]" viewed the misrepresentation, in which case the Court can apply a presumption of reliance.  *Pfizer Inc.*, 105 Cal. Rptr. 3d at 803; *see also Mazza*, 666 F.3d at 596 (finding that no presumption of reliance could be applied because "[h]ere the limited scope of th[e] advertising makes it unreasonable to assume that all class members viewed it"); *Sevidal*, 117 Cal. Rptr. 3d at 84 (examining Target's proffered evidence "showing that the vast majority of customers do not select the 'Additional Info' icon before making a purchase and thus are never exposed to the product's country-of-origin designation" to determine that a presumption of reliance did not apply "because most class members never selected the 'Additional Info' icon" containing the alleged misrepresentation).  But here, there is substantial evidence in the record that makes it

reasonable for the Court to assume that the majority of class members **did** view the information in the "What's this" link.  In a product trial group consisting of twenty-two people, every single person clicked on the link because they did not understand why the product had suddenly appeared in the cart as part of their purchase.  Therefore, unlike the additional info tab at issue in *Sevidal*, where a customer would often have no reason to click the additional info tab to view the product's country of origin, here, the evidence suggests that most, if not all customers, would be curious as to why a product they had not selected to purchase had populated their carts.  Given the prevalence of customers viewing the link in the trial group and the common sense conclusion that customers would seek more information about an additional $4.99 to $16.99 charge in their shopping cart, it is reasonable for the Court to assume that the majority of the class did view the "What's this link."

Symantec next argues that a presumption of reliance cannot be applied – even if customers uniformly viewed the titles of the download insurance products and the "What's this" links – because over time the representations contained in the title and the links varied.  But the evidence in the record shows that representatives of Defendants consistently viewed the slightly varied representations in the three primary pop-ups offered during the class period as being materially similar.  (*See* Second McNamara Decl., Ex. 1 at 97:16-101:19 (testifying that the two "what's this" link descriptions conveyed "fundamentally the same message"); *id.*, Ex. 15 (describing the description of NDI as "almost word for word" of the EDS link message).)  Defendants allege generally that the layout of information may have changed and that some customers may have seen

slight variations on the "What's this" message as they live-tested different versions.  But

a slight variation in language is insufficient to defeat the presumption of reliance.  *See*

*Chavez*, 268 F.R.D. at 378 (finding class certification appropriate where the allegedly

false statement was "worded in several variations"); *see also In re First Alliance Mortg.*

*Co.*, 471 F.3d 977, 992 (9th Cir. 2006) ("The class action mechanism would be impotent

if a defendant could escape much of his potential liability for fraud by simply altering the

wording or format of his misrepresentations across the class of victims.").  Additionally,

Defendants have identified no specific variations that materially altered the "What's this"

messages that would have corrected the impression that the download insurance products

were the sole means of redownloading software outside of the sixty-day download

period.  *See Cole*, 267 F.R.D. at 329-30 ("Here, Defendants refer vaguely to changes in

the program brochure that dealt with layout and graphics and to certain aspects of the

training program that were modified over the years.  Defendants do not, however,

identify with any specificity the nature of these purported changes, nor do they offer any

argument that the purported changes were material." (internal alteration, citation, and

quotation marks omitted)).

### ii.    Other Information Available to Consumers

Symantec also argues that a presumption of reliance is inappropriate because

information about download insurance alternatives was available to customers through

other avenues, such as Symantec's website, publicly available blogs and possibly some

customer service representatives.  Symantec contends that this information could have

served to cure any misrepresentations made by Defendants.  With respect to customer service, although Defendants make much of the fact that the call center was not strictly scripted, they have provided only a few examples of instances when customer service representatives actually explained to customers that download insurance was not the only means of redownloading Norton products.  Instead, the record reflects that although each customer service representative might have phrased the information in a unique way, each representative used a script that conveyed fundamentally the same information as that provided by the online descriptors of the download insurance products – that EDS and NDI were required purchases in order to later redownload Norton software.  *Cf. Vaccarino v. Midland Nat'l Life Ins. Co.*, Civ. No. 11-5858, 2013 WL 3200500, at *13 (C.D. Cal. June 17, 2013) (finding that oral disclosures made by agents in addition to misleading written disclosures did not cure any deception "where a defendant required agents to adhere to its marketing materials in selling its products").

