UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Devi Khoday and
Danise Townsend,              File No. 11CV180
                                  (JRT/TNL)
          Plaintiffs,

vs.                           Minneapolis, Minnesota
                              January 12, 2015
Symantec Corp. and            11:15 A.M.
Digital River, Inc.,

          Defendants.

------------------------------------------------------------

BEFORE THE **HONORABLE JOHN R. TUNHEIM**
UNITED STATES DISTRICT COURT JUDGE
**(MOTIONS HEARING)**


<u>APPEARANCES</u>
For the Plaintiffs:     Cohen, Milstein, Sellers & Toll
                        **DOUGLAS McNAMARA, ESQ.**
                        **ANDREW FRIEDMAN, ESQ.**
                        **MATTHEW AXELROD, ESQ.**
                        1100 New York Avenue NW
                        Suite 500 East
                        Washington, DC  20005

                        Lockridge Grindal Nauen PLLP
                        **KATE M. BAXTER-KAUF, ESQ.**
                        100 Washington Avenue South
                        Suite 2200
                        Minneapolis, MN  55401


For Deft. Symantec:     Latham & Watkins LLP
                        **PATRICK GIBBS, ESQ.**
                        Menlo Park, CA  94205
                        Gaskins, Bennett, Birrell, Schupp
                        **STEVE GASKINS, ESQ.**
                        333 South Seventh Street
                        Suite 2900
                        Minneapolis, MN  55402

```
For Deft. Digital:        Skadden Arps Slate Meagher & Flom
                          AMY VAN GELDER, ESQ.
                          JESSICA FROGGE, ESQ.
                          MARCELLA LAPE, ESQ.
                          155 North Wacker Drive
                          Chicago, IL  60606


Court Reporter:           KRISTINE MOUSSEAU, CRR-RPR
                          1005 United States Courthouse
                          300 Fourth Street South
                          Minneapolis, MN  55415
                          (612) 664-5106



     Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1                                                    **11:15 A.M.**

2

3                              **(In open court.)**

4            THE COURT:  You may be seated.  Good morning,

5     everyone.  This is Civil Case Number 11-180, Devi Khoday

6     and Danise Townsend versus Symantec Corporation and Digital

7     River, Incorporated.

8            Let's have counsel note appearances, starting

9     with the plaintiffs, please.

10           MR. FRIEDMAN:  Good morning, Your Honor.  Andrew

11    Friedman with Cohen, Milstein, Sellers & Toll for the

12    plaintiffs.

13           MR. AXELROD:  Good morning, Your Honor.  Matt

14    Axelrod also with Cohen Milstein for the plaintiffs.

15           THE COURT:  Good morning.

16           MR. McNAMARA:  Doug McNamara also with Cohen

17    Milstein for plaintiffs.

18           MS. BAXTER-KAUF:  Kate Baxter-Kauf with Lockridge

19    Grindal Nauen also for plaintiffs.

20           THE COURT:  All right.  Good morning.

21           MR. GIBBS:  Good morning, Your Honor.  Patrick

22    Gibbs from Latham & Watkins for Symantec, along with

23    Mr. Gaskins, and Carrie Flynn from Symantec Corporation is

24    here with us at counsel table.

25           THE COURT:  Good morning to all of you.

1            MS. VAN GELDER:  Good morning, Your Honor.  Amy

2    Van Gelder from Skadden Arps for Digital River.

3            MS. FROGGE:  Good morning, Your Honor.  Jessica

4    Frogge from Skadden Arps for Digital River.

5            MS. LAPE:  Good morning.  Marcella Lape from

6    Skadden Arps for Digital River.

7            THE COURT:  All right.  Good morning to everyone.

8    We have a number of motions this morning, primarily the

9    summary judgment motion and then motions regarding the

10   experts as well and an unopposed motion for modification of

11   the class order.  The Court has read the briefs in

12   preparation.

13           How are we going to begin?  Do you have a plan?

14           MR. FRIEDMAN:  Your Honor, we have broken it out

15   depending upon which motions you want to do first.  I will

16   be doing the plaintiffs' *Daubert* motions.  Mr. Axelrod will

17   be doing the summary judgment opposition.  Mr. McNamara

18   will be doing the defensive *Daubert* motions.

19           THE COURT:  All right.  Why don't we start with

20   the summary judgment motion, if that's okay?

21           MR. GIBBS:  That's fine, Your Honor.

22           THE COURT:  All right.  Go ahead, Mr. Gibbs.

23           MR. GIBBS:  Thank you, Your Honor.  Your Honor,

24   Symantec is entitled to summary judgment because Plaintiff

25   Devi Khoday has failed to prove that she suffered any harm

1     from her purchase of Norton download insurance from

2     Symantec, and in any event, even setting aside the question

3     of whether she suffered harm, she has failed to put forth

4     evidence that she suffered any particular amount of harm,

5     and therefore, there is not evidence from which a trier of

6     fact could award her damages in this case.

7             I think there is no dispute between the parties

8     that each of Ms. Khoday's claims against Symantec requires

9     proof of harm caused by something Symantec did, and in this

10    case, that is the, the sale to her of Norton download

11    insurance.

12            Ms. Khoday's theory is that she was harmed

13    because she spent money she would not have spent if she had

14    known about what we call the work-arounds, what plaintiffs

15    call the free alternatives, to download insurance.  In

16    other words, her theory is, if she had known about these

17    work-arounds, she would not have purchased Norton download

18    insurance.

19            During her deposition, however, Ms. Khoday made a

20    series of key admissions that are flatly inconsistent with

21    her theory of harm in this case and which in our view would

22    preclude any rational trier of fact from finding in her

23    favor.  Now, Khoday testified that after seeing "what's

24    this" pop up in her shopping cart and reading the

25    description of the product found there, she decided to

1    purchase NDI as what she called a precaution.

2            She wanted to have NDI in case she needed to

3    download her software more than 60 days after the date of

4    purchase.  In other words, she wanted to ensure, and

5    "ensure" was her word, e-n-s-u-r-e, she wanted to ensure

6    that her software would be there if for any reason she

7    needed to re-download it after 60 days.

8            In short, what Ms. Khoday was looking for,

9    according to her own testimony, was the certainty that if

10    she needed to re-download or download the product more than

11    60 days after the date of purchase, it would be there.

12            During her deposition, Ms. Khoday admitted that

13    if Symantec had the right to stop allowing these

14    work-arounds, and that's a right that Symantec very clearly

15    had, then she may have purchased NDI even if she had known

16    about the work-arounds in order to ensure the ability to

17    re-download her product at any time during the license.

18            In other words, even if she had known about the

19    work-arounds, if she had also known that Symantec had the

20    right to stop allowing the work-arounds at any time, she

21    may have bought it in order to get the certainty that she

22    wanted.

23            In fact, this certainty was so important to

24    Ms. Khoday, she admitted that if Symantec had the right to

25    stop allowing the work-arounds, then the failure to

1    disclose the work-arounds at the point of sale would not

2    even be a material omission as to her.

3           Now, in light of these admissions, Khoday will

4    not be able to prove that she suffered harm when she bought

5    NDI from Symantec because she will not be able to prove

6    that she would have done something different if she had

7    known the truth.

8           Now, plaintiffs spent a lot of time citing

9    testimony from Ms. Khoday where she said she would not have

10   bought NDI if she had known about the work-arounds.  You

11   know, there are several problems with that testimony.

12   First of all, Ms. Khoday cannot create a factual issue by

13   contradicting her materiality testimony.

14          Second of all, it's clear from the entire record

15   that when Ms. Khoday was testifying she would not have

16   bought NDI if she had known about the work-arounds, she was

17   simply assuming equivalence between NDI and the

18   work-arounds.  In other words, as to the product feature

19   that she cared about, certainty, she was assuming that the

20   work-arounds were just as certain as NDI.

21          And that's why when confronted in her deposition

22   with the notion that Symantec did not have to keep

23   providing the work-arounds, she conceded she may have

24   bought it anyway even if she had known about the

25   work-arounds because what she cared about was making sure,

1    being certain, that the product would be there.

2         Now, even setting aside the fact of damages, we

3    also argue that Khoday will not be able to prevail in this

4    case, and no reasonable trier of fact could find in her

5    favor because she has not put forward evidence from which a

6    trier of fact could affix a specific amount of damages to

7    her, could award a specific amount of damages.

8         The plaintiffs have basically teed up two

9    theories of damages here.  One is a total refund.  They

10   have suggested that Khoday ought to be entitled to a refund

11   of the entire amount of money that she paid for Norton

12   download insurance.  The problem with that theory is,

13   Khoday has testified very clearly that what she wanted was

14   certainty, and she got certainty.

15        She got a legal right to re-download her software

16   at any time during the life of her license.  Now, there has

17   been some suggestion during this case that someone who buys

18   NDI but doesn't actually end up having to use it to

19   re-download somehow has not gotten any value out of the

20   product, but Ms. Khoday herself has flatly disagreed with

21   that notion, and she has made very clear that it was

22   essentially the peace of mind.

23        It is not whether you have to use it.  It's

24   knowing you have the ability to do it if you need to.

25   That's what she valued, and that's what she got.  So I

1    think there is no legitimate dispute that she got some

2    value out of the product.  So the plaintiffs have also

3    suggested that even if she and other consumers got some

4    value out of the product, Ms. Khoday would be entitled to

5    recover the difference between what she paid and the value

6    of what she got.

7           The problem is, the plaintiffs have not put

8    forward any evidence from which a trier of fact could reach

9    any conclusion about the value of what she got.  They point

10   to testimony from their expert, Mr. Gaskin, who we are all

11   trying to distinguish from Mr. Gaskins.

12          THE COURT:  Confusing in this case.

13          MR. GIBBS:  It is at times.  The problem there

14   is, by his own admission, Mr. Gaskin's analysis simply

15   doesn't apply to the thing that Ms. Khoday said she valued.

16   In fact, Mr. Gaskin admitted repeatedly that his conjoint

17   analysis valued only one attribute of EDS and NDI, and that

18   is the automatic key injection, which is what we would say

19   is one of many convenience features of the product.

20          Ms. Khoday has made very clear, convenience had

21   nothing to do with it for her.  She did not buy this

22   product based of convenience.  She placed no value on

23   convenience.  The thing she valued was certainty, and

24   Mr. Gaskin made no effort, no effort at all, to place some

25   value on the certainty that one gets out of EDS and NDI

1    versus the work-around.

