# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

DEVI KHODAY and DANISE
TOWNSEND, *individually and on behalf of
the class they represent*,

                                        Plaintiffs,

v.

SYMANTEC CORP. and DIGITAL RIVER,
INC.,

                                        Defendants.

Civil No. 11-180 (JRT/TNL)


**MEMORANDUM OPINION
AND ORDER**

---

Douglas J. McNamara and Andrew N. Friedman, **COHEN, MILSTEIN, SELLERS & TOLL PLLC**, 1100 New York Avenue Northwest, West Tower Suite 500, Washington, DC  20005; Kate M. Baxter-Kauf, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN  55401, for plaintiffs.

Patrick E. Gibbs, **LATHAM & WATKINS, LLP**, 140 Scott Drive, Menlo Park, CA  94025; Steve W. Gaskins, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN  55402, for defendant Symantec Corp.

Charles Smith, Amy Van Gelder, Jessica Frogge, and Marcella L. Lape, **SKADDEN, ARPS, SLATE, MEAGHER & FLOM**, 155 North Wacker Drive, Chicago, IL  60606, for defendant Digital River, Inc.

Named Plaintiffs Devi Khoday and Denise Townsend bring this class action against Defendants Symantec Corporation ("Symantec") and Digital River, Inc. ("Digital River") (collectively, "Defendants") for misrepresentations the Plaintiffs allege Defendants made in connection with the sale of download insurance between 2005 and 2011.  The Plaintiffs allege violations of California's Unfair Competition Law ("UCL"), California's Consumers Legal Remedies Act ("CLRA"), the Minnesota Consumer Fraud Act, and unjust enrichment.  This matter is now before the Court on Symantec's motion

for summary judgment, the Plaintiffs' and Defendants' motions to exclude expert reports and testimony, and the Plaintiffs' unopposed motion to modify the class Order.

Viewing the facts in the light most favorable to the nonmoving party, the Court finds that genuine issues of material fact remain as to whether Defendants made misrepresentations or omissions upon which the Plaintiffs relied to their detriment. The Court also finds that the conclusions of each challenged expert are, at least in part, permissible under Rule 702 and *Daubert*. Finally, the Court finds that the two proposed modifications to the class certification Order are appropriate. Accordingly, the Court will deny Symantec's motion for summary judgment, deny or deny in part each of the pending *Daubert* motions, and grant the Plaintiffs' motion to modify the class certification Order.

# BACKGROUND[1]

## I.   PARTIES

Defendant Symantec is a software company that sells internet security software products under the Norton brand. (Decl. of Patrick E. Gibbs ("Gibbs Decl."), Ex. 1 at 3, 6, Aug. 23, 2013, Docket No. 217;[2] Am. Compl. ¶ 2, Apr. 14, 2011, Docket No. 40.) Defendant Digital River is an ecommerce website designer for online retailers. (Decl. of Amy L. Van Gelder ("Second Van Gelder Decl."), Ex. 1 (Decl. of Andrew Carrane

---

[1] A more complete recitation of the facts is available in this Court's Order on the Plaintiffs' motion for class certification. *Khoday v. Symantec Corp.*, No. 11-180, 2014 WL 1281600, at *1-*13 (D. Minn. Mar. 13, 2014).

[2] With the exception of deposition transcripts and documents filed under seal, all page numbers refer to CM/ECF pagination.

("Carrane Decl.")) ¶ 2, Aug. 23, 2013, Docket No. 215.)  From 2000 through June 2010, Digital River managed the online storefront through which Symantec sold its Norton products.  (Decl. of Douglas J. McNamara ("Second McNamara Decl."), Tab 1 at 12:16-18, 15:3-20, June 26, 2013, Docket No. 183; Gibbs Decl., Ex. 4 at 38:7-39:3.)

During that time, Symantec authorized Digital River to offer a download insurance product called Electronic Download Service ("EDS") through the Symantec storefront. (Second McNamara Decl., Tab 2 at DR-0054170.)   EDS allowed customers who purchased Norton software to redownload that software for up to one year after purchase in the event they lost the original software by purchasing a new computer or if their computer crashed.  (*Id.*, Tab 10; Gibbs Decl., Ex. 18 at 197:10-25.)   Beginning in October 2009, when Symantec started the transition from Digital River managing the Symantec storefront to Symantec managing its own storefront, it began offering a product called Norton Download Insurance ("NDI"), which operated very similarly to EDS. (Gibbs Decl., Ex. 4 (Dep. of James P. Renalds) at 38:15-39:3; *id.*, Ex. 5 (Dep. of Krysten Thompson) at 21:18-22:10; *id.*, Ex. 8 at 39.)

Named Plaintiffs Khoday and Townsend purchased download insurance from Defendants during the relevant class period, from January 2005 to March 2011.  *Khoday v. Symantec Corp.*, No. 11-180, 2014 WL 1281600, at *36 (D. Minn. Mar. 13, 2014). Townsend purchased EDS from Defendant Digital River on multiple occasions, including June 7, 2006.  (Second McNamara Decl., Tab 41 at 53.)  When she purchased Norton antivirus software, EDS was automatically added to her shopping cart, and she agreed to purchase it for $8.99 because she believed it would be necessary if she wanted to redownload the Norton software after the first sixty days post-purchase.  (*Id.*; *id.*, Tab 42

at 46:2-20.)   For similar reasons, Khoday purchased NDI from Symantec in February 2010 at the time she purchased Norton 360 software.  (*Id.*, Tab 43 at 60:3-61:18; *id.*, Tab 44 at 74.)

## II.    DOWNLOAD INSURANCE

During the relevant time period, a customer using Symantec's online storefront to purchase Norton software would obtain a hyperlink that the customer could click to begin the software's automatic download.  (Gibbs Decl., Ex. 7 at 56-57; *id.*, Ex. 8 at 60.) Clicking on the hyperlink, which appeared as a large, electronic "Download" button, would cause the software to automatically download and install upon the customer's computer.  (*Id.*, Ex. 8 at 60, 65.)  The customer would have sixty days after purchasing the product to use the hyperlink to download and install the product.  (*Id.*, Ex. 14 (Dep. of James P. Renalds) at 62:9-12; *id.*, Ex. 15 (Dep. of Nat Maple) at 53:11-13.)  During this sixty-day window, customers could redownload the product an unlimited number of times by logging in to their Norton account and reinitiating the automatic download process.  (*Id.*, Ex. 14 at 62:9-12.)

The function of a download software product like EDS or NDI was to enable customers to continue to redownload and install a purchased Norton software product even after the sixty-day window had expired.  EDS allowed customers to redownload the exact version of Norton software they had originally purchased after the original sixty-day period had expired.  (Second McNamara Decl., Tab 10; Digital River's Answer and Affirmative Defenses to Pls.' Am. Compl. ("Digital River's Answer") at 3-4, Apr. 11, 2012, Docket No. 86; Gibbs Decl., Ex. 19 at 134:12-135:6.)  NDI operated almost

identically to EDS, except customers could select one, two, or three years of extended redownloads.  (Gibbs Decl., Ex. 22 at 26:10-15; *id.*, Ex. 26 at 281:1-10.)  Additionally, NDI would download the most recent edition of the product the consumer had originally purchased, whereas EDS only redownloaded the exact version of the software the customer originally purchased.  (*Id.*, Ex. 22 at 26:6-15; *id.*, Ex. 23 at 35.)