Indeed, the record indicates that the general trend in Defendants' customer service calls was to first attempt to sell the customer download insurance and then suggest alternatives only if the customer refused to purchase the products.  This is not a case where purchase of the product in question necessarily entailed talking with a representative of the defendant before making the purchase.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (finding that individual issues predominated in claims arising out of allegedly misleading practices in tool rentals – for which a customer would need to talk to a Home Depot employee – because "any oral notice given by Home Depot employees about the optional nature of the damage waiver

during a particular rental transaction would necessarily be a unique occurrence").   It would certainly contravene the purposes of the UCL to require customers to first affirmatively call the company and badger its customer service representatives into disclosing the truth about a product before customers could properly state a claim based on misleading information about the product provided at the point of sale.   Therefore, the possible availability of information through customer representatives is insufficient to defeat Plaintiffs' showing of entitlement to a presumption of reliance.  *See Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 464-66 (N.D. Cal. 2012) (finding that a presumption of reliance could be made based on misleading loan documents even though "the substance of any conversations with a mortgage broker" may have provided some individual class members with different information).

Additionally, the fact that information about the unnecessary nature of Defendants' download insurance products was available in other locations on Symantec's website, public blogs, or affiliate websites cannot relieve Defendants of liability for engaging in unfair or fraudulent business practices.  *See In re Tobacco II Cases*, 207 P.3d at 40 ("[A]n allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff . . . .").   Furthermore, Defendants have presented no evidence regarding how many customers reviewed the FAQ section on Symantec's website, accessed public blogs about download insurance, viewed YouTube videos about trialware, or visited affiliate sites, and therefore its availability does not defeat commonality.  *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 118-19 (S.D.N.Y. 2011) ("[Defendants'] sheer conjecture that class members 'must

have' discovered [the omission] is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendants' assertions.").

### iii. Different Rationale for Purchasing Download Insurance Products

Finally, Symantec argues that no presumption of reliance should apply because individuals may have purchased download insurance, even if they had known the truth – that the products were not the sole means of redownloading Norton software outside of the sixty-day download window. But Symantec's argument misses the mark because it is contrary to the **presumption** of reliance applied by California courts where, as here, uniform misrepresentations have been made to class members. Symantec's argument is essentially that Plaintiffs cannot show that each class member made the decision to purchase download insurance in reliance upon the misrepresentations and omissions. But this would require **proof** of class-wide reliance and California courts have held that "of course, were a plaintiff required to prove that to which a presumption entitles her in order to qualify for the presumption, it would make little sense to speak of a 'presumption' in the first place." *Cole*, 267 F.R.D. at 330. Furthermore, as discussed more fully below in the context of class-wide damages, even if some class members would have purchased the download insurance products knowing the truth – that there were other available means to accomplish the same redownloading task – that does not change the fact that each class member paid more for the product than it was worth. *See Ebin*, 2014 WL 737960 at *6-7 (rejecting defendant's argument that individual issues of reliance would predominate because each consumer may have purchased olive oil misleadingly labeled

as 100% olive oil "without looking at the label, because they liked the[] taste, because they liked the price, or because they liked the shape or color of the tin" because "even if a class member actively wanted to buy pomace instead of 100% pure olive oil, they nevertheless paid too much for it"); *Waller*, 295 F.R.D. at 485 ("If a product is advertised with a misrepresentation, that is more or less the end of it; it can be presumed at the class certification stage that the consumer would have paid less for the product, or not purchased it at all, with more accurate information.   This means there is a disparity between their expected and received value.").

Therefore, the Court concludes that class issues will predominate with respect to Plaintiffs' claims under the UCL because the class was exposed to uniform misrepresentations and omissions and therefore a presumption of reliance is appropriate. This conclusion is in keeping with California law's preference for certifying fraud claims that stem "from a common course of conduct."   *In re First Alliance Mortg. Co.*, 471 F.3d at 990 (internal quotation marks omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions.").

### b.  California Consumers Legal Remedies Act

Plaintiffs' claims against Symantec under the CLRA, Cal. Civ. Code §§ 1750 *et seq.*, are based on allegations that Symantec (1) violated California Civil Code § 1770(a)(5) "by leading consumers to believe that Download Insurance is necessary to download Norton Products after sixty days"; (2) violated California Civil Code § 1770(a)(9) "by advertising Download Insurance as necessary to download Norton Products after sixty days"; and (3) violated California Civil Code § 1770(a)(15) "by intentionally leading consumers to believe that they would need Download Insurance in order to download Norton Products after sixty days."  (Am. Compl. ¶¶ 52-54.)