2              And where that leads us is nothing but

3    speculation.  In their briefing, plaintiffs suggest that

4    having been given Mr. Gaskin's analysis of the value of

5    automatic key injection, the jury can somehow use what they

6    call common sense to value a totally different attribute of

7    the product.

8              Now setting aside the many other problems with

9    Mr. Gaskin's analysis, which we will get to later, there is

10   no basis for suggesting they could use an expert's

11   testimony about the value of automatic key injection and

12   somehow calculate a rational value for a totally different

13   feature, which is the certainty compared with the

14   uncertainty of the work-around.

15             So we're left with essentially zero evidence from

16   which a trier of fact could rationally figure out the

17   difference between what Ms. Khoday paid for the product and

18   the value of what she actually got, and for that reason,

19   Symantec is entitled to summary judgment because there has

20   been a failure of proof as to the amount of damages.

21             With that I will be happy to respond to anything

22   plaintiffs want to say about it, but I don't want to get

23   too much into what we said in the briefs.

24             THE COURT:  All right.  Thank you, Mr. Gibbs.

25             Go ahead.

 1              MR. AXELROD:  Good morning, Your Honor.

 2      Symantec's entire motion hinges entirely on two things, an

 3      incorrect understanding of the law and inadmissible

 4      evidence.  Let me talk first about the incorrect

 5      understanding of the law.

 6              Symantec's argument is that Ms. Khoday can't

 7      prove she suffered any harm because the alternatives to NDI

 8      weren't equivalent to NDI, and because the alternatives

 9      weren't equivalent, you just heard Mr. Gibbs say this,

10      Symantec couldn't possibly have had an obligation to

11      disclose their existence, but equivalence is not what the

12      law requires.

13              The law requires just that Ms. Khoday show that

14      there was a representation or omission likely to mislead or

15      deceive the consumer and that the misrepresentation was

16      material to the consumer's purchasing decision.  Symantec

17      had made essentially the same argument at the class

18      certification stage, and Your Honor already rejected them.

19              You already ruled that, and this is quoting from

20      your class certification ruling, quote, "Because the

21      misrepresentations relate to the necessity of the products,

22      a reasonable jury could find that the fact that download

23      insurance was not the only means to re-download Norton

24      products would have been material to a customer making a

25      decision about whether to purchase download insurance at

1   the point of sale," end quote.

2           Now, Symantec is arguing that despite your

3   earlier ruling, they deserve summary judgment as to

4   Ms. Khoday's claim because the evidence pertaining to her

5   individual purchase decision rebuts the presumption of

6   materiality that Your Honor held to apply, but that's just

7   plain wrong given the evidence in the record.

8           There is more than sufficient evidence to carry

9   Ms. Khoday's burden of proof before the jury.  First, there

10  was a misleading representation.

11          THE COURT:  Let me ask you a question about that.

12          MR. AXELROD:  Sure.

13          THE COURT:  The so-called "what's this" link --

14          MR. AXELROD:  Mm-hmm.

15          THE COURT:  -- had a provision that says it

16  extends the time period beyond the 60 days.  Are you

17  relying on that word "extends" for the material

18  misrepresentation claim, or is it the entire "what's this"

19  link?

20          MR. AXELROD:  Well, it's a couple of things, Your

21  Honor.  I would say it's the entire link, but the word

22  "extends" is a part of it, as Ms. Khoday testified at her

23  deposition.  The pop up descriptor led her to believe that

24  the only way to, quote unquote, "extend" her 60-day

25  download period was to buy NDI.

1          So she read the descriptor, and in particular I

2     think that that word "extends" is something she focused on

3     in her deposition answers as giving her the impression that

4     it was absolutely necessary to purchase NDI if she wanted

5     the ability to download beyond the 60-day window.

6          In addition to that, and there is a number of

7     citations in her, in the transcript where you can see

8     exactly how she explains that.  These are all attached to

9     Exhibit 2 of the McNamara declaration.  There are scattered

10    excerpts of her deposition at pages 27, 80 to 81, page 83,

11    pages 88 to 89, pages 106 to 107 and pages 144 to 145.

12         But in addition, Your Honor, the

13    misrepresentation was exacerbated by the fact that NDI was

14    auto populated into her cart, and you mentioned this and

15    referenced this in your class certification ruling.

16    Ms. Khoday also mentioned it during her deposition

17    testimony.

18         She testified that by putting the product in her

19    cart automatically, the defendants further reinforced the

20    message that the product was necessary if a consumer wanted

21    to be able to download beyond the 60-day limit.  That's at

22    pages 163 and 164 of her deposition testimony.

23         In preparing for the hearing, I noticed that page

24    164 was provided to you as one of the excerpts.  Page 163

25    was not.  I have provided it to counsel before the hearing.

1    I would like to hand it up, if that's okay.

2         So page 163 and then on to page 164 talks about

3    the auto population feature and how that reinforced her

4    belief that because of what was in the pop up descriptor

5    that in order to extend, in order to be able to download

6    beyond the 60 days, there was no alternative other than

7    NDI, NDI was necessary.

8         So that's the misleading representation as to

9    Ms. Khoday, Your Honor; and second, Ms. Khoday testified at

10   her deposition that had she been made aware of the free

11   alternatives, she would not have purchased NDI.  She got

12   asked that question, and those were, that was the answer

13   she gave.  That's at page 149 and at page 151 of her

14   deposition, and that's more than enough to get to a jury on

15   her individual claim, Your Honor.

16        Symantec misleadingly implied to its customer

17   that NDI was required, was essential, if they wanted to

18   extend the download period beyond the 60 days, both through

19   the text of the pop up, the whole pop up and the word

20   "extends" and through the auto population feature, and that

21   misrepresentation was material to Ms. Khoday's individual

22   purchasing decision.

23        THE COURT:  What about the argument that Symantec

24   makes that only NDI could absolutely guarantee access after

25   the 60-day period?  What's your response to that, that in

1    theory would make it different from the other work-arounds

2    or download options?

3            MR. AXELROD:  A couple of things.  First, this is

4    a disclosure case, so the fact that they weren't perfectly

5    equivalent doesn't matter.  What matters is that Ms. Khoday

6    was told, the only option you have to download beyond the

7    60 days is NDI, and that wasn't true.

8            NDI is not a perfectly similar or exactly similar

9    in all respects as the free alternatives, but that doesn't

10   mean that the free alternatives weren't necessary to be

11   disclosed because that was information that she wanted to

12   have, and she testified information that she would have

13   made a different decision had she been aware of.

14           Beyond that, Your Honor, Ms. Khoday, it's an

15   interesting wrinkle in this case that Ms. Khoday was

16   actually the purchaser of what's called a multi user

17   product.  So in other words, she was allowed to, when she

18   made the purchase, she had the right to download the -- her

19   software onto multiple machines.

20           THE COURT:  Mm-hmm.

21           MR. AXELROD:  Symantec's only method to allow the

22   purchase of a multi user to get the software onto more than

23   one machine was through the free alternatives.  The

24   download links that they had on their customer service page

25   was the official sanctioned method that Symantec provided

1    to multi users to get the software onto multiple machines.

2            So they did commit to Ms. Khoday that she would

3    be able to, when she purchased the multi user pack, be able

4    to use the product, download the product onto multiple

5    machines, and the method that they provided her to do that

6    was through the download links, which was, in other words,

7    one of the free alternatives.

8            So they could not have removed the free

9    alternatives because then they would not have allowed her

10   to fulfill the obligation that they had -- they would not

11   be able to fulfill the obligation that they had made to

12   her, which was the ability to download on multiple

13   machines.

14           Moreover, as a practical matter, as a practical

15   matter, they couldn't have removed, they couldn't have

16   removed the free alternatives.  It was, they needed them

17   because as a customer service matter they needed them.

18   They needed them because it was in, a large part of their

19   business was the renewal business, and the renewal business

20   doesn't work if you don't have the software on your

21   machine, and so the download links help people to do that.

22           Then one other thing, Your Honor, was when

23   Ms. Khoday made her individual purchase, she got a receipt

24   promising her easy access to her Norton download account so

25   she could easily reinstall if she needed to.  That was what

1    they are now saying are the free alternatives they could

2    have removed at any minute, but they had committed to her

3    that she would have had that access.

4         And the evidence in the record is completely

5    devoid of any suggestion that they ever contemplated, let

6    alone took steps, to remove any of these alternatives.

7    There is just no evidence of that whatsoever because of all

8    these reasons.  They really as a practical matter could not

9    have done that, Your Honor, and now sort of after the fact,

10   their lawyers have come up with this theory that, oh, it

11   was all about the guarantee.

12        But when you look at the evidence at the time,

13   the e-mails, the documents at the time, that is not what

14   was going on.  In addition, Your Honor, the testimony that,

15   of Ms. Khoday at her deposition that Symantec relies so

16   heavily upon for this point, right, they say that because

17   they weren't -- Mr. Gibbs said, Ms. Khoday was all -- only

18   concerned about certainty, wanted to make sure there was

19   certainty.

20        Well, first of all, Ms. Khoday never says that in

21   her deposition.  That, that's not her testimony.  Secondly,

22   the question, the answers that Mr. Gibbs relies on and that

23   Symantec relies on, they're cherry picked, inadmissible

24   snippets of her testimony.  She was asked a series of

25   improper questions by defense counsel, not this defense

1    counsel but another lawyer at the firm.

2           The questions called for both speculation and

3    legal opinions.  She was essentially asked, if Symantec had

4    the ability to remove the free alternatives, would that

5    failure to disclose the existence of those alternatives be

6    a material omission, and there are two problems with this

7    type of question.

8           First, if this happened, would something be so,

9    it's a textbook example of an improper question calling for

10   speculation.  I'm sure Your Honor sustains objections to

11   those types of questions in this courtroom all the time.

12   Second, asking a lay witness whether something would be a,

13   quote unquote, material omission, which is a legal term of

14   art, is a textbook example of an improper question calling

15   for a legal conclusion.

16          The questions did not ask whether something would

17   have influenced her individual purchasing decision.