Download insurance was automatically added to a customer's shopping cart at the time a customer purchased Norton software through Symantec's online storefront.  (*See id.*, Ex. 8 at 74; *id.*, Ex. 29 at 66.)  To refrain from purchasing EDS or NDI, a customer would have to affirmatively "opt out" of the download insurance purchase and remove it from the cart.  (Second Van Gelder Decl., Ex. 12 at 50:4-16; Second McNamara Decl., Ex. 2 at DR-0054171.)  Defendants charged between $4.99 and $16.99 for the download insurance products, depending on the value Defendants believed customers would be willing to pay for download insurance for a particular type of Norton software.  (Carrane Decl. ¶ 4; Second McNamara Decl., Tab 25 at 138; *id.*, Tab 6 at 20.)

When download insurance was automatically added to a customer's shopping cart, it was generally displayed along with a link saying, "What's this" or "What is the Extended Download Service".  (Gibbs Decl., Ex. 8 at 39; *id.*, Ex. 29 at 66; Second Van Gelder Decl., Ex. 2 at 23:14-19.)  From 2004 to approximately August 2008, clicking on the "What's this" link led to a pop-up description, (Second Van Gelder Decl., Ex. 7 at 95:17-25), stating:

**What is the Extended Download Service?**

When you order a downloadable product from the Symantec Store you are automatically granted a 60 day window in which your purchase can be redownloaded at any time.  After this 60 day window has passed your

download will no longer be available unless the Extended Download Service is also purchased.  When this service is purchased, we will keep a backup copy of your file on our server for one full year after the date of purchase, meaning that you can redownload whenever necessary during that extended period.

(Gibbs Decl., Ex. 29 at 66.)  In 2008, Digital River amended the description to:

### What is the Extended Download Service?

When you purchase downloadable software from Symantec's online store, Digital River, Symantec's authorized online retailer, automatically grants you 60 days from the date of purchase to download your software order.

If you add Extended Download Service to your downloadable software purchase order, Digital River will keep a backup of all the software on your order for ONE YEAR[.]  If you need to re-download your software, or access your Serial Key, it will be available 24 hours a day, 7 days a week for ONE YEAR from the date of purchase by going to www.findmyorder.com.

(Gibbs Decl., Ex. 29 at 67 (formatting omitted).)[3]

---

[3] Symantec's description of NDI was nearly identical:

**Norton Download Insurance**

When you purchase downloadable software from the Norton Store you automatically receive the ability to download your software for 60 days from the date of purchase.  Norton Download Insurance extends the time you can access your downloadable software by providing you the freedom and flexibility to download or re-download your software for one year. . . .

Gain flexibility and peace of mind!

If you decide to replace your PC or if your PC has problems, is damaged or stolen and you need to reinstall your software, with Norton Download Insurance you have the peace of mind of knowing you can re-download your software at anytime for one year.  Norton Download Insurance may be refunded within 60 days from the date of purchase.

(Second McNamara Decl., Tab 15 at 45.)

- 6 -

To learn more about download insurance, customers could contact customer service.  (Gibbs Decl., Ex. 32 at 19:8-13; *id.*, Ex. 33 at 19:12-25.)  If customers called customer service, Digital River representatives consistently told customers to purchase download insurance if they wished to be able to download their software more than sixty days after purchase.  (Second McNamara Decl., Tab 1 at 224:9-14.)

If a customer emailed customer service regarding the purchase of EDS, they would receive a form e-mail stating:

> Thank you for choosing Symantec store.  When you order a downloadable product from the Symantec store, you are automatically granted a 60-day window in which your purchase can be re-downloaded at any time.  After the 60-day window has passed, your download will no longer be available unless the Extended Download Service is also purchased.  When . . . the service is purchased, we will keep a backup copy of your file on our server for one full year after the date of purchase, meaning that you could re-download it whenever necessary during that extended time period.

(*Id.*, Tab 11 at 116:9-117:6; *id.*, Tab 18 at 93.)

In August 2006, Symantec moved from Digital River to third party customer service vendors.  (Gibbs Decl., Ex. 32 at 19:8-13; *id.*, Ex. 33 at 19:12-20:25.)  The third party vendors did not follow a consistent practice with respect to download insurance inquiries.   Some representatives informed customers that download insurance was optional, but did not tell customers that other mechanisms were available for redownloading their software after the sixty-day window elapsed.  (*See id.*, Exs. 44-45.)  Other representatives told customers that trialware would allow customers to redownload a Norton product, explaining that the only advantage of purchasing download insurance was to save time.  (*Id.*, Ex. 46.)  Many representatives appear to have attempted to sell customers download insurance as a first resort, and then suggest trialware or another

download alternative only if a customer refused to purchase EDS. (Second McNamara Decl., Tab 11 at 81:24-82:6.) Beginning in November 2007, customers could also visit Symantec's "FAQ" website to learn more about download insurance, by clicking on "I want to re-download my Norton product." (Gibbs Decl., Ex. 47 at 9.)

## III.   ALTERNATIVES TO DOWNLOAD INSURANCE

The Plaintiffs argue that there were multiple alternative options for customers to redownload purchased Norton software at no cost. One option was trialware, a free version of Norton software available through Symantec's website and storefront. (Second McNamara Decl., Tab 20 at 15:23-17:8; *id.*, Tab 24 at 132.) Trialware was not available for some software products, however, if the version of the software the customer purchased was different from the current version offered through trialware. (Gibbs Decl., Ex. 59 at 81:3-18.)

Second, a customer could purchase EDS later, after the point of sale but before their Norton software subscription ended. (Second McNamara Decl., Tab 37; *id.*, Tab 40 at 70:11-21.) This option was only available for EDS, as NDI was not available post-purchase. (Gibbs Decl., Ex. 73 at 53:13-25.) Third, customers could call Symantec customer service, and customer service representatives had discretion to allow free redownloads of software, even without download insurance, after the sixty-day window had expired. (*Id.*, Ex. 68 at 86:13-87:20.) After October 2007, a fourth alternative was for customers to redownload a purchased Norton software product through Symantec's support website. (*Id.*, Ex 81 at 127:7-23.)

## IV.    PROCEDURAL HISTORY

On March 31, 2014, the Court granted the Plaintiffs' motion for class certification, certifying the following class:

> All persons in the United States who [p]urchased Extended Download Service ("EDS") for Norton products or Norton Download Insurance ("NDI") between January 24, 2005 and March 10, 2011.
>
> **January 24, 2005 – October 26, 2009** – Claims against Digital River under the Minnesota Consumer Fraud Act and False Statement in Advertising Act, or Unjust Enrichment;
>
> **January 24, 2007 – March 10, 2011** – Claims against Symantec under California Unfair Competition Law, or Unjust Enrichment;
>
> **January 24, 2008 – March 10, 2011** – Claims against Symantec under California Consumer Legal Remedies Act, for only those class members defined as "consumers" under the CLRA.

*Khoday*, 2014 WL 1281600, at *36.

In April 2014, the parties filed several motions to exclude expert witness reports and testimony at trial.   (Pls.' Mot. to Exclude Certain Testimony of Defs.' Expert Witnesses Bobby Stephens and Kirthi Kalyanam, Apr. 15, 2014, Docket No. 276; Defs.' *Daubert* Mot. to Exclude the Report & Testimony of Pls.' Expert, Steven Gaskin, Apr. 15, 2014, Docket No. 279; Defs.' *Daubert* Mot. to Exclude the Report & Testimony of Pls.' Expert, Nicholas Taylor, Apr. 15, 2014, Docket No. 285; Symantec's *Daubert* Mot. to Exclude Portions of the Report & Testimony of Pls.' Expert, Steven Herscovici, Apr. 15, 2014, Docket No. 292.)   This matter is now before the Court on these motions to exclude expert testimony, along with a motion for summary judgment filed by Symantec on May 15, 2014, (Symantec's Mot. for Summ. J., May 15, 2014, Docket No. 314), and

the Plaintiffs' motion to modify the class certification Order, (Pls.' Unopposed Mot. for

Modification of Class Order, Dec. 29, 2014, Docket No. 360).