The CLRA provides, in relevant part, that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.
>
> . . . .
>
> (9) Advertising goods or services with intent not to sell them as advertised.
>
> . . . .
>
> (15) Representing that a part, replacement, or repair service is needed when it is not.

Cal. Civ. Code § 1770(a).  "[T]he primary purpose of the [CLRA] is to protect the public from unscrupulous business practices."  *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 4 Cal. Rptr. 693, 200 (Ct. App. 1992).  And the CLRA enables

consumers to bring a class action if the consumer has suffered "any damage" from the use or employment of a "method, act, or practice" made unlawful by the act. Cal. Civ. Code § 1781(a). Unlike the UCL "the CLRA requires each class member to have an actual injury caused by the unlawful practice." *Stearns*, 655 F.3d at 1022. "But 'causation, on a classwide basis, may be established by **materiality**. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'" *Id.* (alteration omitted) (emphasis in original) (quoting *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Ct. App. 2009)); *see also Occidental Land, Inc. v. Superior Court*, 556 P.2d 750, 754 (Cal. 1976). A representation is material if it induces a consumer to alter a position to his or her detriment, *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d at 95, or if a reasonable person would attach importance to its existence in making a decision regarding the transaction, *In re Steroid Hormone Proc. Cases*, 104 Cal. Rptr. 3d at 338–39. The mere fact that a "defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones." *Mass. Mut. Life Ins. Co. v. Superior Court*, 119 Cal. Rptr. 2d 190, 197 (Ct. App. 2002).

Symantec raises many of the same arguments against class certification of the CLRA claims as it does against the UCL claims – for example, that uniform misrepresentations were not made to class members and that other information was available to consumers beyond the title of the product and the information contained in the "What's this" link. For the reasons explained above, those arguments do not preclude an inference of reliance. Symantec makes the additional argument that the

misrepresentations and omissions were not material as to all class members because the availability of alternatives to download insurance varied over the course of the class period. Symantec essentially contends that determining whether its conduct was misleading or deceptive would require a factfinder to know precisely what other alternatives were available to any given plaintiff. But this argument imposes greater specificity on Plaintiffs' misrepresentation claims than they actually allege or seek to prove. Plaintiffs' claim is simply that download insurance was not necessary – i.e., it was not the sole means to accomplish the redownload of Norton products after the sixty-day window. Whether redownloading through other sources was more difficult, more inconvenient, or more unreliable is irrelevant to materiality. It is also irrelevant how many alternative options were available to any specific class member. Defendants have never argued that, at any point in time during the class period, there were absolutely no other alternatives to download insurance. Because the misrepresentations relate to the necessity of the products, a reasonable jury could find that the fact that download insurance was not the only means to redownload Norton products would have been material to a customer making a decision about whether to purchase download insurance at the point of sale. *See Vaccarino*, 2013 WL 3200500 at *12 ("A jury could thus find that any reasonable person would attach significance to the alleged misrepresentations which concerned the value of the Class Products.").

Finally, Symantec argues that the CLRA only provides remedies to a consumer, which is defined as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d); *see*

*also* Cal. Civ. Code § 1770(a) (prohibiting certain unfair or deceptive acts "which results in the sale or lease of goods or services to any consumer").  Plaintiffs agree with this interpretation of the statute, but argue that it does not defeat predominance, as class members can indicate whether they purchased download insurance as a consumer – rather than, for example, business purposes – during the claims process.  The Court agrees that this minimal inquiry into the nature of each class member's purchase does not defeat commonality.  *See Butto v. Collecto Inc.*, 290 F.R.D. 372, 382 (E.D.N.Y. 2013) (finding that it would not be "particularly arduous to ask potential class members the simple question of whether the individual's debt at issue qualifies as a consumer debt" and that "any disputes regarding whether a particular class member's debt is consumer or commercial can be remedied through proper drafting of the claim form, and at the damages phase of this case" (internal quotation marks omitted)); *Gradisher v. Check Enforcement Unit, Inc.*, 203 F.R.D. 271, 279 (W.D. Mich. 2001) (finding that issues of whether a debt was a consumer debt did not defeat predominance because "there are a number of relatively straightforward ways of handling this issue without it overshadowing the common issues of fact and law" such as "through one simple question to each class member").  Therefore, the class questions will predominate over individual issues with respect to Plaintiffs' CLRA claims.