18   Instead, the questions used a very specific legal term,

19   "material omission."  Asked repeatedly, was this a material

20   omission, was that a material omission, and you can see

21   this in the transcript in the excerpts provided with

22   Symantec's summary judgment papers in the Gibbs'

23   declaration Exhibit 12.  It is at pages 97, 101, 102, 107,

24   108 and 109.

25          And what you'll see is that plaintiffs' counsel

1    repeatedly objected to these questions saying, quote,

2    "Objection to form.  Calls for a legal conclusion," end

3    quote.  Symantec is now appearing to argue that those

4    questions weren't asking for a legal conclusion.  They were

5    asking whether certain omissions were material to

6    Ms. Khoday's original purchasing decision, but this

7    argument fails on two levels.

8            First, reading of the excerpts that Symantec did

9    provide you in their filing shows quite clearly that the

10   questions were not about the individual purchasing decision

11   but were general questions about whether certain things

12   were or were not material omissions.

13           Second, if you look at page 85 of the transcript,

14   which was not provided in Symantec's papers but was

15   provided in ours in the McNamara declaration, it shows you

16   how that material omission line of questioning started.  It

17   started by defense counsel referring to an interrogatory

18   answer, and it's plain that defense counsel's questions

19   were seeking to use the interrogatory answer to elicit

20   improper legal conclusions from a lay witness.

21           So the answers to those questions are

22   inadmissible, and they're improper, and plaintiffs' counsel

23   said so at the time.  So they can't now be used here to

24   support summary judgment, and they similarly rely on

25   another series of improper hypothetical questions that

1    called for speculation.  This gets a little bit to the

2    question Your Honor raised earlier.

3            At page 149, defense counsel asked, quote, "Would

4    you have purchased NDI if you had been informed that

5    although you could at that time re-download your Norton

6    software without charge from the customer service web page

7    that Symantec could remove those downloads at any time,"

8    end quote.

9            That's the question that's asked.  Plaintiffs'

10   counsel objects to the form and rightly so.  It's both an

11   improper hypothetical question, and it calls for

12   speculation.  Ms. Khoday answers, quote, "I'm not sure.  I

13   may or may not have," end quote.

14           Your Honor, this is a perfect example of why the

15   rules of evidence don't permit hypothetical questions of

16   lay witnesses, because it's likely the witness's answer

17   will be, I don't know.  That's not what happened, so I'm

18   not really sure.

19           Also, it was an incomplete hypothetical.  Defense

20   counsel didn't ask if the disclosure said, quote, and then

21   came up with a specific text of the disclosure to ask

22   Ms. Khoday about.  Instead it was asked very generally, and

23   then in addition, as I mentioned earlier, it's a completely

24   counter factual hypothetical because the reality is that it

25   would have been practically impossible for Symantec to have

 1     removed the alternatives.

 2          THE COURT:  Is there anything in the factual

 3     record that has been developed during discovery concerning

 4     Symantec's right to remove the alternatives?

 5          MR. AXELROD:  I don't believe, I don't believe

 6     so, Your Honor.  I know that there is nothing in the, in

 7     the factual record that indicates that they ever

 8     contemplated doing so, they ever discussed doing so.

 9     Certainly there is no evidence that they did so because

10     they were available the whole time.

11          As to your specific question as to whether there

12     is anything about whether they had a right to remove them

13     at any time, that I'm not certain of, although I don't

14     believe so, but I'm sure Mr. Gibbs will tell me if I'm

15     wrong on that score.

16          So I guess that's, that's our argument.

17     Actually, let me turn to damages for just a minute or two.

18     The damages issue is a red herring, Your Honor.  There is,

19     as Your Honor already ruled in the class certification

20     ruling, this is a total refund case.

21          There is evidence in the record, and we'll have

22     a, depending on how the *Daubert* motions get resolved, I

23     guess, but we anticipate having an expert who can testify

24     as to what those total refund damages will be.  We also are

25     providing, in an abundance of caution, plan to provide the

1    jury with an alternate measure of damages if they do

2    believe that there should be some amount subtracted for the

3    convenience value to account for the difference between the

4    automatic key injection and the nonautomatic key injection.

5           The fact that we don't have an expert who

6    calculated the value of some sort of guarantee is

7    irrelevant because, as I have said earlier, Your Honor, we

8    don't think the guarantee matters.  As a legal matter, the

9    point is that they didn't disclose the existence of these

10   alternatives, and if the jury does want to make some

11   adjustment to the damages if the jury thinks that the

12   guarantee does matter, it's well within the jury's province

13   to reduce the amount that has been provided to them by the

14   experts.

15          There is no requirement that specific expert

16   testimony be provided on a particular attribute like that

17   in order for a jury to be able to return an actual damages

18   figure.  So in sum, we believe, Your Honor, that Symantec's

19   motion should be denied.  It misapprehends the law, relies

20   entirely on inadmissible evidence obtained through improper

21   deposition questioning.

22          There are genuine disputes as to material facts

23   here, and it's should be up to the jury to decide whether

24   to resolve them in favor of Ms. Khoday or in favor of the

25   defendants.

 1                    THE COURT:  Thank you.

 2              Mr. Gibbs?

 3              MR. GIBBS:  Thank you, Your Honor.  Let me begin

 4     by picking up with Your Honor's question about whether

 5     there is any evidence in the record about whether Symantec

 6     could remove the work-arounds.

 7              Ms. Khoday herself flatly admitted that it could,

 8     and this appears at page 123 of her deposition transcript,

 9     which is attached to my declaration.  She was asked:  "Was

10     Symantec required to offer Trialware?"

11              And she answered:  "No, they are not required to

12     do anything."

13              She was asked:  "Was Symantec required to offer

14     downloads on its support website?"

15              She answered:  "No."

16              She was asked, "Was Symantec required to allow

17     customers who contacted consumer support to re-download

18     their product?"

19              She answered:  "No."

20              That is the evidence in the record about whether

21     Symantec was required to maintain these work-arounds.  Let

22     me back up, though, now and address some of the points that

23     plaintiffs' counsel made.  The plaintiffs have argued that

24     our motion is based on an incorrect understanding of the

25     law, and they're trying to characterize our argument as

1    requiring equivalence as a matter of law.

2          It's not our argument.  We're not arguing that

3    the UCL or the CLRA or a claim for unjust enrichment

4    require as a legal matter the showing of equivalence.  Our

5    argument is -- it's not really even based on equivalence as

6    such.  Our argument is, each of their claims requires her

7    to show damages.

8          Her theory of harm is where the equivalence

9    matters because her theory of harm is, I wouldn't have

10   bought the product if I had known about the work-arounds.

11   That's why the equivalence or the lack of equivalence on

12   this key feature of a guarantee matters, because when she

13   is confronted by the notion that Symantec had no obligation

14   to maintain the work-arounds, she is confronted with the

15   fact that work-arounds don't give her the guarantee, which

16   was the reason why she bought it.

17         She had to admit I might have bought it anyway,

18   and again, it doesn't matter how many times she said

19   something different.  She doesn't get to create a factual

20   dispute by contradicting her own sworn testimony.  Now,

21   it's frankly ironic to hear a plaintiff's lawyer arguing

22   that some ruling that you made at the class certification

23   stage is somehow binding on the merits.

24         Normally, they're saying you can't decide the

25   merits at the class certification stage, but even setting

1    that aside, your ruling on class certification goes only to

2    the question of whether it's possible for the plaintiffs to

3    establish reliance and damages on a class-wide basis, and

4    we obviously disagree with the Court's ruling.  The ruling

5    is what it is.

6            It's not a finding that the plaintiffs have in

7    fact established materiality or reliance or causation with

8    respect to Ms. Khoday's individual claim, and we have cited

9    case law in our reply very clearly distinguishing between

10   the nature of the inquiry made at class certification,

11   which goes to what the plaintiffs may be able to prove on a

12   class-wide basis, and the nature of the inquiry at summary

13   judgment, which is whether the evidence in this case would

14   allow a jury to award damages to Ms. Khoday specifically.

15   That's a different inquiry.  Your ruling at class

16   certification is not binding.

17           I was also struck, though, by the repeated

18   reference to necessity, that we somehow misled people into

19   thinking that the product was necessary and the auto

20   population misled people into thinking it was necessary.

21   We cited record evidence in this case repeatedly that

22   something like 50 percent of the consumers who were offered

23   this insurance product removed it from the cart.

24           So if the theory is it is the necessity, people

25   are being misled into thinking it's necessary, then I would

1    submit it's pretty clearly idiosyncratic and is certainly

2    not uniform across the class, because 50 percent of the

3    people who were given this option didn't think it was

4    necessary.  They took it out of the cart.

5           Now, we heard a lot about the alleged

6    misrepresentations here.  We heard a lot less about what

7    our motion is actually directed at, which is the existence

8    of harm and the amount of harm, but I want to comment then

9    on their response to the guarantee point because I don't

10   think it's persuasive at all.  I don't think there is any

11   legitimate dispute that EDS and NDI offered a guarantee, a

12   legal right, a promise, and the alternatives did not.

13          What the plaintiffs have responded with is,

14   frankly, a lot of efforts to change the subject.  Instead

15   of claiming that there was a legal right to use the

16   work-arounds, the free alternatives, they talk about

17   whether Symantec ever actually considered getting rid of

18   them.  That's irrelevant, right?

19          Ms. Khoday's testimony is crystal clear.  She

20   wanted to be sure, and it would be different, things may

21   have been different if she had known that the work-arounds

22   could disappear at any time.  It doesn't matter whether

23   they did disappear.  It doesn't matter whether Symantec

24   thought about making them disappear.  The fact is --

25          THE COURT:  What about the argument that they

1    could not have been made to disappear because of the fact

2    that they were necessary for the 60-day guarantee and the

3    multiple user option and these other aspects of it?

4            MR. GIBBS:  Again, I think it is a, it's a red

5    herring, but it's also not supported by the record.  It is

6    true that as a technical matter, the method for multi user,

7    multi licensed users to download multiple times accessed

8    the same back office system to download the product

9    multiple times.  That's the technical solution that

10   Symantec chose to deal with that particular business

11   problem.

12           But as we pointed out in our reply, the witnesses

13   who talked about that issue made very clear, there were

14   other alternatives they could have used to solve that

15   problem.  They decided to use this one.  That doesn't mean

16   they couldn't have chosen another way.  They could very

17   easily have set up a system where multi user, multi pack

18   licensees used this method to download multiple times and

19   still shut down the system they were using at the time.