## ANALYSIS

### I.    DAUBERT MOTIONS

#### A.    Standard of Review

Under Federal Rule of Evidence 702, expert testimony must satisfy three

prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized
> knowledge must be useful to the finder of fact in deciding the ultimate issue
> of fact.  This is the basic rule of relevancy.  Second, the proposed witness
> must be qualified to assist the finder of fact.  Third, the proposed evidence
> must be reliable or trustworthy in an evidentiary sense, so that, if the finder
> of fact accepts it as true, it provides the assistance the finder of fact
> requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations and internal

quotation marks omitted).  The district court has a "gatekeeping" obligation to make

certain that all testimony admitted under Rule 702 satisfies these prerequisites and that

"any and all scientific testimony or evidence admitted is not only relevant, but reliable."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993).  The proponent of

the expert testimony has the burden of establishing by a preponderance of the evidence

that the expert is qualified, that his methodology is scientifically valid, and that "the

reasoning or methodology in question is applied properly to the facts in issue."  *Marmo v.

Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006).

The Supreme Court in *Daubert* outlined particular factors for courts to consider in

assessing reliability, such as (1) whether the opinion is based on scientific knowledge, is

susceptible to testing, and has been tested; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology; and (4) whether the theory has been generally accepted by the scientific community. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (summarizing *Daubert* factors). However, in *Kumho Tire*, the Court explained that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141-42. The reliability inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire*, 526 U.S. at 152).

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758; *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

**B.      Plaintiffs' Motion to Exclude Defendants' eCommerce Experts**

The Plaintiffs challenge the Defendants' experts on "eCommerce," arguing that their reports and conclusions fail to satisfy the reliability standards articulated in Federal Rules of Evidence 702 and 403 and *Daubert*.  These experts are Kirthi Kalyanam, Ph.D., and Robert ("Bobby") C. Stephens.

**1.      Kirthi Kalyanam**

Kirthi Kalyanam, Ph.D., is a professor in the Department of Marketing at the Leavey School of Business at Santa Clara University.  (Decl. of Douglas J. McNamara ("Fifth McNamara Decl."), Ex. 4 (Expert Report of Kirthi Kalyanam ("Kalyanam Report") at 6, Apr. 15, 2014, Docket No. 278.)  Defendants offer the report and testimony of Dr. Kalyanam on "eCommerce" and whether EDS and NDI were safe, secure, and guaranteed ways for Symantec customers to redownload EDS and NDI, as compared to the alternative options.  His report summarizes his conclusions as follows:

1.  EDS and NDI belong to a class of add-on products that provide convenience value to customers.  Consumers may be able to achieve their end goals without them, but these products offer speed, simplicity, reliability, peace of mind, and other nonmonetary benefits that consumers value and are willing to pay for.

2.  The EDS and NDI pricing methodology employed by Defendants are consistent with standard pricing methods described in marketing and retailing textbooks.

3.  Automatic pre-population of the customer's shopping cart with EDS and NDI follows the standard marketing strategies of (1) preconfiguring product options, and (2) offering add-on products at the end of the shopping process, after the customer has committed to the base product.

4.  Digital River and Symantec rationally chose to provide a short description of the EDS and NDI offerings in the shopping cart.  This

type of disclosure is consistent with industry practice of making sure that the checkout process is succinct and streamlined.

5. During their purchase journey, shoppers can consult or access multiple sources of information.  Thus, the incremental impact of a single description (such as the "What's This" description at issue) must be evaluated in light of the other information the customer reviewed, as well as shopper characteristics – including but not limited to demographics, Internet shopping expertise, and prior awareness of the product category and brand.  The impact is therefore different for different customers.

(Kalyanam Report at 8.)

Khoday and Townsend ("the Plaintiffs") challenge Dr. Kalyanam's report and testimony on multiple grounds.  First, they argue that his conclusions are not reliable because he has never used download insurance or any of the alternatives.  (Fifth McNamara Decl., Ex. 5 (Dep. of Kirthi Kalyanam ("Kalyanam Dep.") at 11:11-12:5, 161:23-162:23.)  Additionally, he did not perform testing of the Symantec website or the download insurance alternatives, so he is unable to describe the details of exactly what steps a consumer would need to take to purchase EDS or NDI after the initial purchase. (*Id.* at 12:15-13:9.)  The Plaintiffs further maintain that Dr. Kalyanam did not use a recognizable methodology that could be verified or tested.

The Court finds that at this stage there is adequate support for Dr. Kalyanam's conclusions as to eCommerce and marketing strategies, including how he understands EDS and NDI to be consistent or inconsistent with general marketing practices. Dr. Kalyanam is eminently qualified through education and experience to testify on the subjects of eCommerce, retail, and marketing generally.  (Kalyanam Report at 6-7, 40-53.)  To the extent the Plaintiffs challenge his conclusions as to how EDS and NDI in particular reflect standard marketing practices, they will have ample opportunity to attack

- 13 -

the basis of Dr. Kalyanam's opinions through cross-examination. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner, Inc.*, 259 F.3d at 929-30. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The Court cautions, however, that Dr. Kalyanam will not be permitted to testify about the process of downloading EDS, NDI, or the alternatives – how customers would have conducted a "purchase journey" and how they might have reacted to specific features of EDS and NDI versus the alternative options during the download process. Without ever downloading or using download insurance or any of the alternatives, Dr. Kalyanam lacks familiarity with those specifics, and to the extent his testimony purports to describe particular aspects of that process, the Court will exclude it. The fact that Dr. Kalyanam is personally a frequent downloader of software, and that many of his conclusions about convenience are based on an application of his knowledge of eCommerce to his own download experiences, (Kalyanam Dep. at 63:19-64:3), is insufficient foundation to draw conclusions about a process he has not performed with respect to EDS and NDI. Given that he has considerable knowledge about the industry, his testimony as "to an opinion or inference based on facts or data . . . perceived by him or made known to [him] at or before the hearing," *Davis v. United States*, 865 F.2d 164, 168 (8th Cir. 1988) (internal quotation marks omitted), will be permitted, even if it references EDS and NDI specifically. For example, the Court will permit Dr. Kalyanam

to testify whether the pricing strategies for EDS and NDI were reflective of standard marketing practices, even though such a conclusion pertains to specific information about EDS and NDI. Even without personally using the product, Dr. Kalyanam's conclusions about Defendants' marketing strategies is not "so fundamentally unsupported that it can offer no assistance to the jury," *Bonner*, 259 F.3d at 929-30. If the Plaintiffs feel that Dr. Kalyanam could have used different methods or that his factual basis in forming those marketing conclusions was insufficient, they may attack those insufficiencies on cross-examination. At the *Daubert* stage, however, "doubts regarding the usefulness of an expert's testimony [should be resolved by courts] in favor of admissibility." *Burks v. Abbott Labs.*, 917 F. Supp. 2d 902, 920 (D. Minn. 2013) (internal quotation marks omitted).