### c.      Minnesota's Consumer Fraud Act

The CFA prohibits the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice,

with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled." Minn. Stat. § 325F.69, subd. 1. To recover damages, the CFA requires that the person be injured by a defendant's violation. Minn. Stat. § 8.31, subd. 3a. The Minnesota Supreme Court has interpreted the statute to require proof of causation as a necessary element to recover damages. *Grp. Health Plan, Inc. v. Phillip Morris Inc.*, 621 N.W.2d 2, 13-14 (Minn. 2001). Under this causation requirement "plaintiffs must still 'prove a causal nexus between the allegedly wrongful conduct of the defendants and their damages.'" *In re St. Jude Med., Inc.*, 522 F.3d 836, 839 (8th Cir. 2008) (emphasis omitted) (quoting *Grp. Health Plan, Inc.*, 621 N.W.2d at 13). In *Group Health*, the court explained that

> where, as here, the plaintiffs allege that their damages were caused by deceptive, misleading, or fraudulent statements or conduct in violation of the misrepresentation in sales laws, as a practical matter it is not possible that the damages could be caused by a violation without reliance on the statements or conduct alleged to violate the statutes. Therefore, in a case such as this, it will be necessary to prove reliance on those statements or conduct to satisfy the causation requirement.

*Grp. Health Plan, Inc.*, 621 N.W.2d at 13; *see Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 927 (8th Cir. 2004) (concluding that plaintiff must "establish some proof that the [defendants' conduct] caused consumers to continue using smokeless tobacco and to sustain physical injury in reliance on the defendants' conduct").

However, the Minnesota Supreme Court went on to conclude that in cases where

> damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products. Rather, the causal nexus and its reliance component may be established by other direct

or circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct.

*Grp. Health Plan, Inc.*, 621 N.W.2d at 14.   Therefore, similar to California, Minnesota courts have found that class members' awareness of misrepresentations provides a sufficient causal nexus between a violation of the consumer protection statutes and damages in the form of restitution.   *See City of Farmington Hills*, 281 F.R.D. at 356 (finding that where each class member signed a document containing the alleged misrepresentation "[t]he impact of Wells Fargo's statement regarding safety of principal and liquidity requirements was likely the same for all class members – namely, to instill a belief about the nature of the risk of the investment"); *Curtis v. Altria Grp., Inc.*, 792 N.W.2d 836, 858 (Minn. Ct. App. 2010) ("[N]o matter what individual factors may have been involved in a class member's decision to purchase Lights, all consumers of Lights were led by false advertising to believe that Lights were healthier than regular cigarettes when they were not, such that purchasers are entitled to reimbursement for all amounts spent on the misrepresented cigarettes. . . . Therefore, the causal nexus is a question common to all class members."), *reversed on other grounds by*, 813 N.W.2d 891 (Minn. 2012).

Digital River makes essentially the same arguments against certification of the CFA claims as Symantec does against certification of claims under the UCL and the CLRA.   For example, Digital River argues that class members were not subject to uniform representations and may have had access to information that cured Defendants' deceptive conduct.   For all of the reasons explained above, the customers' awareness here

of the misrepresentations – automatically placing a product in a consumer's cart, a misleading title, and a misleading "What's this link"– can constitute the causal nexus required for violation of the CFA.  Digital River has not refuted the common sense inference that its representations may have successfully persuaded class members that download insurance was a required purchase at the point of sale in order to later redownload Norton products.  *See City of Farmington Hills*, 281 F.R.D. at 356 ("Wells Fargo has not, at this point in the litigation, negated the common sense inference in this case that the statement in the [document] may have successfully persuaded the class members of the safety of their investments.  Because each member of the putative class signed [the document] containing the alleged misrepresentation and because Plaintiff can rely upon direct and circumstantial evidence to prove reliance on a class-wide basis, common questions predominate over questions affecting individual class members.").  Therefore, the Court concludes that common questions will predominate as to Plaintiffs' claims under the CFA.