20           That's just a technical issue.  That doesn't mean

21   they couldn't have done it another way.  They chose to do

22   it this way, that's true, but they could have done it

23   another way.

24           Plaintiffs also make a big deal out of the fact

25   that Symantec had an interest in making sure people had the

1    product on their machines.  Of course they did.  They're

2    selling the product, but again, the fact that it was in

3    their interests to have people have the product on their

4    machines does not mean they were required to have the

5    downloads up on the support site, for example.  I mean,

6    step back for a minute.

7         The downloads didn't appear on the support site

8    until several years into this class period.  It's clearly

9    not the case that Symantec couldn't run its business

10   without having those links up there.  They did for the

11   first several years of the class period.  Right?  So, yeah,

12   there is a portion of time where they have the links up on

13   the support site.

14        But just because they did not consider shutting

15   them down or protecting them in some way to prevent people

16   from doing outside of 60 days doesn't mean they couldn't

17   have done that.  They made a judgment that it wasn't worth

18   doing.  That doesn't mean they couldn't do it, and it

19   doesn't mean that the work-arounds were in any way

20   guaranteed in the same way that EDS and NDI were because

21   those gave you a contractual right to do it.  Nothing else

22   did.

23        I want to address the inadmissible testimony

24   point just a bit, Your Honor.  First of all, most of that

25   argument is focused on pieces of testimony which I agree we

1    have cited in reference, but it is not really at the heart

2    of our motion, and that's the testimony about the material

3    omission.

4              Now, I don't think that testimony is

5    inadmissible.  I don't think it's calling for an improper

6    legal conclusion.  Ms. Khoday did not express any confusion

7    over the meaning of the term "material."  I think she knew

8    what she was answering, and that answer was based on her

9    own perception of her own purchase of NDI.

10             So I don't think they're right, but it doesn't

11    matter.  You could ignore the testimony about material

12    omission, and we would still be entitled to summary

13    judgment based on her admission that if she had known about

14    the work-arounds, but she had also known that Symantec

15    could stop allowing the work-arounds at any time, she might

16    still have bought NDI.

17             So the, all this stuff about material omissions,

18    it doesn't really affect the motion.  As to her answer to

19    the question would you have bought NDI if you had known

20    about the work-arounds and if you had known that Symantec

21    could remove the work-arounds at any time, plaintiffs

22    complain that it's an improper hypothetical question.

23             Again, fairly ironic, given that her claim is

24    based on her testimony that if I had known about the

25    work-arounds I would not have bought the product.  That is

1   no less hypothetical than the question that we asked her in

2   her deposition.  The only thing, the only difference is, we

3   asked her what she would have done if she had known the

4   complete truth, which is not just that the work-arounds

5   existed, but that Symantec was not under any obligation to

6   leave them in place.

7          If she can answer the question, what would you

8   have done if you had known the work-arounds existed, surely

9   she can answer the question, what would you have done if

10  you knew the work-arounds existed and you knew Symantec

11  could remove them at any time.

12         Now, plaintiffs have said what they have to say

13  about whether Symantec would have removed them or did

14  remove them, but the fact is, Khoday herself admitted as I

15  read when I got up here, she admitted they were not

16  required to leave those in place.  You put that testimony

17  with the testimony that she may have bought the product

18  anyway if she had known about the work-arounds but knew

19  that Symantec could remove them, and she cannot prove harm,

20  and she cannot prove the amount of her damages.

21         One last point on the evidence, and I'm tempted

22  to read a bunch of excerpts, but I know we're short on

23  time, so I won't get bogged down on that.  If you read

24  Ms. Khoday's testimony that is attached to my declaration,

25  this is not general testimony.  It's not hypothetical

1    testimony.  It's testimony about her own state of mind and

2    her own purchasing decision.

3              Now we may not have framed the question exactly

4    the way plaintiffs' counsel wanted us to frame it, but we

5    asked her, what would you have done if you had known this

6    fact and this fact, and she answered that question.  And

7    her answer to that question precludes her from proceeding

8    on a theory that she definitely would have done something

9    else if she had known about the work-arounds.

10             Thank you, Your Honor.

11             THE COURT:  Thank you, Mr. Gibbs.

12             All right.  Did you have something else?

13             MR. AXELROD:  Your Honor, just briefly to one

14   thing that Mr. Gibbs mentioned.

15             THE COURT:  All right.

16             MR. AXELROD:  I promise two minutes or less.

17   Mr. Gibbs got up and cited you to a bunch of Ms. Khoday's

18   testimony that he says proves that's the evidence in the

19   record that shows that, that shows that the work-arounds

20   could not have been, could not -- could have been removed.

21   That's his evidence.

22             I just, when you look at that page, you will note

23   that every single one of those questions was objected to by

24   plaintiffs' counsel because she has no personal knowledge

25   of that.  She couldn't possibly have answered that.  So if

 1    that is what he is relying on, it's a fairly thin reed.

 2          The only other point is that Mr. Gibbs said,

 3    well, plaintiffs are relying on her answers to the

 4    questions would you have bought it if you had known about

 5    the free alternatives but don't want to -- don't think --

 6    think that the answers are improper when the question was,

 7    if you had known about the free alternatives but also knew

 8    they could have been removed.

 9          Your Honor, she testified that she bought NDI

10    because she was led to believe it was necessary.  There is

11    nothing hypothetical about that answer, and that's all we

12    need to show harm.  The questions that Mr. Gibbs wants to

13    rely on are completely improper, and objections were raised

14    at the time.

15          That's all I have, Your Honor.

16          THE COURT:  Thank you, Mr. Axelrod.

17          MR. GIBBS:  Just very briefly.  I did cite

18    Ms. Khoday's testimony about Symantec and whether it was

19    required to do these things.  I don't think there is

20    anything objectionable about those questions or those

21    answers, but I want to be very clear.  I don't think it's

22    our burden to prove that Symantec had the right to do it.

23          There is, in my view, a plain difference between

24    buying a product that gives you a legal right to do

25    something and relying on a bunch of self help work-arounds,

1    and I think if plaintiffs' theory is the work-arounds were

2    just as much of a guarantee as this legal right, the burden

3    should be on them to come up with evidence showing that

4    Symantec could not have done that.  In other words, that

5    those work-arounds gave Ms. Khoday just as much certainty

6    as the product she bought.

7              I think her admission stands, and I think it

8    undermines their case, but just to be clear, I don't think

9    it's my burden.

10             THE COURT:  All right.  Thank you, Mr. Gibbs.

11             All right.  Let's turn to the plaintiffs' motion

12   to exclude testimony of Stephens and Kalyanam.

13             MR. FRIEDMAN:  Thank you, Your Honor.  Again,

14   it's Andrew Friedman with Cohen Milstein.

15             I think at the outset, it's important to

16   understand what relief plaintiffs are seeking through this

17   motion and what we're not seeking.  Our *Daubert* motion here

18   doesn't seek to exclude all the testimony of defendants'

19   experts.  In fact, we're only seeking to exclude portions

20   of testimony from two of their purported experts,

21   Mr. Kalyanam, Professor Kalyanam, and Mr. Stephens.

22             We acknowledge that both of them have experience

23   in the general area of e-commerce, but portions of their

24   anticipated testimony fall outside their expertise.  They

25   lack a reliable basis, and they're cumulative.  Let's start

1    with their testimony for a minute on the supposed benefits

2    of download insurance, also its value to customers.

3                THE COURT:  Are you taking them both together?

4                MR. FRIEDMAN:  I'm going to address both of them

5    because they really do weave together, Your Honor.

6                THE COURT:  All right.

7                MR. FRIEDMAN:  But right now I'm addressing

8    strictly the 702 standard.  One of the things they both

9    testified to was the free alternatives offered and

10   comparing those free alternatives to download insurance,

11   either NDI or EDS.

12               Those are topics that neither of these witnesses

13   can testify under *Daubert*.  Under Rule 702 of the Federal

14   Rules of Evidence, expert testimony, as Your Honor knows,

15   has to satisfy three prerequisites.  We're not taking any

16   attacks right here on their specialized knowledge that

17   might be helpful ultimately to the trier of fact.

18               We're really focusing on the second two portions

19   of that, the second prongs, that the proposed witnesses

20   have to be qualified to assist the finder of fact, and they

21   have to offer proposed evidence that's reliable in an

22   evidentiary sense.  They can't meet those two second two

23   prongs.

24               Let's look at Mr. Stephens first.  He is a 2000

25   college graduate, claims to have focused his career on,

1   again, the very broad topic of e-commerce and the retail

2   industry.  According to his expert report and his

3   deposition testimony, he expects to testify on numerous

4   e-commerce topics including the general landscape of

5   e-commerce during the class period, the auto population of

6   products into what we have been calling the customer

7   shopping carts, and also generally about disclosures in

8   e-commerce.

9        Now, other than the fact that much of this

10  testimony will overlap with Professor Kalyanam's, we don't

11  object to it, and I will get to the cumulative portion in a

12  minute, but what is objectionable here, Your Honor, is that

13  Mr. Stephens' testimony regarding the benefits of download

14  insurance, how it was used, he has no expertise in how

15  download insurance was used or how it could be valued by

16  Norton customers, and he has certainly no experience,

17  educational or otherwise, comparing this relative value to

18  the free alternatives offered by Symantec.

19       He simply can't do that under *Daubert*.  He has no

20  educational qualifications, no experience to form these

21  opinions.  While he has worked generally in the e-commerce

22  field, he admits he has no experience with download

23  insurance at all.  He has zero experience in re-downloading

24  the Norton products using any of the methods, any of the

25  free alternatives.

1          Not only did he testify that he never used

2     download insurance, but he also testified he didn't even

3     consider going to the Symantec website to look at it, and

4     Mr. Stephens testified that he never used the free

5     alternatives, either.  Didn't try to use them, either.  He

6     never tried to re-download using the Symantec website.

7          He never tried to use Trialware, and again, he

8     didn't try to go to the Symantec website.  The most

9     defendants can point to with regard to Mr. Stephens in

10    terms of his qualifications is that when he consulted at

11    some point in his career with Adobe, he said he gained an

12    understanding of the challenges that they had with regard

13    to downloading.  That's a very slim reed upon which to rest

14    his qualifications on this testimony.