Although Dr. Kalyanam is qualified to testify about the development and common practices of eCommerce and recommendation-based selling, his report goes beyond these subjects and also critiques the conjoint analysis performed by the Plaintiffs' expert, Steven Gaskin. (Kalyanam Report at 21-23.) Conjoint analysis is a marketing research method that measures customer preferences for particular product features. (Decl. of Patrick J. Gibbs ("Second Gibbs Decl."), Ex. 2 (description of "conjoint analysis" from Sawtooth Software), Apr. 15, 2014, Docket No. 283.) He concludes that "Gaskin's study is flawed for several [] reasons," including the way in which "Gaskin filtered his survey participants," his failure to "adjust[] his backcasting for appropriate technology trends or price erosion," and his use of "stated preferences of his survey subjects rather than data on actual choices of online shoppers (revealed preferences)." (Kalyanam Report at 21-22.) Although conjoint analysis is based in marketing, the Defendants have offered no

evidence that Dr. Kalyanam has ever been trained in or performed conjoint analysis, or that he is qualified to testify about its strengths and weaknesses.  As a result, the Court will allow Dr. Kalyanam to affirmatively testify within his expertise as to what he believes the value of add-on products like EDS and NDI to be, but the Court will not allow Dr. Kalyanam to attack the foundation of Gaskin's analysis as such an attack would fall outside Dr. Kalyanam's qualifications.

Therefore, the Court will grant the Plaintiffs' motion to exclude the report and testimony of Dr. Kalyanam to the extent it references specifics about how customers would download EDS, NDI, or the alternative options, or what they would be viewing and perceiving during that process.  The Court will also grant the Plaintiffs' motion to exclude Dr. Kalyanam's testimony to the extent it discusses and critiques Gaskin's analysis and valuation of EDS and NDI.  The Court will deny the Plaintiffs' motion to exclude Dr. Kalyanam's report and testimony in all other respects.

### 2.    Robert C. Stephens

Since 2012, Bobby Stephens has been the President and Chief Operating Officer of BucketFeet, Inc. ("BucketFeet"), a footwear and apparel company selling most of its products online through "eCommerce."  (Fifth McNamara Decl., Ex. 2 (Expert Report of Robert ("Bobby") C. Stephens ("Stephens Report")) at 5, 39.)  Defendants offer Stephens as an expert in eCommerce practices and operations from 2005 to 2011.  Stephens has a bachelor's degree in accounting from Indiana University and no advanced degrees.  (*Id.* at 40; Fifth McNamara Decl., Ex. 3 (Dep. of Robert Stephens ("Stephens Dep.") at 13:6-11.)  He has four publications on online retailing, (Stephens Report at 40), and worked as

an eCommerce consultant at Deloitte Consulting in Chicago from 2004 to 2012. (*Id.* at 39.) In 2012, he left to become a co-owner of BucketFeet, a footwear company with a significant percentage of its business generated through online retail. (*Id.*) At Deloitte, he assisted in developing eCommerce strategies for several major corporations, including Walmart.com, Officemax.com, Macys.com, TOMS.com, Adobe.com, HP.com, and Kohls.com. (*Id.*) He has no prior experience testifying as an expert witness. (Stephens Dep. at 12:23-25.)

Stephens reaches several conclusions, some of which are focused on general eCommerce practices and some of which are specific to Symantec's actions during the relevant time period. He summarizes his conclusions as follows:

1. The eCommerce landscape has changed rapidly throughout the period at issue (2005-2011) and continues to change today. Both customers and corporations were still learning about online shopping behavior and best practices during the time at issue, and are still learning today.

2. In auto-populating customers' online shopping carts with NDI and EDS, and displaying "better value" pop-up offers, Symantec and Digital River employed the standard eCommerce practice of recommendation-based selling, including product grouping, cross-selling, and tight bundling, which was common during the period at issue. Both the delivery method and contents of these recommendations could elicit a number of different customer responses, and it would be difficult to determine how the recommendations impacted each customer.

3. Between 2005 and 2011, different non-expert users would have been aware of or would have encountered some of the many difficulties arising from re-downloading software, which reasonably would have led them to purchase NDI or EDS as protection against those common problems.

4. Due to the challenges faced in re-downloading a product during much of the relevant period, many leading companies offered value-add features to mitigate both customer concerns and operational challenges.

5. Long in-line information disclosures (i.e., "what's this" or "more info" links) that require multiple scrolling or clicking actions from the user are generally ineffective. Such disclosures and in-line links can lead to information overload and a resulting loss of customers.

(Stephens Report at 7 (footnote and citations omitted).) Stephens goes on to describe in greater detail the eCommerce process and compare the value added from EDS and NDI versus the alternative options. He also briefly comments on what he believes to be the central weakness of the conjoint analysis conducted by Gaskin – that it does not capture the value of NDI or EDS to consumers. (*Id.* at 29-30.)

The Plaintiffs' attacks on Stephens largely overlap with their attacks on Dr. Kalyanam: he never purchased or downloaded EDS or NDI, he did not use a reliable methodology, and he lacks qualifications to critique Gaskin's conjoint analysis. The Plaintiffs also argue, more generally, that Stephens lacks adequate experience and education to reach his expert conclusions and that he did not review many critical pieces of evidence, such as the chat or call logs between customer service representatives and customers with respect to download insurance or alternative options, (Stephens Dep. at 24:14-26:16); Symantec's technical support website, (*id.* at 153:8-154:18); Symantec's market research data, (*id.* at 96:22-98:8); or customer service scripts and training manuals on download insurance and alternatives, (*id.* at 22:17-24:13, 27:1-5).

Although Stephens has less education and experience than Dr. Kalyanam, the Court finds that he has sufficient experience in online marketing and retail to testify about those subjects and general eCommerce trends and practices. Stephens goes well beyond these topics, however, into areas where he has conceded he does not have personal knowledge. For example, he opines on what he believes to be the primary business goals

of NDI and EDS, (Stephens Report at 16); how "easily" customers could have taken certain actions with respect to selecting or rejecting EDS and NDI, (*id.* at 20); and what customers would have expected from download insurance or other redownloading software, (*id.* at 20-24). With respect to the last opinion, Stephens appears to have based the conclusion in part on "analy[zing] Omniture Analytics data," without providing an explanation of what that analysis entailed. (*Id.* at 10-11, 20).

Nothing in Stephens's report or deposition testimony indicates that he has any training or experience with download insurance. His experience with online marketing and commerce do not confer upon him the expertise necessary to testify about the added value of one form of redownload software over another or about the process of downloading EDS or NDI, specifically. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (in steel warehouse flooding damage case, finding that a witness easily qualified as an expert on flood risks, but that his testimony on warehouse safety was not appropriate, given that he "sorely lacked the education, employment, or other personal practical experiences to testify as an expert" on that issue).

Further, Stephens's conclusions about consumer expectations appear to be unfounded in a recognizable scientific or technological method. During his deposition testimony, in response to a question about the basis for his opinions on what consumers expected from a download insurance product, Stephens stated:

> [C]ommon sense is a portion of it, but really I'm relying much more on my experience with, you know . . . having worked face to face with customers quite a bit over time, surveying, focus groups. . . . I think that this is – these are sort of your bare minimums for interacting with customers in a distance environment when you're not standing next to them.

(Stephens Dep. at 94:13-25.)

Common sense and general background interacting with consumers, or previous experience consulting for e-retailers, may be relevant to Stephens's qualifications as an expert, but they are not adequate methods or techniques for formulating specific opinions about download insurance, the value customers would assign to it, or how easily customers could have navigated certain online options, especially where the witness has not personally observed or used the download insurance or websites. *See Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8ᵗʰ Cir. 1999) (affirming that the district court made the correct decision in excluding experts' testimony on alternative designs when they had no prior experience testing or creating such designs).  To the extent common sense or general knowledge about customer preferences offers Stephens insight into any aspect of EDS and NDI, the Court finds that a jury could reach the same conclusions just as easily without Stephens's expert testimony. *Lillebo v. Zimmer, Inc.*, No. 03-2919, 2005 WL 388598, at *6-*7 (D. Minn. Feb. 16, 2005) (in which this Court did not permit an expert to testify to matters where the jury could "draw that conclusion from the evidence presented, but it [did] not require expert assistance to do so").  Expert witness testimony is not necessary where the expert merely "appeared to have made logical deductions based on the set of assumptions that plaintiff directed them to employ and the circumscribed universe of data available to them.  Any juror could have employed common sense to perform the same analysis[.]" *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010).