### d.    Unjust Enrichment

Plaintiffs also bring class claims for unjust enrichment alleging that "Plaintiffs purchased unnecessary Download Insurance from Defendants as a direct result of Defendants' material misrepresentations and omissions" and therefore "Defendants have been knowingly and unjustly enriched at the expense of and to the detriment of Plaintiffs and each member of the Class by collecting money to which it is not entitled." (Am. Comp.  ¶¶ 75-76.)    Unjust enrichment occurs when the defendant has been

conferred a benefit that it is inequitable for it to retain. *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494–95 (Minn. 1971); *see also Semiconductor Components Indus., L.L.C. v. I2A Techs., Inc.*, Civ. No. 10-0603, 2010 WL 3036731, at *3 (N.D. Cal. July 30, 2010) (citing *Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 323 (Ct. App. 2008)).   Unjust enrichment claims often turn on individualized facts. *See Daigle v. Ford Motor Co.*, Civ. No. 09-3214, 2012 WL 3113854, at *4-5 (D. Minn. July 31, 2012). However, courts have certified unjust enrichment claims where they are based on the same claims that were certified under consumer protection statutes. *Mooney v. Allianz Life Ins. Co. of N. Am.*, Civ. No. 06-545, 2007 WL 128841, at *11 (D. Minn. Jan. 12, 2007); *cf. Berger*, 741 F.3d at 1070 (analogizing the predominance inquiry with respect to unjust enrichment and statutory claims, explaining that individual issues would predominate as to claims under the UCL, CLRA, and unjust enrichment because unjust enrichment, like the statutory claims "depends on whether Home Depot told its tool rental customers that the waiver was an optional product").   Because Plaintiffs' unjust enrichment claims arise out of the same conduct as the statutory claims, the Court concludes that class issues will also predominate regarding whether Defendants were unjustly enriched at class members' expense.

### 3.     Damages

Defendants argue that individualized damages issues will predominate over class issues, because some customers actually received value from using their download insurance product or would have purchased it anyway, even had they known of the free

alternative methods for redownloading. "At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." *Chavez*, 268 F.R.D. at 379 (internal quotation marks omitted). "Calculations need not be exact, but at the class-certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *Comcast Corp.*, 133 S. Ct. at 1433 (internal citation and quotation marks omitted).

Plaintiffs have presented two possible measures for damages, both of which the Court finds are measurable on a class wide basis. First Plaintiffs contend that each class member should be entitled to recover the full value of the download insurance product. *See Korea Supply Co. v. Lockheed Marin Corp.*, 29 Cal. 4th 1134, 1149 (Cal. 2003); *Lewis v. Citizens Agency of Madelia, Inc.*, 235 N.W.2d 831, 835 (Minn. 1975). This measure of damages would likely be appropriate here, where the products in question have no intrinsic value other than the advertised use. In other words, unlike a beverage or an item of clothing, which may have value to a consumer even if the beverage is not actually "natural" as advertised or the clothing does not eliminate odor as promised, the download insurance only has potential utility if a consumer is actually required to redownload a Norton software product after the sixty-day period for downloads has expired. *See Chavez*, 268 F.R.D. at 379 (finding that an appropriate measure of classwide damages might be "the price differential between the premium paid for the [falsely advertised] Blue Sky line of beverages and the lower price of Hansen's mainstream line of beverages"); *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 192 &

n.4 (D. Minn. 2009) (finding that individual issues of damages would predominate because even if the clothing at issue did not have the odor-eliminating properties advertised "many class members may have wanted this clothing for other reasons in addition to those pertaining to order-elimination, such as warmth, appearance, and water-proofing"). It is undisputed here that Defendants priced download insurance based solely upon a customer's perception of value – not upon any cost of producing the product or intrinsic value imparted by the product. In fact, Defendants found that by increasing the price of download insurance more customers purchased the product because their perception of its value increased along with the increase in price. The record also indicates that employees of Defendants did not believe that download insurance provided much value to consumers. Additionally, the record reveals that almost no class members ever used download insurance, because almost one hundred percent of downloads occurred within the sixty-day window for download provided by purchase of the original product. Therefore, almost all of the class members received no value from their purchase of download insurance.