15         His testimony is, he is talking about customer

16    expectations, and he opines in his report that re-download

17    options were fraught with problems.  He has no

18    qualification to talk about that.  In fact, in his report,

19    Mr. Stephens even presents a chart purporting to compare

20    download insurance with the free alternatives.

21         And he professes that download insurance had

22    several advantages to the free re-downloading alternatives.

23    Again, unfortunately, he has just generalized knowledge

24    about e-commerce, and that can't substitute for real

25    knowledge here.

1           The same can be said for Professor Kalyanam.  He,

2     too, seeks to testify about add-on products in general,

3     standard pricing methods in e-commerce and again the

4     automatic pre population of products and services in

5     shopping carts.  For the most part, again other than the

6     redundancy there, that testimony is not precluded under

7     *Daubert*, and we're not trying to knock it out.

8           But again he has, Mr. Kalyanam, Professor

9     Kalyanam has no expertise to opine about download insurance

10    or the free alternatives.  Yet in his expert report,

11    Professor Kalyanam opines about the purported attributes to

12    using download insurance, how much faster it was, how much

13    more convenient it was than the free alternatives that were

14    offered by Symantec.

15          Worse yet, he purports to describe in

16    excruciating details, he claims, and in chart form, the

17    steps one would take to actually use the download

18    insurance, either Norton download insurance or extended

19    download service, and he compares those to, to, again, the

20    free alternatives.

21          Let's look at what Professor Kalyanam is.  He's a

22    professor of marketing.  He asserts he has general

23    experience in Internet marketing and e-commerce, but again,

24    he has no background, no training in re-downloading options

25    like EDS, NDI, and none of the alternatives.  And like

1    Mr. Stephens, he never used EDS, nor even attempted to use

2    it.  Defendants admit this in their brief.

3          In short, defendants cannot point to any

4    background or training for these witnesses as to the

5    re-downloading options.  They have no experience with EDS,

6    NDI or any of the alternatives, but what defendants, we

7    hear them say is, well, that's okay.  We're a little short

8    on qualifications, little short on experience, but that's

9    okay because they have experience in e-commerce and

10   marketing in general.

11         But that's like saying because I purport to be an

12   expert on major league baseball, I could then talk about

13   the specific construction of a baseball stadium.  That's

14   not what *Daubert* is all about.  *Daubert* says the expert

15   opinion has to be limited to the expert's specific area of

16   expertise, and neither expert here have that expertise,

17   that specific expertise with regard to re-downloading.

18         But let's for a minute ignore those gaps in

19   qualifications.  Let's pretend they don't exist.  They

20   would still violate the third prong of *Daubert* or 702.

21   They completely lack reliable methodology.  Under Rule 702,

22   the expert's conclusions have to be susceptible to

23   reproduction so it's objectively verifiable.

24         Now, that requires a showing that the opinion is

25   based on some recognized methodology that is reliable, and

1    the first requirement for reliability under *Daubert* is to

2    determine if the theory can be or has been tested, and

3    defendants don't contest that.

4         They say neither Kalyanam nor Mr. Stephens did

5    anything to test or evaluate their own conclusions.  They

6    never tested the re-downloading process.  Neither of them

7    actually used download insurance.

8         Neither of them tried to use the free

9    alternatives, and frankly, that was evident in their

10   testimony because they got a little confused about what the

11   actual steps were, and neither of these witnesses conducted

12   any research on Norton customers.  They didn't conduct any

13   research on download insurance purchasers or anyone that

14   actually used the download insurance or the free

15   alternatives.

16        Instead of looking at the objective data, each of

17   these witnesses simply concluded that download insurance

18   somehow saved time and was more convenient than the free

19   alternatives, that is, but neither of them actually tested

20   these conclusions.

21        With regard to each, virtually every one of their

22   conclusions, at depositions we asked them, well, what did

23   you do to test that?  We said, did you, for example, did

24   you interview customers to see how they reacted to the

25   descriptions of download insurance?  Did you ask any

1    consumers whether they found the alternatives difficult to

2    use?  Did you run a survey of how customers valued download

3    insurance.

4           And each response was the same.  No, I didn't do

5    anything.  I didn't do anything to objectively test those

6    conclusions.  Yet these witnesses purport to show in a

7    descriptive, and both of them a chart form, the steps one

8    would take to use extended download service, to use NDI and

9    to use the free alternatives and making wildly inaccurate

10   conclusions about how much faster, easier and how reliable

11   it was.

12          Look, for example, Your Honor, at Figure 1, which

13   is attached to Professor Kalyanam's expert report.  It

14   purports to depict two separate routes for re-downloading.

15   One is an impossibly complicated route to re-downloading

16   using the free alternatives, and the second one is this

17   impossibly short route to re-download using download

18   insurance.

19          Forgetting for a minute that they are factually

20   inaccurate, wildly inaccurate, this chart and both

21   witnesses' conclusions again aren't based on anything they

22   did.  All they did was, it's just rehashing defendants'

23   testimony, defendants' arguments and sort of cherry-picking

24   some testimony that they saw in the record.  It's

25   completely uncorroborated, and one of the hallmarks of

1    reliability is the ability to test what these purported

2    experts did, but since they did nothing, their conclusions

3    cannot effectively be tested here.

4          This requires that these witnesses' testimony on

5    download insurance and the alternatives be stricken.

6    Defendants again counter here, and they say, wait, these

7    experts aren't testifying about scientific testimony, so

8    their conclusions don't have to be testable.

9          Well first and foremost, *Daubert* doesn't make

10   that decision.  *Daubert* says everything has to be, all

11   factors apply, whether it's nonscientific or not.  Here

12   with regard to download insurance, it's undisputed.  All

13   they did was essentially -- you'll forgive me.  They're

14   regurgitating the same tired descriptions that defendants

15   have said all along how great download insurance is and how

16   horrible the free alternatives are, but they didn't do

17   anything on their own.

18         But if defendants are now saying that it's okay,

19   we don't actually have to test anything, you can just rely

20   on our experience, well, the advisory committee notes to

21   702 handle that.  They actually say that raises the bar.

22   If you're just going to rely on your qualifications, your

23   experience, and you haven't done anything, you actually

24   then have to explain how that experience leads to the

25   conclusions that you got to.

1      They can't do that here, and as I've already

2   noted, they simply don't have that direct experience in

3   this area, so they really can't fall back on experience.

4   They don't have it.

5      More importantly, because all these witnesses are

6   doing here is parroting back certain testimony and

7   documents from this litigation and defendants' own

8   arguments made by their attorneys, they are not assisting

9   the fact finder.  The jury can look at the same record

10  evidence and come to its own conclusions, look at any

11  inferences it wants to make.  It is not helping the jury at

12  all.

13     Defendants claim that this lack of reliability

14  can be tested at trial through cross-examination, but

15  again, Your Honor, the role of the Court here is as the

16  gatekeeper.  It would be unfair to allow purely and

17  obviously unreliable testimony to go to the jury because it

18  would give the jury, frankly, the unfair impression it

19  might give them more credence, these experts' testimony

20  more credence than it frankly warrants because it's

21  unreliable.

22     I just wanted to say a few words about the

23  redundancy arguments, which are listed in our brief.  With

24  regard to both of these witnesses, they both take shots at

25  one of our experts, Steven Gaskin, again not to be

1    confusing with local counsel here.  They are taking shots

2    at Mr. Gaskin's conjoint analysis.

3          Neither of them tested -- testified, by the way,

4    that there is something inherently wrong with the conjoint

5    analysis.  They're not saying it's unreliable.  They opine

6    that Mr. Gaskin should not have focused solely on the

7    automatic key injection as the differentiator between the

8    free alternatives and the download insurance, and they also

9    say he should have looked at other variables, but both

10   witnesses' testimony on this also ought to be excluded.

11         Why is that?  Well, with regard to Professor

12   Kalyanam, he testified that a conjoint analysis is a

13   standard marketing practice.  It's a good tool that he

14   teaches in his MBA program.  He could have used the

15   conjoint analysis.  He just chose not to.

16         So he might have been able to opine on a conjoint

17   analysis, but nevertheless, his testimony ought to be

18   excluded under 403, and that's because defendants have

19   already retained, and we have not objected to, a separate

20   expert, a Dr. Van Liere, whose discipline and testimony

21   here on the subject overlaps completely with

22   Dr. Kalyanam's, and thus it would be cumulative.

23         You would have two witnesses to basically to

24   attack -- I'm sorry -- to allow Kalyanam to rebut

25   Mr. Gaskin's study.  Now, with regard to Mr. Stephens, he

1    has the same issue under 403.  It's equally cumulative.

2    It's the same testimony as Dr. Van Liere, but in addition,

3    Stephens is not qualified to opine at all on a conjoint

4    analysis.

5          He has never done a conjoint analysis.  He has

6    never published in this area.  He has never even reviewed

7    the applicable literature.  He simply isn't qualified.  So

8    you have under 702 and 403 as to his somewhat rebuttal of

9    Mr. Gaskin.

10          Finally, the last point that we made in our brief

11    bears noting.  I won't go through all of it, but there is

12    cumulative testimony, in addition to the testimony against

13    Mr. Gaskin.  Both Kalyanam and Stephens offer very similar,

14    if not identical, testimony on several subjects, and we

15    have summed them up on page 5 of our opening brief.

16          And those subjects include the auto population of

17    customer shopping carts with download insurance as a

18    standard practice.  They talk about the lengthy

19    informational disclosures like the descriptors in this case

20    are somehow frowned upon in the marketing world.

21          They also equally testify that download insurance

22    was safe, fast, convenient, all the things Your Honor has

23    heard, and that download insurance was a common type of

24    what they call a value added item that benefits customers.

25    So these are identical testimony.  It's absolutely

1    identical on those points that we have listed in the chart.

2            So even if the Court finds that any of this

3    testimony could aid the trier of fact and that Stephens and

4    Kalyanam are equally qualified to provide that testimony,

5    the Court should limit defendants to call only one of them

6    at trial and exclude the other's testimony as cumulative

7    under 403.