Stephens's experience in eCommerce qualifies him to testify regarding many of the conclusions described in his report.  The Court will permit Stephens to testify to the changing landscape of eCommerce, the practice of recommendation-based selling and its prevalence in the industry, and the efficacy of in-line information disclosures and links. To the extent Stephens's testimony becomes cumulative at trial, however, the Court will entertain an objection at that time and restrict his testimony accordingly.  The Court will not allow him to testify to particular redownloading challenges that prompted companies to offer value-add features, nor will the Court allow Stephens to testify to specifics of EDS and NDI, including how easily Symantec customers could have opted or rejected those products, or whether customers would have desired to purchase EDS and NDI to avoid common problems with redownloading software.  Further, the Court will not allow Stephens to critique the foundation or mechanics of Gaskin's conjoint analysis, for the same reason the Court will not allow Dr. Kalyanam to do so – he does not have any training or experience in conjoint analysis, nor does he have any education in economic analysis of this sort.  The Defendants' concerns about any infirmities in Gaskin's analysis may be explored on cross-examination of Gaskin.

### C.  Defendants' Motions to Exclude Plaintiffs' Experts

#### 1.  Steven Gaskin

Steven Gaskin is a Principal at Applied Marketing Science, Inc., focusing on market research.  (Second Gibbs Decl., Ex. 1 (Expert Report from Steven Gaskin for Plaintiffs Khoday and Townsend ("Gaskin Report")) at 3, 21.)  He has worked in the field of market research and marketing science models for over 30 years.  (*Id.* at 3.)  He

holds Bachelor of Science and Master of Science degrees from the Massachusetts Institute of Technology and has authored numerous articles, papers, and presentations on the subjects of marketing science and conjoint analysis, an analytic survey method used to measure customer preferences for specific features of products. (*Id.* at 3, 22-23; Second Gibbs Decl., Ex. 2.)

The Plaintiffs offer Gaskin as a damages expert who performed a conjoint analysis. Using this analysis, Gaskin concluded that the value of the automatic product key injection feature of EDS and NDI was worth between $00.05 and $00.16 per transaction to customers. (Gaskin Report at 5, 19.) Defendants previously argued at the class certification stage that the Court should exclude the results of the conjoint analysis because the analysis is unreliable. *Khoday*, 2014 WL 1281600, at *33.

Defendants now challenge the analysis again through a motion to exclude Gaskin's testimony. More specifically, Defendants maintain that the conjoint analysis Gaskin performed is not designed to place a monetary value on a specific product attribute but rather measure user preferences for particular features and predict interest in that product. Citing *In re Tobacco Cases II*, No. 711400, JCCP-4042 (Super. Ct. San Diego County, Cal. Sept. 23, 2013), Defendants contend that Gaskin's analysis should be excluded on the grounds that "conjoint analysis has not been accepted in the relevant scientific community as a means of assigning a monetary value to any particular attribute." (Second Gibbs Decl., Ex. 5 (*In re Tobacco Cases II*, JCCP-4042) at 13.)

The Court finds that Gaskin's conjoint analysis is generally a permissible method for calculating damages. *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, No. 08-WP-65000, 2014 WL 4954467, at *22-*24 (N.D. Ohio Oct. 3,

2014) (finding conjoint analysis survey as to customers' "willingness to pay" for various product attributes to be "reasonably reliable"); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-27 (N.D. Cal. 2013) (admitting conjoint analysis over defendant's *Daubert* objection as to unreliability, where expert testimony used the analysis to identify a "value" for specific product attributes). Even where there is a challenge that the survey "may not perfectly represent the class[,] that does not make it irrelevant or unhelpful. Sample surveys, by their very nature, are sketches, not exact replicas, of the examined population." *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1170 (E.D.N.Y. 2006) (denying a motion to exclude an expert's testimony applying a conjoint analysis), *rev'd on other grounds*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008). To the extent Defendants believe Gaskin's analysis should have included additional factors or that it does not adequately explain the conclusions Gaskin reached, "[d]irect and cross-examination, testimony by supporting and opposing witnesses, and argument by plaintiff and defense counsel will provide the additional guidance 'needed to justify the inferences' the parties seek to draw from [Gaskin]'s survey." *Id.* The Court will allow Gaskin to testify to his conclusions reached by applying a conjoint analysis, and Defendants may cross-examine Gaskin to attempt to address the weaknesses they perceive in his analysis.

### 2. Nicholas Taylor

Nicholas Taylor is the Web Archiving Service Manager for Stanford University Libraries. (Decl. of Patrick J. Gibbs ("Third Gibbs Decl."), Ex. 1 (Expert Report from Nicholas Taylor for Plaintiffs Khoday and Townsend) at 3, Apr. 15, 2014, Docket

No. 289.)  He has previously served as a Data Specialist for the Library of Congress Web Archiving Team and worked at the United States Supreme Court Library.  (*Id.*)  Taylor has experience creating web archives with the Internet Archive's open-source web crawler project, Heritrix.  (*Id.* at 4.)  He has also "examined hundreds of archived websites made available through both Wayback [an open source version of the Internet Archive's Wayback Machine, a digital archive of the World Wide Web from 1996 to the present,] and the Internet Archive's Wayback Machine . . . ."  (*Id.*)

The Plaintiffs offer Taylor's expert testimony on the process of using Symantec's website to redownload previously-purchased Norton software.  Taylor used archived versions of the "I want to re-download my Norton product" web page from the Internet Archive Wayback Machine ("Wayback Machine") to describe the historical experience of a user attempting to re-download a purchased Norton product from Symantec's website.  (*Id.* at 6-11.)  Specifically, Taylor examined versions of Symantec's website from 2005[4] to at least September 2011.  (*Id.* at 7-10.)  Based on his review, he opines that "from at least November 20, 2007 through at least September 5, 2011, the principal instructions provided to users looking to re-download purchased software were to download and install trialware, find their product key through http://www.mynortonaccount.com/, and use the product key to activate the full version."  (*Id.* at 11.)  Taylor goes on to observe that "[a]t no time during this time frame were EDS

---

[4] Symantec's link to "I want to re-download my Norton product" did not appear in archived versions of the Symantec website until April 2007, so from 2005 through April 2007, Taylor reviewed archived versions of similar pages connected to the topic title "Download Information."  (Third Gibbs Decl., Ex. 1 at 7-9.)

or NDI presented as a solution for users looking to re-download their purchased software." (*Id.*)

Defendants seek to exclude Taylor's report and testimony on the grounds that it merely consists of regurgitating information Taylor saw on selective websites he chose to examine through the Wayback Machine and speculation about what customers "would likely" have seen if they were using the website, neither of which constitutes an expert opinion. Defendants further argue that Taylor is not qualified to testify about the websites he viewed through the Wayback Machine, because he did not assist with creating Symantec's websites, nor did he work for the Internet Archive to design the Wayback Machine archives or the web crawler.

Expert testimony that merely repeats information capable of easy comprehension by a jury is excludable. For it to be admissible, it must go "beyond the ken of people of ordinary intelligence." *U.S. v. Davis*, 457 F.3d 817, 824 (8th Cir. 2006). Where an expert witness merely describes what he or she hears or sees, and that information is readily presentable to a jury without the expert's testimony, the testimony is inadmissible. *See, e.g.*, *Am. Family Mut. Ins. Co. v. Kline*, 780 F. Supp. 2d 839, 841-43 (S.D. Iowa 2011) (excluding expert testimony describing a 911 phone call where the call recording was available to show the jury). Defendants maintain that Taylor merely describes websites he saw without drawing conclusions that would require any specialized knowledge, and a jury could review the same websites without the assistance of his testimony. *See Lee v. Andersen*, 616 F.3d 803, 808-09 (8th Cir. 2010) (finding that an expert's testimony was not appropriate where it merely described, without any specialized knowledge, images that "the jury was entirely capable of analyzing" on their own).