Defendants argue that a full refund is an inappropriate measure of damages, because some consumers may have valued the peace of mind and the convenience that were associated with download insurance. (*See, e.g.* Symantec's Mem. in Opp'n to Mot. for Class Cert. at 8.) Even if some class members realized some value from their purchase of download insurance, Plaintiffs have identified an ascertainable measure of those damages. Plaintiffs have presented the conjoint analysis used by their expert Gaskin as a means to isolate the value for specific convenience features of the download

insurance products – such as automatic injection of the product key.  Defendants' expert takes issue with the precise model prepared by Gaskin – in that it measures only the value of the automatic injection and not, for example, the possible value of having the download insurance automatically "remember" what type of software was originally purchased, and therefore also disputes the estimated value found by Gaskin of between $0.05 and $0.16 for each purchase of download insurance.  But disputes about the precision of the particular model developed by Gaskin do not indicate that damages will not be measurable on a classwide basis.  In other words, Plaintiffs have presented a method that allows for a determination of the actual value to consumers of the download insurance products.  Defendants do not dispute that the conjoint analysis will be capable of measuring damages on a classwide basis, nor do Defendants contend that any member of the class received $4.99 to $16.99 worth of value from their purchase of download insurance.  They argue only that Gaskin's model may need to include several more variables in order to be a completely accurate measure of damages.  Such a dispute does not prevent the Court from certifying the class at this stage of litigation.  *See Vaccarino*, 2013 WL 3200500 at *14 ("[P]laintiffs must . . . offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class."); *Chavez*, 268 F.R.D. at 379 (explaining that plaintiffs need only identify a proposed method for evaluating class damages).

Finally, Defendants appear to argue that ascertaining the value of download insurance will require individualized inquiries because for different class members the available alternatives to download insurance were different.  For example, a customer for

whom only the options of downloading trialware, purchasing EDS later, or calling customer service were available may have placed a different value on convenience than those customers who also had the option of redownloading the product from Symantec's support website.   But Defendants have not shown that the differences in alternatives to download insurance were so uniquely individualized as to preclude class certification. For example, at oral argument, counsel for Symantec represented that the class period could be divided into three distinct periods of time during which different alternatives were available to class members.   Should it later become apparent that damages for class members in these distinct time periods are materially different, the Court can always divide the class into sub classes for purposes of ascertaining damages.   *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").   Furthermore, at most Defendants have identified that there was uncertainty – as to **all** class members – about the later availability of trialware at the time of purchasing download insurance.   In other words, at the point in time when an individual was deciding whether or not to purchase download insurance for all class members there was some risk that available trialware or support website links would no longer be available at the point in time when the customer needed to redownload the purchased Norton product.   Because the uncertainty that a particular version of a Norton product would be available at the moment in time that the customer wished to redownload the product existed for all class members, this uncertainty can appropriately be measured in Gaskin's conjoint analysis by ascertaining the value that consumers placed upon the certainty of access to download insurance versus trialware.   Therefore,

the Court concludes that damages are measurable on a classwide basis, and individual damage issues will not predominate.

### 4.      Standing

Lastly, Defendants argue that the class cannot be certified because some members of the class lack Article III standing.   In order to have standing a plaintiff must demonstrate (1) an actual or imminent, concrete injury in fact; (2) a causal relationship between the injury and the conduct complained of; and (3) that the injury is capable of being redressed by a decision of the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "The constitutional requirement of standing is equally applicable to class actions."   *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010). "Although federal courts 'do not require that each member of a class submit evidence of personal standing,' a class cannot be certified if it contains members who lack standing." *Id.* (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006)). Therefore "a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Id.*

Defendants argue that many people in the proposed class lack standing because they suffered no injury as a result of the alleged misrepresentations.  Defendants argue that this category includes people who used download insurance and people who knew about the alternatives and still purchased download insurance.[13]   As explained above,

---

[13] Defendants also argue that individuals who purchased download insurance when trialware was unavailable also lack standing.  But, as explained above, Defendants have

(Footnote continued on next page.)