8            Now, defendants don't dispute that these

9    witnesses' testimony overlap on those points, but they

10    claim this distinction, Your Honor.  They say, well, one is

11    an academic and the other is a marketer.  To us that's a

12    distinction without a difference.  They're using the same

13    materials, the same materials to review to get to those

14    conclusions, and the conclusions are identical.

15            If they were both permitted to testify on the

16    same topics, Your Honor, then you run into a prejudicial

17    effect to the jury saying, well, they have -- essentially

18    count the expert witnesses and say, well, there must be

19    something to that because they have two or three expert

20    witnesses on that topic.

21            The Court respectfully should require defendants

22    to coordinate their testimony to avoid the overlapping and

23    duplicative testimony.  Thank you, Your Honor.

24            THE COURT:  Thank you, Mr. Friedman.

25            Mr. Gibbs?

1          MR. GIBBS:  Thank you, Your Honor.  I apologize

2     if my voice keeps giving out.  The dry air is not what I am

3     used to these days.

4          THE COURT:  We have been heating it up a lot

5     lately.

6          MR. GIBBS:  Well, I appreciate that.  Your Honor,

7     I have some slides that I prepared.  I don't intend to walk

8     through them, but I intend to use them as a reference.  I

9     have shown them to plaintiffs' counsel.  May I hand up a

10    set?

11         THE COURT:  Yes.

12         MR. GIBBS:  With the Court's permission, I'll try

13    to get this displayed on the screens.  Okay.  Can you see

14    it, Your Honor?

15         THE COURT:  Mm-hmm.

16         MR. GIBBS:  Thank you.  Okay.  Mr. Friedman has

17    just spent a substantial portion of his presentation, just

18    as plaintiffs spent a substantial part of their briefing,

19    trying to prevent these two witnesses from offering opinion

20    testimony that they are not going to offer as opinion

21    testimony, and so a substantial portion of this motion is

22    simply misdirected and is based on a misunderstanding of

23    the opinion testimony that these witnesses are going to

24    offer.

25         Plaintiffs' principal complaint here is that

1    Professor Kalyanam and Mr. Stephens are not experts in

2    download insurance, and they're not experts in

3    re-downloading software; and therefore, plaintiffs claim,

4    they have no basis for offering opinions about how EDS or

5    NDI worked, how the work-arounds worked or how those two

6    things compare to one another, but the fact is, neither of

7    these witnesses is offering opinion testimony on those

8    subjects.

9         Those subjects, in my view, are questions of

10   fact.  What both of these witnesses have done is, they have

11   gained an understanding of how EDS and NDI work.  They have

12   gained an understanding of how the alternatives or the

13   work-arounds work, and they have gained an understanding of

14   how the two differ from one another, and they have done so

15   by looking at the record evidence in this case.

16        They have looked at deposition testimony.  They

17   have looked at documents produced in the case, and their

18   reports very clearly document the sources that they're

19   relying upon for their understanding of how EDS and NDI

20   worked and their understanding of how the work-arounds

21   worked.

22        That understanding forms a part of the factual

23   basis on which they have then applied their experience,

24   their expertise, their research to form opinions that go

25   well beyond the factual issues that the plaintiffs are

1    complaining about.

2              So what is really going on here is, the experts

3    have reviewed some of the evidence in the case to gain a

4    factual understanding, and then they have applied their

5    expertise and their experience to form other conclusions

6    about the value that EDS and NDI offer to consumers beyond

7    what the work-arounds offered.

8              There is absolutely nothing unusual about experts

9    looking at record evidence to gain an understanding of

10   certain facts and then applying their expertise or their

11   experience to form conclusions which are separate and apart

12   from those underlying facts.

13             And so the simple fact is, we're not offering

14   Professor Kalyanam or Mr. Stephens to offer an opinion

15   about how EDS or NDI worked.  They have an understanding

16   about that that is based on the evidence, and if plaintiffs

17   think their understanding is incorrect, they can

18   cross-examine them at trial.

19             We're not offering them to give opinions about

20   how the work-arounds work.  They have an understanding

21   about that based on the evidence, and plaintiffs can

22   cross-examine them on that as well.  The fact that they

23   have grounded their opinion in certain facts does not mean

24   that they have to have experience or expertise in those

25   factual issues in order to give their opinions.

1              So plaintiffs are focusing on the wrong target

2       here.

3              THE COURT:  Mr. Stephens references something

4       called conversion analysis in his report.  What does that

5       mean?

6              MR. GIBBS:  Conversion analysis, I believe is, I

7       think it's conversion ratio, and I think what he is talking

8       about is a comparison of the number of unique visitors who

9       come to your sight versus how many of them actually make a

10      purchase.  So in a sense how many visitors do you convert

11      into a sale.

12             I believe that's what he is talking about there,

13      and that's just some of the background of his analysis of

14      various of the things that Symantec and Digital River did

15      here because, you know, the principal goal of any

16      e-commerce retailer is to have as high a conversion ratio

17      as possible.

18             Now, so plaintiffs have shot at the wrong target

19      for the most part.  Plaintiffs then pivot in their reply

20      and say, well, these guys are just regurgitating the record

21      evidence.  They're just constructing a narrative, and

22      that's not proper as well, but that's not a fair

23      characterization of the opinion testimony that these

24      witnesses are offering, again as distinct from their

25      discussion of some of the factual information that they've

1    relied upon to form their opinions.

2             And I don't want to dwell on a lot of detail

3    because I know we're short on time, but I want to focus for

4    an example on an opinion offered by one of them that I

5    think is basically what the plaintiffs are complaining

6    about here.

7             All right.  This is the summary of opinion number

8    three from Mr. Stephens's report.  Mr. Stephens, although

9    he only graduated from college in 2000, is unquestionably a

10   very real expert in e-commerce.  He has been working in

11   e-commerce since that time, which essentially encompasses

12   the entire time that there has been any such thing as

13   e-commerce.

14            His e-commerce experience includes helping other

15   software vendors set up e-commerce sites to sell software

16   over the Internet via downloads, just like Symantec was

17   doing at the time period in question.

18            Mr. Stephens has looked at the record evidence

19   about what EDS and NDI offered and how the free

20   alternatives or the work-arounds worked, and based on his

21   experience with difficulties that retailers and their

22   customers encountered in dealing with software downloads

23   over the Internet, he has reached a conclusion that

24   nonexpert users who were buying software during the 2005 to

25   2011 time frame would have been familiar with those

1    difficulties that people encountered in downloading

2    software.

3            And it is his opinion based on that experience

4    that in light of their awareness of those difficulties,

5    purchasing EDS or NDI would have been attractive to

6    consumers.  They would have seen value in what those

7    products were offering.

8            There is nothing unusual or strange about that

9    sort of opinion.  It is grounded in part on their

10   understanding of the facts based on the record evidence,

11   and it is grounded on his deep experience in e-commerce.

12   It is unquestionably of help to the jury.

13           Professor Kalyanam offers a similar opinion in

14   the sense that he also believes that these products would

15   be valuable to consumers, but it comes from a very, very

16   different perspective.  His opinion on this subject is not

17   based on personal experience helping people set up web

18   sites to sell software.

19           His experience is based on his academic

20   experience and on published research, and he has looked at

21   research about how consumers value their time, how they

22   value certainty over uncertainty, how they value

23   convenience.

24           Based on that published research and based on his

25   understanding of the facts about how EDS and NDI differed

1    from the work-arounds, he has concluded that these products

2    offered value to consumers because they offered an easier

3    process, a more convenient process, a more certain process.

4    That's the gist of his opinion.

5          It is not a matter of offering opinion testimony

6    about the underlying facts.  It is an opinion they have

7    formed based in part on factual information from the

8    record.  Let me move now to a slightly different subject.

9          Plaintiffs want to exclude both of these

10   witnesses from offering commentary on their expert,

11   Mr. Gaskin's, conjoint analysis.  Here these two experts

12   are clearly different.  Mr. Stephens is not offering an

13   opinion about Mr. Gaskin's conjoint analysis.

14         He notes in passing in his report that

15   Mr. Gaskin's conjoint analysis only attempted to value,

16   place a value on the automatic key injection feature of the

17   product.  That fact is not in dispute, and so Mr. Stephens

18   is not offering an opinion when he notes that fact.

19         All he is doing is saying, because of that

20   limitation on what Mr. Gaskin did, which again is

21   undisputed, because of that limitation what he has done is

22   not inconsistent with the conclusions I'm reaching, and I

23   don't think there is anything in *Daubert* or Rule 403 that

24   precludes Mr. Stephens from explaining why his conclusions

25   about value to customers are not inconsistent with what

1    Mr. Gaskin did because of an admitted limitation of

2    Mr. Gaskin's work.

3         So that's not an opinion at all, and it's not

4    really repetitive of what the other experts are doing.

5    Professor Kalyanam does have a series of opinions about

6    what Mr. Gaskin did, and plaintiffs don't question his

7    expertise and experience and his ability to comment on

8    that.

9         They take issue with the fact that he didn't do

10   his own conjoint analysis, but there is no requirement that

11   someone do that in order to analyze and critique an

12   analysis that someone else has done.  So their principal

13   complaint about Professor Kalyanam is really just, I think,

14   it's duplicative of what Dr. Van Liere did.

15        In that regard, there is at most some overlap

16   between the points that they make, but again, they're

17   making it from very different perspectives.  Among other

18   things, Professor Kalyanam believes that the use of

19   Dr. Gaskin's conjoint analysis in this setting is of

20   limited value because what it's measuring is something

21   called stated preference, what people say they value, as

22   opposed to revealed value, which is what people actually do

23   out in the marketplace.

24        And that is something that Dr. Van Liere, for

25   example, does not touch on at all.  Dr. Van Liere is an

1    unquestioned expert in performing conjoint analyses, and he

2    has some pretty serious criticisms of Mr. Gaskin's work

3    here, but Dr. Van Liere does not in any way touch on

4    whether using stated preference versus revealed preference

5    is an appropriate way of measuring value here.

6              So, you know, to the extent there is overlap it's

7    limited.  It doesn't come anywhere near a 403 prejudice

8    requirement.  They are coming at it from different

9    perspectives and largely offering different testimony.

10             More generally on the overlap point as it relates

11   to Mr. Stephens and Professor Kalyanam, first of all, the

12   actual overlap, places where they are saying the same

13   things, is quite limited.  They both testify that it's not

14   unusual to auto populate a cart.  That testimony is, I

15   agree, similar.