The Court finds that Taylor offers conclusions not readily available to the jury without the assistance of expert testimony. Whether legitimate alternatives for redownloading Norton products were available, at no cost, to customers during the relevant time period is central to the Plaintiffs' claims, making Taylor's proffered testimony highly relevant. James Renalds, Symantec's website designer, stated in a deposition that Symantec does not keep all past versions of its website. (Decl. of Douglas J. McNamara ("Seventh McNamara Decl."), Ex. 2 (Dep. of James Renalds) at 18:1-4, May 6, 2014, Docket No. 311.) Further, when asked whether Symantec keeps copies of the customer support pages specifically, Renalds stated, "Not to my knowledge." (*Id.* at 18:8-10.) Because the websites are no longer readily accessible, obtaining previous versions of the websites "would require [Taylor] to apply knowledge and familiarity with computer and the particular [internet archiving] software well beyond that of the average layperson. This constitutes 'scientific, technical, or other specialized knowledge' within the scope of Rule 702." *U.S. v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006).

In *Ganier*, the court rejected the argument that expert testimony was not necessary where the witness was relaying to the jury the results of running commercially-available software. *Id.* at 925-26. The court concluded that a layperson may be familiar with common software programs and "may be able to interpret the outputs of popular software programs as easily as he or she interprets everyday vernacular," but testimony from an expert with specialized knowledge about interpreting software reports was still useful for the jury. *Id.* at 926. Similarly, in this case, the jury may be able to easily look at screenshots of past versions of Symantec's website and make a determination about what

information customers would have seen upon visiting the site. Because these sites are only available now through running a web crawler, with which many jurors may not be familiar, this case presents an even greater necessity for expert testimony than *Ganier*, in which the software programs at issue were Microsoft Word and Microsoft Outlook. *Id.* The expert in *Ganier* also ran forensic software programs that generated reports he interpreted through specialized knowledge. The reports merely indicated that "three different types of searches were performed [using the forensic software] with particular search terms at particular times," but the court found that expert testimony was relevant to the interpretation of those results. *Id.* Likewise, Taylor's testimony is narrowly focused on describing the searches he performed and explaining how to understand the results the search produced. Indeed, his testimony offers a specialized perspective on which previous versions of the Symantec website he collected and how he collected them, as well as how the versions relate to one another, which is precisely the sort of information for which expert testimony might be helpful.

The Court concludes, at this stage in the litigation, that Taylor's testimony would likely be useful in providing previous versions of the website for the jury's evaluation. Taylor's specialized knowledge of the website archiving and retrieval process would also likely offer some assistance to the jury in understanding the relationship between various archived versions of Symantec's websites. Because Taylor's report is focused on explaining which versions of Symantec's websites are available from different dates and what content would have been available to customers visiting those sites, rather than attempting to make broader conclusions about whether that content constituted a misrepresentation, it is appropriately limited in scope to Taylor's area of expertise.

Therefore, the Court will deny Defendants' motion to exclude the report and testimony of Taylor.

### D.   Symantec's Motion to Exclude Plaintiffs' Damages Expert Steven Herscovici

Steven Herscovici, Ph.D., is a damages expert retained by the Plaintiffs to apply Steven Gaskin's conjoint analysis and determine the losses sustained by the Plaintiff class in connection with the purchase of EDS and NDI.  He is an economist at The Brattle Group consulting firm.  (Decl. of Patrick J. Gibbs ("Fourth Gibbs Decl."), Ex. 1 (Expert Report of Steven Herscovici, Ph.D. ("Herscovici Report")) at 3, 13, Apr. 15, 2014, Docket No. 296.)   Herscovici has provided economic analysis, including damages analysis, in numerous previous cases.  (*Id.* at 14-18.)

To reach his damages estimate in this case, Herscovici calculated the total revenues, units, and overall prices for EDS and NDI purchases during the relevant time period, using sales revenue records provided by Defendants during discovery.  (*Id.* at 4-5.)  He calculates two different types of damages.  First, he reaches an amount of what he calls "Refund Damages" using a refund of the full EDS or NDI purchase price.  (*Id.* at 7, 9-10.)  Second, using the highest EDS or NDI valuation from Gaskin's analysis – $00.16 per transaction – Herscovici opines on what he calls "Convenience Damages," which is a measure of damages that takes the full refund, less the money Gaskin found customers saved in "convenience" from the automatic product key injection.  (*Id.* at 7-10.)

In *Daubert*, the Supreme Court cautioned that judges "assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules," including Rule 403.  *Daubert*, 509 U.S. at 595.  Symantec attacks Herscovici's analysis

and conclusions under Rules 702 and 403, arguing that his methodology comprises simple calculations for which an expert is not needed.  Rather, the jury can perform them by looking at the same data Herscovici used.  Symantec asks the Court to exclude these calculations, given that "[t]here is absolutely no reason why the jury cannot do this for itself; in fact, juries do these types of calculations all the time."  *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, No. 09-cv-1546, 2010 WL 2978289 (D. Conn. Apr. 9, 2010).

The Court will allow Herscovici to testify to his conclusions based on the calculations he performed.  The Court finds that he did not merely perform basic math from readily-accessible numbers, but rather he aggregated sales data from across multiple sources to calculate revenues for EDS and NDI sales, applied Gaskin's conjoint analysis results to determine an amount of "Convenience Damages," and adjusted the historic data to calculate present value through the application of interest rates.  (Herscovici Report at 4-10.)  The Court concludes that the testimony of an expert in economics would assist the jury in performing and understanding these calculations.  To the extent that portions of Herscovici's analysis constitutes basic addition or multiplication of the numbers he aggregated, the Court rejects Symantec's argument that such testimony would be inadmissible purely because it is a simple calculation.  "There is not, as [Symantec] suggests, an implicit requirement in [Rule] 702 for the proffered expert to make **complicated** mathematical calculations."  *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (citing *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831 (8th Cir. 2008) (finding that it was not an abuse of discretion for a district court to permit expert testimony that was "an exercise in basic math using

simple deductive reasoning")).   Therefore, the Court will deny Symantec's motion to exclude Herscovici's report and testimony.

## II.    SYMANTEC'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

###### B.      Material Misrepresentations or Omissions

Symantec seeks summary judgment on the basis that Khoday has not shown that Symantec made any material misrepresentation or omission with respect to NDI.   The burden on the plaintiff raising a claim under California's Unfair Competition Law ("UCL") is "to show that the defendant engaged in a practice that was unlawful, unfair, or fraudulent and that the defendant may have acquired money or property by means of that practice." *In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 336 (Ct. App. 2010).   To prevail on a material misrepresentation theory, Khoday must show that Symantec's representations about the necessity of NDI – taken as a whole – had a tendency to mislead or deceive customers, even if they were partially or even largely true. *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 239 (Ct. App. 2006).

Khoday maintains that by auto-populating NDI into customers' shopping carts and representing that NDI "extends" the sixty-day window to download Norton software, Symantec mislead customers to believe that there was no other means of re-obtaining the software after sixty days aside from repurchasing it in full.   In other words, once the sixty-day deadline had passed, a customer could not re-install the software unless they had the insurance.   According to Khoday, this constituted a misrepresentation because there were at least three alternative means of redownloading the software for free.