however, Plaintiffs' contention is that "class members paid more for [download insurance] than they otherwise would have paid, or bought it when they otherwise would not have done so, because [Defendants'] made deceptive claims and failed to disclose" that alternatives to download insurance were available. *See Mazza*, 666 F.3d at 595. This type of injury is sufficient for Article III standing. *See Stearns*, 655 F.3d at 1021 (finding that Article III standing was satisfied where "[e]ach alleged class member was relieved of money in the transactions," and "it can hardly be said that the loss is not fairly traceable to the action of the Appellees within the meaning of California substantive law"). Therefore, even class members who used download insurance or who would have purchased download insurance even had they known of the alternatives suffered an injury in the form of an increased price. *See Ebin*, 2014 WL 737960 at *7 ("[T]he common actual injury consisted of the payment of the price of olive oil for a product that was pomace oil and the associated receipt of an inferior product different from that which the consumers purchased."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 287 F.R.D. 590, 607 (C.D. Cal. 2012) ("So long as at least some class members – and presumably, a large percentage of class members, although not every single one – were induced into purchasing Allianz products because of the alleged misrepresentations, the price of these annuities would be greater for everyone in the class, even those class members who **did not** rely on the misrepresentations. . . . In other words, class members who did not rely on

_____

(Footnote continued.)

presented no evidence that at any point in time there were absolutely no alternatives to download insurance for any class member.

the misrepresentations would nonetheless suffer an out-of-pocket loss by being overcharged for Allianz annuities even absent their reliance on the alleged misrepresentations." (emphasis in original)).   Therefore, the Court concludes that the class members in Plaintiffs' proposed class have standing.

### B.   Superior Method

"There is no bedrock standard upon which a Court determines that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."   *Sonmore*, 206 F.R.D. at 265 (internal quotation marks omitted).   Rather, courts generally look to the following non-exhaustive list of relevant factors: (1) the interest of class members in individually controlling the prosecution of their claims; (2) the extent and nature of any litigation that has already begun; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties of managing a class action.   Fed. R. Civ. P. 23(b)(3)(A)-(D).   Class actions are also superior if the alleged damages are small, and absent a class action most plaintiffs would not realistically enjoy a day in court.   *Phillips Petroleum Co.* 472 U.S. at 809.

In this case there is no evidence of similar pending litigation, and it is doubtful that potential class members would rather control separate actions.   Most are potentially unaware that Defendants' conduct could be unlawful and the alleged damages are small, making individual actions impracticable.   *See Hartley v. Suburban Radiologic Consultants, Ltd.*, 295 F.R.D. 357, 379 (D. Minn. 2013) ("Because all class plaintiffs are unlikely to bring their own claims for FDCPA violations, the Court finds that a class

action in this case is best suited to address 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" (quoting *Amchem Prods., Inc.*, 521 U.S. at 617); *see also Rainbow Bus. Solutions v. Merchant Servs., Inc.*, Civ. No. 10-1993, 2014 WL 1047149, at *3 (Mar. 17, 2014) ("The risks, small recovery, and relatively high costs of litigation here make it unlikely that individual merchants will pursue claims against Leasing Defendants independently."). Indeed, given the size of the proposed class "individual claims for damages would not only burden the court system that would be deciding the same legal issues in a number of small cases, but would also not make economic sense for litigants or lawyers.  It is possible that in many, if not most, individual cases, litigation costs would dwarf potential recovery." *Jordan*, 285 F.R.D. at 467 (internal quotation marks omitted),

Finally, the Court finds that managing this class action will not present undue difficulty given the similarity of the misrepresentations "and the likely ability of the class members to prove their claims with generalized evidence." *City of Farmington Hills*, 281 F.R.D at 357.  Furthermore, given the size of the class, certification will be "more manageable than . . . any other procedure available for the treatment of factual and legal issues raised by Plaintiff's claims." *Sullivan v. Kelly Servs., Inc.*, 268 F.R.D. 356, 365 (N.D. Cal. 2010).  Therefore, the Court concludes that a class action is a superior method of adjudicating Plaintiffs' claims.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Plaintiffs' Motion for Class Certification [Docket No. 180] is

**GRANTED**.  The Court certifies the following class:

> All persons in the United States who Purchased Extended Download Service ("EDS") for Norton products or Norton Download Insurance ("NDI") between January 24, 2005 and   March 10, 2011.

> **January 24, 2005 – October 26, 2009** – Claims against Digital River under the Minnesota Consumer Fraud Act and False Statement in Advertising Act, or Unjust Enrichment;

> **January 24, 2007 – March 10, 2011** – Claims against Symantec under California Unfair Competition Law, or Unjust Enrichment;

> **January 24, 2008 – March 10, 2011** – Claims against Symantec under California Consumer Legal Remedies Act, for only those class members defined as "consumers" under the CLRA.

DATED: March 31, 2014                    _____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                United States District Judge