16             They both offer testimony about lengthy online

17   disclosures, although I don't think that testimony is

18   anywhere near identical.  It's touching on the same

19   subject, but they're not saying identical things about

20   that.  More importantly, they're coming at it from very

21   different perspectives.

22             Mr. Stephens's opinion on that point is obviously

23   based on his experience helping vendors set up e-commerce

24   sites, setting up his own e-commerce site and testing

25   consumer reactions to various disclosures.

1          Professor Kalyanam's testimony about lengthy

2     online disclosures is based on published research, not on

3     his own experience, and so I don't think that's

4     duplicative.  It's not at all unusual for there to be more

5     than one expert covering a similar subject matter.

6          In fact, just last year in the *Burks versus*

7     *Abbott Laboratory* case at 917 F.Supp.2d 902, this Court

8     allowed three experts all to testify as to causation, among

9     other things.  You know, what we're really talking about

10    here is a 403 analysis.  This is not a *Daubert* issue.

11         And frankly, I think any consideration of

12    cumulative or duplicative or prejudice is just way too

13    premature.  All we have is their disclosures.  Neither one

14    of them has actually taken the stand.  There is no way for

15    the Court to actually conclude that prejudice from

16    duplicative testimony outweighs probative value when you

17    haven't heard one of them testify.

18         So I don't think there is any basis for the Court

19    at this stage of the proceedings to tell the defendants you

20    have to pick one.  You can't have two.  I just don't think

21    that's appropriate at this stage of the proceedings.

22    Couple of more points.  Excuse me.

23         As we said in our opposition brief, plaintiffs'

24    motion cites all sorts of case law talking about testing

25    your results and being able to reproduce your work and your

1     methodology.  They're citing a bunch of cases dealing with

2     scientific testimony where those kinds of categories and

3     those kinds of analyses actually make sense.

4          As we have said in our briefing, nonscientific

5     testimony isn't necessarily evaluated using those

6     categories.  Now, I heard Mr. Friedman say that *Daubert*

7     says all factors apply.  That's just wrong.  Plaintiffs

8     themselves cite the *Kumho Tire Company versus Carmichael*

9     case from the United States Supreme Court.  That is at 526

10    U.S. 137.

11         This was one of the first follow-on cases to

12    *Daubert*, and the question was, for nonscientific expert

13    testimony, do you have to apply all of the factors that

14    *Daubert* lists, and the answer is, no, you don't.

15         What the Supreme Court said in *Kumho* is, it's

16    going to depend on the specific testimony.  In some cases

17    for some testimony, those categories might be appropriate

18    even for nonscientific testimony.  In others, they will

19    not.

20         The bottom line is, they said the trial court has

21    the same discretion in deciding how to evaluate

22    nonscientific testimony as it does in deciding whether to

23    let it in.  So there is nothing in *Daubert* that says you

24    have to click through all of those categories, which many

25    of those are very focused on scientific testimony, in every

1      case for every kind of expert testimony.

2            There is lots of testimony where those categories

3      simply do not make sense, and I would submit this is

4      precisely one of those categories.  Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. Gibbs.

6            I have about maybe 17 minutes more here because I

7      have a sentencing at one o'clock or a series of

8      sentencings.  We've got three additional motions regarding

9      defendants' motions on expert testimony.

10           Who is going to be making the arguments on those?

11           MS. VAN GELDER:  Your Honor, I'll be making the

12     argument on the Gaskin *Daubert*.

13           MR. GASKINS:  To avoid confusion, and I will be

14     making the argument on Professor Kalyanam.

15           MS. FROGGE:  I will be making the argument on

16     *Daubert* of Mr. Nicholas Taylor.

17           THE COURT:  Okay.  Well, let's start right away

18     with the argument on the testimony of Mr. Gaskin, and then

19     let's just try to get this done if we can.

20           MR. FRIEDMAN:  Your Honor, may I be heard just

21     for two minutes?

22           THE COURT:  I don't know that I need any response

23     on the last motion.  I don't typically do that on these, so

24     let's just go ahead.

25           MS. VAN GELDER:  Thank you, Your Honor, and this

1    one is a little bit complicated, but I'll try to speed

2    through it as quickly as I can.  Just by way of background,

3    conjoint analysis is a method of market research that is

4    used to measure relative preferences for product features.

5    Thus, for example, if somebody properly employs a conjoint

6    analysis, they can say that the survey respondents value a

7    car with a sun roof to some extent more than a car without

8    a sun roof, and conjoint can get to that extent.

9            But to be clear, value in this context is not

10   equivalent with price in the real world market.  Value is

11   consumer utility, what sort of subjective utility did

12   consumers place on that particular feature when they were

13   taking the survey.

14           So in this case, plaintiffs hired Mr. Gaskin to

15   devise a conjoint survey that ostensibly would attempt to

16   place a dollar value, a monetary value on automatic key

17   injection, which Your Honor is aware is one of the features

18   of extended download service in Norton download insurance.

19           Gaskin comes to the end of the survey and

20   ultimately reaches the opinion that the, quote, fair market

21   value of automatic key injection is between 5 and 16 cents,

22   and it's this testimony, Your Honor, that we find

23   objectionable as both unreliable and irrelevant.

24           You will recall, and we have discussed it today,

25   that this download button appeared when folks bought

1      Norton, and EDS and NDI extended the time that that

2      download button would be available in folks' accounts, and

3      because it was in the purchaser's account, it automatically

4      injected the product key, that 25 character code.

5            In this case, plaintiffs claim that EDS and NDI

6      weren't necessary.  That's what Mr. Axelrod said this

7      morning because these work-arounds existed, and ignoring

8      various record evidence with respect to the guarantee or

9      convenience, safety, peace of mind, related to EDS and NDI

10     that defendants intend to prove existed, plaintiffs are

11     going to try to prove that the only difference between the

12     work-arounds and, on the one hand, and extended download

13     insurance and Norton download insurance on the other was

14     this manual key entry versus automatic key entry.

15           Thus, they hoped to measure the monetary value of

16     automatic key injection and then subtract that amount from

17     the EDS and NDI purchase price as a measure of damages.

18     Enter Gaskin.  So Gaskin to monetize automatic key

19     injection develops this survey based on hypothetical

20     re-download products, not EDS and NDI, but hypothetical

21     products, some of which included automatic key injection

22     and some of which did not.

23           He surveyed 333 people and presented them with

24     various choice sets of varying products with different

25     attributes, and for each of the choice sets for which they

1    were presented, the survey respondents picked their

2    preferred choice, and then Gaskin converted those answers

3    to a consumer utility value, which is not equivalent to

4    price.

5          And then he purports to take the consumer utility

6    value that consumers placed on automatic key injection and

7    convert that into absolute dollar equivalence finding it is

8    5 to 16 cents.  From there, without any scientific support,

9    he jumps from his hypothetical survey out into the real

10   world and says the fair market value of automatic key

11   injection is 5 to 16 cents.

12         The problem with this testimony is twofold.  It's

13   neither reliable, nor is it relevant.  It's not reliable

14   because the scientific literature that supports conjoint

15   does not allow to place a single monetary value on a single

16   attribute of a product.

17         The Sawtooth Software literature, and Gaskin used

18   Sawtooth Software in his study, and we have attached that

19   to our brief in Exhibit 4, specifically says that you can't

20   do it.  That's what Gaskin is trying to do, because

21   automatic key injection is a single attribute in the

22   hypothetical products he is testing.

23         Moreover, no court has accepted conjoint for this

24   purpose.  We have only found one court that has considered

25   it.  It is the *In Re:  Tobacco* case, California Superior

1    Court, and we have attached the opinion at Exhibit 5, and

2    the court expressly found when it considered a study that

3    attempted to do this that, quote, Conjoint analysis has not

4    been accepted in the relevant scientific community as a

5    means of assigning a monetary value to any particular

6    product attribute.

7          You know, plaintiffs dismiss this case because

8    this opinion wasn't written in response to a motion to

9    exclude the experts, but the underlying opinion there, the

10   conclusion is still valid.  The court finds it's not

11   reliable.  It's not scientifically accepted.

12         Moreover, every case that accepts conjoint, the

13   expert is valuing the product as a whole, and that includes

14   the recent *Whirlpool* decision that came down out of the

15   Northern District of Ohio, 2014 Westlaw 4954467.  There,

16   the expert was analyzing defects in washing machines, and

17   she determined that washing machines without the defect

18   were worth some amount more than washing machines with the

19   defect.

20         What do plaintiffs do here?  They're attempting

21   to justify what Gaskin did by explaining in their response

22   that what he did was measure value of relative preferences.

23   Despite his ultimate conclusion, they say what he actually

24   said is that a service with automatic key injection is

25   worth 5 to 16 cents more than a re-download service without

1    automatic key injection.

2         Well, this might be true within the confines of

3    Gaskin's hypothetical study, but plaintiffs take this a

4    step too far.  They take those consumer utility values, the

5    subjective values that were constructed in this

6    hypothetical survey, and they apply them outside to the

7    real world market where they claim these work-arounds

8    defendants did not charge for.  So they have a value of

9    zero; and therefore, EDS and NDI are necessarily only worth

10   5 to 16 cents more than that.

11        But if you look at the study, Your Honor, there

12   was a consumer utility value on the products that were

13   supposedly equivalent to the work-arounds in Gaskin's

14   survey.  So consumers didn't value the work-around as zero.

15   They valued them as something, so we can't compare Gaskin's

16   numbers that he developed in the hypothetical world to the

17   real market values out in the real world.

18        Whether it's adding 5 to 16 cents to zero or

19   subtracting 5 to 16 cents from the price, and for this

20   reason his study is totally unreliable, and this is also

21   why he can't opine on fair market value.  He admits he

22   didn't measure real products.

23        He hasn't explained how the 333 people are

24   representative of the market and can be extrapolated out to

25   the market.  He doesn't explain how the measurements that

1    he has made at all apply to supply and demand such that he

2    can say anything about fair market value, and there is

3    simply no authority that a hypothetical survey can tell us

4    anything about fair market value in the real world, and

5    plaintiffs haven't cited any.