Symantec disclaims that anything in the NDI description suggested there were no alternatives to download insurance.   Khoday's interpretation of the "What's this?" link, Symantec argues, is a "strained" interpretation that cannot form the basis for a misrepresentation action.   *See Veloff v. Pac. Bell Wireless*, No. B156110, 2002 WL 31429802, at *3 (Cal. Ct. App. Oct. 31, 2002) (unpublished) (holding that a

misrepresentation claim "may not be based on a 'strained and unjustified interpretation of the [defendant's] advertisements'" (quoting *State Bd. of Funeral Dirs. v. Mortuary in Westminster Memorial Park*, 271 Cal. App. 2d 638, 642 (Ct. App. 1969))).  Alternatively, to the extent the "What's this?" link indicated there were no redownload alternatives, Symantec maintains that it is not a misrepresentation because none of the alternative products were guaranteed to be available for customers to redownload the software.[5]  As such, they were not equivalent to NDI, and Symantec was under no obligation to inform customers about them.[6]  Only NDI would guarantee a customer the ability to redownload purchased software beyond the sixty-day window.

Symantec may prove to be correct as to NDI being the only guaranteed redownload option, but taking the facts in the light most favorable to the nonmoving party, the Court finds that a genuine issue of material fact remains on the issue of

---

[5] To support this argument, Symantec leans heavily on a segment of a deposition of Khoday, in which Khoday was asked whether Symantec's NDI representations would "still be material omissions if Symantec had the ability to, on a moment's notice, not provide trialware versions of its products available for download, to not include downloads on its support Web site, or not to allow its customer service representatives to assist customers with re-downloading their product?"  (Decl. of Patrick E. Gibbs ("Fifth Gibbs Decl."), Ex. 12 (Dep. of Devi Khoday ("Khoday Dep.") at 124:8-14, May 15, 2015, Docket No. 318.)  Khoday replied, "If they had the right to stop those services, then it wouldn't be a material omission."  (*Id.* at 124:17-19.)  Symantec asserts that because it had the right to stop providing the alternatives, Khoday's response was an admission that Symantec made no material omissions.  The Court will not consider this evidence at the summary judgment stage, however, because the question sought a legal opinion from a lay witness and was properly objected to during the deposition.  *See Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (explaining that courts, at the summary judgment stage, "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge . . . or purport[] to state legal conclusions as fact").

[6] Symantec argues that, in fact, using trialware to redownload software a customer already purchased violated the trialware terms of use.  (*See* Fifth Gibbs Decl.", Ex. 5 (Dep. of Nat Maple ("Maple Dep.")) at 295:15-296:1.)

material misrepresentation. The Court's inquiry is focused on whether Symantec's representations, taken as a whole, had a tendency to mislead customers. Even if Symantec is correct that it had the right to revoke the alternative options, a "'perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under [the UCL] Section 17200.'" *O'Shea v. Epson Am., Inc.*, No. CV 09-8063, 2011 WL 3299936, at *9 (C.D. Cal. July 29, 2011) (quoting *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009)); *McKell*, 49 Cal. Rptr. 3d at 239-40. Where a technically true fact can still be misleading, an obligation arises "to disclose all other facts which 'materially qualify' the limited facts disclosed." *Randi W. v. Muroc Joint Unified Sch. Dist.*, 929 P.2d 582, 592 (Cal. 1996). In Symantec's case, irrespective of whether NDI was the only "guaranteed" redownload option, the evidence suggests that Symantec continued to provide the alternative options like trialware for the duration of the relevant time period. Further, Symantec representatives counseled at least some customers during the relevant time period to use the alternatives when they had not purchased download insurance. (*See, e.g.*, Decl. of Patrick E. Gibbs ("Fifth Gibbs Decl."), Ex. 10 (Call Log ID 899) (advising a customer that trialware was a redownload option if the customer did not have download insurance), May 15, 2015, Docket No. 318.); Decl. of Douglas J. McNamara ("Eighth McNamara Decl."), Ex. 13 (link to, and transcript of, Symantec's Norton product redownload video, explaining that customers can reinstall Norton software by activating a trial period with their original product key), June 5, 2014, Docket No. 332.)

Construing the facts in the light most favorable to the Plaintiffs, the Court finds that a genuine issue of fact remains as to whether Symantec represented that download insurance was necessary for a customer to redownload a Norton product after sixty days but in fact other options, at no cost, existed. As a result, even a "technically accurate disclosure" as to the guarantee offered by NDI does not warrant summary judgment for Symantec. *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 450 (N.D. Cal. 2012) (denying defendant's motion for summary judgment because "simply providing technically accurate disclosure does not excuse the potentially inadequate or misleading character of other disclosures . . . . [T]here remains a genuine issue of material fact as to whether an ordinary consumer would be misled by [defendant's] explanation of the negative amortization inherent in the loan.") Just as in this case, the court in *Jordan* was concerned with whether a "representation has played a substantial part, and so has been a substantial factor, in influencing [the plaintiff's] decision." *Id.* at 454 (quoting *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009)).

## C.     Actual Harm

Symantec contends that even if a material issue of fact remains as to whether Symantec made misrepresentations on which Khoday relied, the Court should still grant its motion for summary judgment because Khoday has not demonstrated that she relied on them **to her detriment**. Specifically, Symantec asserts that Khoday has not shown that she suffered any actual harm as a result of purchasing NDI, which is required for her to recover under each of her causes of action. Under California's Consumers Legal Remedies Act ("CLRA"), "[a]ny customer **who suffers any damage** as a result of the

use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain [damages]." Cal. Civ. Code § 1780(a) (emphasis added).  Unjust enrichment claims operate similarly. "Under California law, an unjust-enrichment plaintiff must show receipt of a benefit and unjust retention of the benefit at the expense of another."  *In re Baycol Prods. Litig.*, 596 F.3d 884, 892 (8th Cir. 2010) (internal quotation marks omitted).  Where "there is no competent . . . evidence showing that [the plaintiff] suffered any harm" from the defendant's product or actions, a court should conclude that the plaintiff "received the benefit of his bargain" and grant summary judgment for defendant.  *Id.*

Symantec contends that Khoday received benefit from NDI in the form of reassurance that she could redownload her software after the sixty days had expired, and she has not shown any harm that came as a result of purchasing NDI instead of using one of the identified alternatives.  *See In re eBay Litig.*, No. 07-cv-2198, 2012 WL 3945524, at *3 (N.D. Cal. Sept. 10, 2012) (granting summary judgment for defendant on breach of contract and UCL claims because the plaintiff did not provide "substantial evidence showing that his measure of damages reasonably approximates the sum necessary to restore him to the status quo ante" (internal quotation marks and alterations omitted)). Symantec argues that Khoday suffered no economic loss by purchasing NDI, because the benefit she sought – a guarantee that she would be able to redownload her software beyond sixty days – is precisely what she received.  *See Day v. AT&T Corp.*, 74 Cal. Rptr. 2d 55, 63-65 (Ct. App. 1998) (denying UCL recovery for plaintiffs who "received **exactly what they paid for**").  Symantec contends that because no alternative product

would guarantee with certainty that Khoday could redownload her software, NDI provided a unique service for which Khoday paid.