6         Quite simply, Gaskin is reaching beyond the scope

7    of his expertise and beyond the limits of his study, but

8    his study is also excludable because it's not relevant to

9    any issue in this case.  I think that we should think very

10   closely about what the issues are when we think about this.

11        Plaintiffs claim, as Mr. Axelrod told you this

12   morning, that Symantec's customers were tricked into buying

13   EDS and NDI because defendants supposedly misrepresented

14   that it was necessary.  They claim that EDS and NDI weren't

15   necessary because these work-arounds existed, and had

16   people known of these work-arounds, they wouldn't have

17   purchased EDS or NDI or at least they wouldn't have paid as

18   much for it.

19        Then they claim that the class is entitled to

20   damages measured as what they paid versus the value

21   received, but this is not what Gaskin measured.  Gaskin did

22   not test whether and how much consumers would pay if they

23   knew that EDS and NDI weren't necessary.  In other words,

24   Gaskin did not test the value of EDS and NDI without the

25   allegedly misrepresented attributes.

1          Now, plaintiffs claim that it was this

2     representation as to necessity that gave EDS and NDI their

3     supposedly false value, but they have not taken away that

4     representation to be able to tell this Court or the jury

5     what worth is left.  Therefore, Gaskin's testimony says

6     nothing about causal nexus or damages, as plaintiffs claim.

7          Second, second with respect to the damages point,

8     as Mr. Gibbs touched on this morning, Mr. Gaskin has not

9     measured the value that the class members received when

10    they purchased EDS and NDI.  Plaintiffs attempt to equate

11    EDS and NDI to automatic key injection, but the fact of the

12    matter is, as I told you at the beginning here, they got

13    this download button in their account, and they got it for

14    the full year, and that could have some value to some class

15    members.

16         So -- but all he did, all Gaskin did was attempt

17    to place a fair market value on one component of that

18    button, the automatic key injection.  He never opines on

19    the value of the entire service, and he only opines on the

20    value, the fair market value of the automatic key

21    injection.

22         How does this relate to damages?  The answer is,

23    it doesn't because customers received something more than

24    automatic key injection.  They received the right, the

25    guarantied right to go back to their account to

1    re-download.  Even though plaintiffs might not credit some

2    of the other features that we claim these products had,

3    safety, convenience as compared to the work-arounds,

4    reliability, peace of mind, they can't seriously dispute

5    that defendants gave the customers what they promised,

6    which was that download button in their account.

7         So the question is, would customers pay for that

8    even if they knew the work-arounds were available, would

9    they value it all?  We don't know this because Gaskin did

10   not attempt to answer this question.  Lead Plaintiff Khoday

11   certainly didn't know it.  As Mr. Gibbs said this morning,

12   would she have purchased it?  Maybe, maybe not.

13        If customers did value receiving that download

14   button despite the work-arounds, would they be willing to

15   pay for it?  We don't know because Gaskin didn't test that,

16   either.  Thus, his testimony is not relevant to the

17   question of damages.  It doesn't allow the fact finder to

18   determine between what the class members paid and what they

19   received.

20        For these reasons, Your Honor, and the others

21   stated in our brief we would ask that Gaskin's report and

22   testimony be excluded.

23        THE COURT:  All right.  Very well.  Thank you.

24        MS. VAN GELDER:  Thank you.

25        THE COURT:  I think that we just have time for a

1    response on Mr. Gaskin, and then we'll just have to take

2    the rest on the papers.  We're just running out of time

3    today.

4            MR. McNAMARA:  Thank you, Your Honor.  Let me

5    just start out by saying, you've got an incorrect version

6    of what conjoint analysis does.  You do get a consumer

7    utility, but that is just step one after the participants

8    have gone through the different tables, the different

9    screen shots, the different attributes.

10           It does result in the consumer utility, and then

11   you apply the regression analysis, and then you get the

12   willingness to pay.  The willingness to pay is a monetary

13   value.  Conjoint analysis would not have been around for 30

14   years and being used all over the marketplace for all sorts

15   of issues if all you got was a consumer utility.

16           You get a dollar, and with that dollar, you then

17   use it for planning purposes, what are you going to charge,

18   how much more can you get, how is this going to affect our

19   market.  These are all uses of it, and we gave Your Honor a

20   litany of articles in our brief where they used conjoint in

21   many different facets.

22           Now, what Mr. Gaskin did with his willingness to

23   pay numbers, he followed Sawtooth Software's suggestions

24   and used a market simulator.  The information in the

25   five-page article from 2001 that they attach about, hey,

1     you really should be careful when you use our software that

2     you do these extra steps, he did those extra steps.

3             He ran the market simulations.  He did the

4     constraints.  He compared attributes.  He did all the

5     things that were suggested.  He did exactly what was

6     suggested by Sawtooth to avoid a situation where you would

7     have a misleading number.  By the way, the misleading

8     number mentioned in that Sawtooth article was you might

9     overestimate if you used the software incorrectly.

10            If he overestimated with a nickel to 16 cents,

11    that would be really, really sad for the defendants.  He

12    did not.  He used the Sawtooth Software accurately.  One

13    particular expert who did not was Mr. Steckel in the

14    "light" cigarettes case.  That was one of the many reasons

15    that Judge Prager as a factfinder at trial rejected it.

16            It was a state court case, also.  It wasn't even

17    a *Daubert* issue.  Other differences, by the way, in that

18    particular case is, it dealt with a completely hypothetical

19    product, a safer cigarette.  We're not talking about a

20    hypothetical product or hypothetical services.

21            We're talking about free alternatives, which add

22    a manual key injection, and NDI or EDS, which had automatic

23    key injection.  He choose correctly, as I point out.  He

24    choose to focus on the convenience aspect.  That's what he

25    was asked to assume was the only one that matters.

1          Why?  Well, that was what was advertised.  What

2     was not advertised is, it's guaranteed or as christened

3     today by Mr. Gibbs, certainty.  Certainty is never once

4     mentioned in that what is this descriptor.  It is never

5     once mentioned in any single Power Point discussing the

6     attributes internally about NDI or EDS.

7          Why?  Because they never thought of removing

8     this.  It was never an issue.  It was never, if you buy

9     this download service, we guarantee it will always be

10    there.  They didn't advertise it that way.  You don't add

11    in attributes that aren't advertised to figure how the

12    market is going to react to it in order to assess an extra

13    value like they would want.

14          He took what was advertised there, which was

15    convenience.  The other factors they talk about, safety,

16    security, we're talking about downloading from Symantec's

17    site or store with Trialware.  There is no safety issues of

18    it.  They weren't spamming their own people.  They weren't

19    putting spyware on their own people.

20          Now, if he choose wrongly or too narrowly, the

21    jury can say so.  The jury can say you didn't consider

22    enough factors.  It all goes to the weight.  It does not go

23    to admissibility, and in terms of any courts that have

24    accepted conjoint, we provided this earlier via e-mail to

25    Your Honor.  I could give you your copies if you want hard

1    copies of the *Whirlpool* case.

2         It's a consumer class action case.  It was not a

3    patent case.  There is no issues about *Georgia-Pacific*

4    factors and figuring out a reasonable royalty.  It was the

5    expert figuring out specifically if you had the disclosure,

6    not the damage, but if you had this disclosure that you

7    were going to have to do this extra work to not have a

8    smelly washing machine, how much less would you pay.

9         That's what the end result of that survey was,

10   and it was accepted, and the arguments the defendants make

11   here, it adds some hypothetical distractor factors.  It

12   didn't have the right group.  It was too broad.  The Court

13   rejected it.  The reason the Court rejected it, Your Honor

14   can read yourself pages 22 through 24, this is how conjoint

15   is used in the commercial marketplace.

16        It is used to compare sometimes hypothetical

17   aspects.  It has distractor variables.  This is consistent

18   with how it's used non litigation wise.  The fact that it

19   included a group that wasn't necessarily all class members

20   wasn't a hindrance.  It actually can be a positive.  You

21   don't have the bias of someone saying, oh, I remember that

22   product, and I'm unhappy with it.

23        There is nothing in what Mr. Gaskin did which is

24   patently contradicted using conjoint analysis, and

25   Dr. Kalyanam doesn't say so, and Dr. Van Liere doesn't say

1   so.  That is something that came up in the briefing in the

2   *Daubert*.  None of their experts ever hinted, well, this is

3   categorically the wrong way of using it.  You're using

4   consumer utility, and this is a terrible insult to

5   conjoints anywhere.

6           Let me just if I can add, if there is anything

7   else to add, just that the amount of number used, 333, by

8   Mr. Gaskin, that's more than the 309 that was used in

9   *Whirlpool*.  That's more than the 300 or so that was used in

10  Dr. Van Liere's survey in *Convolve*, which is a case we

11  mentioned.  250 is the normal number for surveys.

12          There is just nothing in anything he did which is

13  categorically improper that would justify getting rid of

14  it.  This is as in *Synergistics* and other cases primarily

15  issues for the jury.  If they want to consider it, they

16  can.  It goes to the weight.  It doesn't go to the

17  admission.

18          THE COURT:  All right.  Thank you, Mr. McNamara.

19  I am sorry.  I have to conclude the hearing because I have

20  got this other matter scheduled.  I will take the other

21  motions on the papers, and I think they are well discussed

22  by both sides.

23          So thank you for your arguments today.  The Court

24  will take the motions under advisement and will issue a

25  written order as quickly as possible.

1          MR. FRIEDMAN:  Your Honor, just a couple of

2     housekeeping matters.

3          THE COURT:  Yes.  Go ahead.

4          MR. FRIEDMAN:  There is also the unopposed motion

5     on the claims.

6          THE COURT:  Right.

7          MR. FRIEDMAN:  And we would also like to ask Your

8     Honor's goals in terms of a trial date.

9          THE COURT:  Well, let's get through the Court's

10    order on this particular, particularly on the summary

11    judgment motion, and at that point, we'll focus on what's

12    left and what we need to go forward with.

13          MR. FRIEDMAN:  Thank you, Your Honor.

14          THE CLERK:  All rise.

15                    **(Court was adjourned.)**

16

17                    *        *          *

18          I, Kristine Mousseau, certify that the foregoing

19    is a correct transcript from the record of proceedings in

20    the above-entitled matter.

21

22

23

24    Certified by:  s/  Kristine Mousseau, CRR-RPR
                              Kristine Mousseau, CRR-RPR
25