The Court finds that a material issue of fact remains as to whether Khoday suffered harm from Symantec's alleged misrepresentations. A plaintiff may prove detrimental reliance on a material omission and recover damages if, "had the omitted information been disclosed [the plaintiff] would have been aware of it and behaved differently." *Mirkin v. Wasserman*, 858 P.2d 568, 574 (Cal. 1993). In this case, when asked whether she would have purchased NDI if she knew she could redownload the Norton software without charge through the customer service webpage, Khoday responded, "I wouldn't have purchased it." (Khoday Dep. at 149:21.) When asked the same question with the added caveat that Symantec could remove the redownload options on the customer service page at any time, Khoday responded, "I'm not sure. I may or may not have [purchased NDI in that situation]." (*Id.* at 150:4-5.) Khoday provided the same responses when asked whether she would have downloaded NDI if she knew she could redownload the Norton software without charge through trialware – that she would not have purchased NDI if redownloading was available through trialware, (*id.* at 151:7-11), and that she was unsure whether she would have purchased it if she knew Symantec could cease offering the trialware option at any time, (*id.* at 151:18-20).

These alternative redownload options are not merely hypothetical. Multiple sources in the record indicate that customers could redownload the Norton software through both the customer support website and trialware. Although Symantec contends that it could have ceased offering these options at any time, it has offered no evidence that the company ever discussed or considered eliminating the alternatives. Because

Khoday's deposition suggests that she would have acted differently had she been apprised of this information, a genuine issue of material fact remains as to whether her reliance on Symantec's representations caused her to suffer harm.  Even if Symantec had a right to remove the alternative options, in the absence of evidence demonstrating that they contemplated removing or actually did remove them, the value of any guarantee or peace of mind the NDI product may have offered Khoday – and, relatedly, whether she suffered any actual harm through Symantec's alleged misrepresentations – is best determined by a jury.  Accordingly, the Court will deny Symantec's motion for summary judgment.[7]

## III.   PLAINTIFFS' UNOPPOSED MOTION FOR MODIFICATION OF CLASS ORDER

The Plaintiffs seek to make two modifications to the Court's Order certifying the class in this case.  The Court has discretion, before entering a final judgment, to amend or alter any "order that grants or denies class certification."  Fed. R. Civ. P. 23(c)(1)(C);

---

[7] In light of the fact that the Court will deny Symantec's motion for summary judgment, Symantec requests, alternatively, that the Court enter an order establishing two facts as true. Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it **may** enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in this case." (emphasis added)).  First, Symantec requests that the Court make a finding that the alternative options identified by the Plaintiffs did not provide a guaranteed right to consumers to redownload their purchased Norton product after sixty days.  Second, Symantec seeks a determination by this Court that NDI provided value to consumers.  After considering the parties' arguments and reviewing the evidence in the record, the Court will deny both of Symantec's requests.  Rule 56(g) grants district courts discretion to make a finding of fact where an issue is genuinely not disputed, or "court[s] may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial . . . ."  *Triple H Debris Removal, Inc. v. Companion Prop. & Cas. Ins. Co.*, 647 F.3d 780, 786 (quoting Fed. R. Civ. P. 56 advisory committee's notes (2010)).  The Court concludes that an order establishing as true either material fact identified by Symantec could potentially mislead the jury at trial, and the Court will consequently exercise its discretion to allow both issues to proceed to the jury.

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."). "A court's rulings on class certification issues may also evolve," *In re Zurn Pex Plumbing Prods. Liability Litig.*, 644 F.3d 604, 613 (8th Cir. 2011), and "Rule 23 empowers district courts to alter or amend class-certification orders based on circumstances developing as the case unfolds." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1202 n.9 (2013) (internal quotation marks and alterations omitted).

The Plaintiffs' first request is for the Court to extend the window for claims against Digital River.  The Class Certification Order established a time frame for claims against Digital River spanning from January 24, 2005 through October 26, 2009.  The Plaintiffs seek to move back the closing date for such claims by roughly eight months, with a proposed amended window of January 24, 2005 through **June 30, 2010**.  To clarify the scope of the liability, the Plaintiffs also request the addition of language specifying that Digital River would only be liable for sales of EDS for Norton products during that time.  The original window reflected the date Digital River ceased its management of Symantec's online storefront.  However, Digital River continued to sell EDS during a transition period that took place from October 26, 2009 to June 30, 2010.  Accordingly, the Court will account for that transition period and grant the motion to extend the claim window.  The Court will also grant the request to add "regarding sales of EDS for Norton products" to that section of the Order.

Second, the Plaintiffs ask the Court to shorten the window for unjust enrichment claims against Symantec.  The original window extended from January 24, 2007 through

March 10, 2011.  The Plaintiffs request that the Court narrow the window to **January 24, 2008** through March 10, 2011.  The initial window was calculated based on a four-year statute of limitations, but the Plaintiffs discovered that the California statute of limitations for unjust enrichment claims based on alleged underlying fraud is three years, not four. Cal. Civ. Proc. Code § 338(d) (providing for a three year statute of limitations on "[a]n action for relief on the ground of fraud or mistake"); *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1036 (N.D. Cal. 2009).  Defendants do not oppose delaying the applicable start date on those claims by one year.  Because the Plaintiffs' unopposed motion on the unjust enrichment window properly comports with the California statute of limitations, the Court will exercise its continuing discretion over the class certification order to grant the motion.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant Symantec's Motion for Summary Judgment [Docket No. 314] is **DENIED**.

2.     Plaintiffs' Motion to Exclude Certain Testimony of Defendants' Expert Witnesses Bobby Stephens and Kirthi Kalyanam [Docket No. 276] is **GRANTED in part** and **DENIED in part** as follows:

      a.     The motion as to Kirthi Kalyanam is **granted** to the extent he seeks to testify to specifics about how customers would download EDS, NDI, or the

alternative options, what they would be viewing and perceiving during that process, and to the extent it discusses and critiques Gaskin's analysis and valuation of EDS and NDI.  The motion as to Kirthi Kalyanam is **denied** in all other respects;

      b.    The motion as to Bobby Stephens is **granted** to the extent he seeks to testify to specifics of EDS and NDI, including how easily Symantec customers could have opted to purchase or reject those products; whether customers would have desired to purchase EDS and NDI to avoid common problems with redownloading software; and his critique of the foundation or mechanics of Gaskin's conjoint analysis.  The motion as to Bobby Stephens is **denied** in all other respects.

3.    Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Steven Gaskin [Docket No. 279] is **DENIED**.

4.    Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Nicholas Taylor [Docket No. 285] is **DENIED**.

5.    Defendant Symantec's Motion to Exclude Portions of the Report and Testimony of Plaintiffs' Expert Steven Herscovici [Docket No. 292] is **DENIED**.

6.    Plaintiffs' Unopposed Motion for Modification of Class Order [Docket No. 360] is **GRANTED**.

      a.    The Court **grants** the motion to extend the class period for claims against Digital River from October 26, 2009 to June 30, 2010.

b.     The Court **grants** the request to add "regarding sales of EDS for Norton products" to the paragraph specifying the class period for claims against Digital River.

c.     The Court **grants** the motion to shorten the class period for unjust enrichment claims against Symantec from January 24, 2007 to January 24, 2008.

**IT IS FURTHER HEREBY ORDERED** that the Court's Order Granting Plaintiffs' Motion for Class Certification [Docket No. 274] is amended as follows:

All persons in the United States who Purchased Extended Download Service ("EDS") for Norton products or Norton Download Insurance ("NDI") between January 24, 2005 and   March 10, 2011.

**January 24, 2005 – June 30, 2010** – Claims against Digital River under the Minnesota Consumer Fraud Act and False Statement in Advertising Act, or Unjust Enrichment, regarding sales of EDS for Norton products;

**January 24, 2008 – March 10, 2011** – Claims against Symantec under California Unfair Competition Law, or Unjust Enrichment;

**January 24, 2008 – March 10, 2011** – Claims against Symantec under California Consumer Legal Remedies Act, for only those class members defined as "consumers" under the CLRA.

DATED:  March 19, 2015                           _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                  JOHN R. TUNHEIM
                                                     United States District Judge