## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

DEVI KHODAY and DANISE
TOWNSEND, *individually and on behalf
of the class they represent*,

Plaintiffs,

v.

SYMANTEC CORP., and DIGITAL
RIVER, INC.,

Defendants.

Case No. 11-cv-180 (JRT/TNL)


**REPORT AND
RECOMMENDATION**

---

Andrew N. Friedman, Douglas J. McNamara, and Sally M. Handmaker, **COHEN, MILSTEIN, SELLERS & TOLL PLLC**, 1100 New York Avenue Northwest, West Tower Suite 500, Washington, DC 20005; Kate M. Baxter-Kauf and Karen H. Riebel, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Jean Wentz, **THE WENTZ LAW FIRM**, 225 South Grand Avenue, Los Angeles, CA 90012; and Lee S. Shalov, **MCLAUGHLIN & STERN, LLP**, 260 Madison Avenue, 19th Floor, New York, NY 10016 (for Plaintiffs);

Allison S. Davidson and Patrick E. Gibbs, **LATHAM AND WATKINS, LLP**, 140 Scott Drive, Menlo Park, CA 94025; and Steve W. Gaskins and Sara H. Daggett, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402 (for Defendant Symantec Corp.); and

Charles Smith, Amy Van Gelder, Jessica Frogge, and Marcella L. Lape, **SKADDEN, ARPS, SLATE, MEAGHER & FLOM**, 155 North Wacker Drive, Chicago, IL 60606; and Jennifer M. Robbins, Denise S. Rahne, and Christopher W. Madel, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402 (for Defendant Digital River, Inc.).

---

This matter is before the Court on Plaintiff's Motion for Final Approval of Settlement, (ECF No. 403), and Plaintiff's Motion for An Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards, (ECF No. 407). The motions were

referred to the undersigned for a report and recommendation to the Honorable John R. Tunheim, Chief United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 (b)(1)(B). (ECF No. 427). For the reasons set forth below, this Court recommends that Plaintiff's Motion for Final Approval of Settlement and Plaintiff's Motion for An Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards each be **GRANTED**.

## I.      BACKGROUND

Plaintiffs brought a putative class action suit against Defendants Symantec and Digital River in July 2013. After the class was certified, the parties agreed to a $60 million settlement in April 2015, which was preliminarily approved by the Court on October 8, 2015. (ECF No. 400). Plaintiffs have now moved for final approval of the settlement. (ECF No. 403). Plaintiffs have also moved for an award of attorney's fees in the amount of 33 1/3 percent of the settlement fund, reimbursement for costs and expenses in the amount of $738,605.19, and $10,000 service awards for each named plaintiff. (ECF No. 407). Five objections to the settlement have been filed. (ECF Nos. 401, 402, 415, 416, 431).[1]

### A.      History of the Lawsuit

On January 24, 2011, Plaintiffs filed a putative class action complaint against Defendants. (ECF No. 1). On April 14, 2011, Plaintiffs filed their Amended Complaint, asserting two claims against Symantec under California law, one claim against Digital

---

[1] The Court received a sixth submission, which was docketed as an objection, but this filing appears to be a class member claim form mistakenly submitted to the Court. (ECF No. 430).

River under Minnesota law, and declaratory judgment and unjust enrichment claims against both Defendants. (Am. Compl., ECF No. 40). Plaintiffs allege that Defendants sold download insurance services—costing between $4.99 and $16.99—to consumers called either Extended Download Service ("EDS") or Norton Download Insurance ("NDI") (collectively, "Download Insurance"), which was marketed as the only way to extend the time for customers to download their Norton software beyond sixty days from the date of purchase. (Am. Compl., at 2–4). Plaintiffs allege that Defendants failed to disclose, at the point of sale, that customers could re-download the software without purchasing Download Insurance through various free alternatives. (Am. Compl., at 2–4). Despite the existence of these alternatives, Defendants automatically added Download Insurance—and its accompanying fee—to consumers' online shopping cart, requiring consumers to affirmatively remove the Download Insurance from their carts before checkout to avoid purchasing it. (Am. Compl., at 2–4).

On May 16, 2011, Defendants each filed motions to dismiss. (ECF Nos. 50, 55). The Court mostly denied Defendants' motions to dismiss, only dismissing the declaratory judgment claim brought against both Defendants. (Mar. 12, 2012 Order, at 25–26, ECF No. 78). In its Order, the Court found, *inter alia*, "that Plaintiffs have raised plausible allegations of fraudulent misconduct," and that "even if Symantec's statements were true, they may have been misleading, creating a duty to disclose." (Mar. 12, 2012 Order, at 14). As to Digital River, the Court held, *inter alia*, that "Plaintiffs have sufficiently alleged that Digital River was required but failed to clarify misleading information that led consumers to believe they could normally access Norton for only sixty days." (Mar.

12, 2012 Order, at 23–24). In so holding, the Court permitted the gravamen of Plaintiffs' case to progress to discovery.

Defendants produced approximately 575,000 documents during the discovery phase, spanning 1.8 million pages, which Plaintiffs' counsel reviewed and analyzed. (Decl. of Andrew N. Friedman in Supp. of Mot. Final Approval Settlement ¶ 13, Dec. 7, 2015, ECF No. 406) (hereinafter "First Friedman Decl."). Plaintiffs conducted 13 fact depositions of current or former Symantec and Digital River employees. (First Friedman Decl. ¶ 18). Plaintiffs were each deposed and depositions were taken of Plaintiffs' three expert witnesses and Defendants' four expert witnesses. (First Friedman Decl. ¶¶ 19–30).

After the close of discovery, Plaintiffs moved for the certification of a national class, (ECF No. 180), which the Court granted in full. (Mar. 31, 2014 Order, at 79, ECF No. 274). The certified class is comprised of: "All persons in the United States who purchased Extended Download Service ("EDS") for Norton products or Norton Download Insurance ("NDI") between January 24, 2005 and March 10, 2011." (Mar. 31, 2014 Order, at 79). Defendants timely filed petitions for permission to appeal the class certification order pursuant to Fed. R. Civ. P. 23(f), which were denied. (ECF Nos. 303, 305).

On June 26, 2014, Notice of Pendency of Class Action was ordered to be disseminated. (June 26, 2014 Order, ECF No. 340). Utilizing the services of a settlement administrator, notice was disseminated via email to class members. (June 26, 2014 Order, at 2–3). Notice was also made through a multi-media publication notice program that

included social media, search advertising, and media outreach publication. (June 26, 2014 Order, at 2–3).

On April 15, 2014, Plaintiffs filed a motion to exclude testimony of two of Defendants' expert witnesses. (ECF No. 276). The same day, Defendants filed several motions to exclude the testimony of Plaintiffs' experts. (ECF Nos. 279, 285, 294).

On May 15, 2014, Symantec filed a Motion for Summary Judgment, (ECF No. 314), which Plaintiffs opposed, (ECF No. 331). Symantec argued that it had no duty to disclose the existence of the free alternatives because, unlike the Download Insurance, the free alternatives were not guaranteed. (ECF No. 316, at 24). Symantec also asserted that Plaintiffs' deposition testimony did not support their claim that they were deceived. (ECF No. 316, at 11–16). The Court denied Symantec's Motion for Summary Judgment. (Apr. 27, 2015 Order, ECF No. 384). The Court held that genuine issues of material fact remained as to whether Defendants made misrepresentations or omissions upon which Plaintiffs relied, specifically noting that "irrespective of whether NDI was the only 'guaranteed' redownload option, the evidence suggests that Symantec continued to provide the alternative options . . . for the duration of the relevant time period," and "Symantec representatives counseled at least some customers during the relevant time period to use the alternatives when they had not purchased download insurance." (Apr. 27, 2015 Order, at 33). The Court further held that a material issue of fact remained regarding whether Plaintiff suffered harm from the alleged misrepresentations because "Plaintiff's deposition suggests that she would have acted differently had she been apprised of [certain] information." (Apr. 27, 2015 Order, at 36). In the same Order, the

Court denied motions to exclude Plaintiffs' experts, and granted in part and denied in part Plaintiffs' motion to exclude certain testimony of Defendants' experts. (Apr. 27, 2015 Order).

In April 2015, Symantec moved to implement a trial plan under Fed. R. Civ. P. 23(d) or, in the alternative, to decertify the class. (ECF No. 377). That motion was pending at the time the settlement was reached, and was later withdrawn by Symantec. (ECF No. 414).

### B.     Settlement Discussions

The parties have mediated this case on three separate occasions. The first mediation took place on February 20, 2013, before mediator Randall Wulff in Oakland, California. (First Friedman Decl. ¶ 50). This mediation session occurred shortly after the commencement of discovery and before class certification had been briefed. (First Friedman Decl. ¶ 50). At that early stage, the parties were unable to reach a settlement. (First Friedman Decl. ¶ 50). In September 2014, after the Court granted certification of a nationwide class and set a trial date for December 8, 2014, the parties again attempted mediation, this time before the Honorable Layn R. Phillips (ret.) in Orange County, California. (First Friedman Decl. ¶ 51). After a full day of mediation, the case was not resolved. (First Friedman Decl. ¶ 51). Finally, on April 22, 2015, with a new trial-ready date set for May 26, 2015 approaching, the parties met again to mediate the case before Judge Phillips in New York. (First Friedman Decl. ¶ 52). This resulted in the settlement now before the Court. (First Friedman Decl. ¶ 52).

### C.      The Settlement Agreement

The terms of the settlement are set forth fully in the Settlement Agreement. (First Friedman Decl. Ex. 1, ECF No. 406) (hereinafter "Settlement Agreement"). The Court will briefly discuss the material terms. Defendants shall pay $60 million, funded evenly between the two Defendants, into a common settlement fund for the benefit of the Class. (Settlement Agreement, at 10). Symantec has already paid $30 million into an escrow fund, Digital River has paid $10 million into the escrow fund, with the remaining $20 million due ten calendar days after entry of the Court's final approval order and judgment. (Settlement Agreement, at 10).

Defendants agree to pay each class representative outside of the settlement fund up to $7,500 of any service award approved by the Court. (Settlement Agreement, at 11). To the extent that the Court awards more than $7,500 in service awards to each class representative, the difference would be paid from the settlement fund. (Settlement Agreement, at 11).

For class members who submit approved claims,[2] the Settlement provides $50 for each purchase of Download Insurance purchased during the class period, subject to a pro rata reduction if the total claims exceed the net settlement fund. (Settlement Agreement,

---

[2] To receive a settlement payment, class members must electronically complete and sign a simplified claim form and submit it to the settlement administrator via an electronic claim form submission process. (Settlement Agreement, at 21). The claim form must be submitted no later than thirty days after entry of the approved final order. (Settlement Agreement, at 21). For those class members who have requested hard copy claim forms, they may submit such claim forms via U.S. mail. (Settlement Agreement, at 21).

at 11).[3] If after distribution of the approved claims there remains sufficient funds (after payment of administrative costs associated with a second distribution) to pay at least $2 to each approved claimant, then any such remaining funds would be distributed on a pro rata basis among class members who submitted approved claims. (Settlement Agreement, at 12). In the event that, after distribution of the settlement funds, there is a balance remaining in the net settlement fund, then the remaining funds shall be distributed *cy pres* to the Electronic Frontier Foundation, a nonprofit digital rights group. (Settlement Agreement, at 12). No portion of the settlement fund will revert to Defendants. (Settlement Agreement, at 12).

The settlement also provides that Plaintiffs release Defendants from any and all claims that were or could have been raised in this litigation. (Settlement Agreement, at 22). The settlement also provides that Defendants release Plaintiffs from any claims related to the prosecution of the litigation. (Settlement Agreement, at 22).

The parties filed for preliminary approval of the settlement on August 18, 2015. (ECF Nos. 392–95). The Court preliminarily approved the settlement and notice of the settlement was disseminated to the class. (ECF No. 400).

### D.   Notice, Opt-Outs, and Requests for Exclusion

Defendants provided notice of the settlement to class members at their last known email address, and by physical mailing to their last known physical address for members with an invalid or an unknown email address. (Supp. Decl. of Lori L. Castaneda re:

---

[3] As noted by Plaintiffs' Counsel, this amount is substantially more than the amount consumers originally paid for the product, and each class member is not limited as to the number of claims he or she can make for each purchase of Download Insurance during the class period. (First Friedman Decl. ¶ 54).

Settlement Admin. ¶ 5, ECF No. 425-1) (hereinafter "Castaneda Decl."). Email notices commenced on October 15, 2015, with 9,337,640 email notices being delivered, which was about a 91.4 percent successful transmission rate. (Castaneda Decl. ¶ 5). Postcard notices were mailed on November 7, 2015 to any individual whose email notice was undeliverable. (Castaneda Decl. ¶ 8). A total of 3,974,058 postcard notices were mailed to potential class members who did not have an email address or whose email notice bounced back during the notice of pendency, and an additional 762,835 postcard notices were mailed to potential class members whose email notice bounced back during the settlement notice dissemination period. (Castaneda Decl. ¶¶ 8–9). As of January 10, 2016, a total of 3,776,787 postcard notices had not been returned as undeliverable, with 19,102 postcard notices returned as undeliverable but containing a forwarding address that were promptly re-mailed to the updated address. (Castaneda Decl. ¶ 10). Based on these statistics, over 92 percent[4] of the 14,179,650 class members sent direct notice did not have their notice subsequently returned as undeliverable. (Castaneda Decl. ¶ 11).

    In addition to this direct notice campaign, the Settlement Agreement contemplated providing supplemental notice through an internet-based, multi-media publication notice program that included social media, search advertising, and media outreach. (Castaneda Decl. ¶ 12). The supplemental publication notice program was executed via publication on Facebook for a four-week period commencing October 15, 2015, a search advertising campaign on Google, and a press release distributed over PR Newswire's *USI Newsline*

---

[4] 9,337,640 email notices + 3,776,787 postcard notices + 19,102 re-mailed postcard notices = 13,133,529 recipients. The 13,133,529 recipients represent approximately 92.62% of the possible class of 14,179,650.

and *National Hispanic Newsline* announcing the settlement in English and Spanish to media outlets across the country. (Castaneda Decl. ¶ 12). Additionally, the publication notice was published in the October 21, 2015 edition of *USA Today Marketplace*. (Castaneda Decl. ¶ 14). As estimated by the settlement administrator, the publication notice program delivered over 87 million opportunities for class members to click on the notice and view the settlement website. (Castaneda Decl. ¶ 13).

Moreover, there was a second email notice campaign to class members whose email notice was not returned as undeliverable but had not yet filed claim forms, reminding them of the claim deadline. (Castaneda Decl. ¶ 15). In each of these notice platforms was information directing class members to a settlement website and a toll-free telephone number for more information regarding the settlement. (Castaneda Decl. ¶¶ 16–17).

As of January 10, 2016, from a class of over 14 million, the settlement administrator had received 105 requests for exclusion. (Castaneda Decl. ¶ 18). And, as of the date of this Report and Recommendation, the Court has received five objections.

## II.    DISCUSSION

### A.    Motion for Final Approval of Settlement

"The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context." *White v. Nat'l Football League*, 822 F.Supp. 1389, 1416 (D. Minn. 1993). In order to approve a class action settlement, the Court must determine whether, in its discretion, the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this determination, the

Court must consider four factors: "(1) the merits of the plaintiff's case weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement." *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) (citing *In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)). "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

Settlement agreements are presumptively valid, particularly where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters, and there are few objectors. *George v. Uponor Corp.*, Case No. 12-cv-249 (ADM/JJK), 2015 WL 5255280, at *6 (D. Minn. Sept. 9, 2015) (citations omitted). The settlement in this case is presumptively valid, given the arm's length negotiations supervised by an independent mediator, the extensive discovery conducted over several years of litigation, the substantial experience of Counsel for Plaintiffs and Defendants, and the relative dearth of objectors. *Id.* Moreover, the four mandatory factors support a finding that the settlement is fair, reasonable, and adequate in this case. *Marshall*, 787 F.3d at 508.

### 1.    The Merits of Plaintiffs' Case Balanced Against the Settlement Terms

As for the first factor, "the outcome of the litigation would be far from certain" if the case had not settled. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005). Although Plaintiffs survived motions to dismiss, a class certification

motion, and motions for summary judgment, they would still have to prevail at trial and contend with any appeals. There are several issues that remain contested, including whether Defendants' purported misrepresentations were material, whether class members suffered damages, and the extent of damages. The outcome of a trial and any subsequent appeal is uncertain. The Settlement Agreement, however, provides for substantial and direct benefits to the class. Under the $60 million settlement, it is anticipated that class members submitting valid claims will receive an amount in excess of their out-of-pocket loss—around $50 per claim, compared to the $4.99 to $16.99 purchase price. This is a strong result in the face of an uncertain trial outcome. Weighing the uncertainty of relief against the immediate benefit in the settlement, as well as the remuneration that likely exceeds out-of-pocket loss, this factor favors approving the settlement.

### 2.      Defendants' Financial Condition

Second, there is no indication that Defendants' financial condition is not secure. Their financial condition has afforded them a spirited defense in litigation, spanning five years. Moreover, Defendants' financial condition appears to permit it to fulfill its settlement obligations, as Defendants have already paid $40 million into an escrow fund, with the remaining $20 million coming within ten days of final approval. Defendants voluntarily agreed to the payment amount in the Settlement Agreement and there is no indication that Defendants' financial condition would prevent it from making the final payment. As such, this factor weighs in favor of approval.

### 3.      The Complexity and Expense of Further Litigation

Third, the complexity and expense of further litigation could be great. "Class actions, in general, place an enormous burden of costs and expense upon parties." *Marshall*, 787 F.3d at 512 (internal quotation and citation omitted). "Where . . . the class members' claims involve complex legal questions, conflicts of law analyses, the application of numerous states' laws, and individualized damages for each class member that are speculative and difficult to estimate, the enormity of the burden is obvious." *Id.* Such a burden exists in this case as well.

Before settling, nearly five years had passed since the complaint was filed, with significant expenditures of time, energy, and labor by each party. The parties engaged in substantial dispositive and non-dispositive motion practice and conducted expansive discovery. What remains is a trial, which is certain to be lengthy and complex, with an unpredictable outcome in contrast to predictable post-trial motions and appeals, all while class members remain uncompensated and litigation time, stress, fees, and costs increase for both side. The nature of the litigation to date, and the certainty of continued complex and expensive proceedings without a predictable outcome, counsel in favor of approval.

### 4.      Opposition to the Settlement

"The weight of this factor depends on the viewpoint of the opposition." *Id.* at 513. When the opposition is considered from the view of the named Plaintiffs, the amount of opposition is nonexistent because neither class representative objects to the settlement. When considered from the viewpoint of the entire class, it is insubstantial: with a month left in the claims period, the settlement administrator received 105 requests for exclusion

compared to approximately 300,000 claims. Put another way, less than .0008 percent[5] of the total class opted out of the settlement, and the Eighth Circuit "previously approved class-action settlements even when almost half the class objected to it." *Marshall*, 787 F.2d at 513 (citing *Van Horn*, 840 F.2d 604) (approving a settlement with 180 of 400 class members objecting), and even "when all named plaintiffs opposed it." *Marshall*, 787 F.2d at 513 (citing *Elliot v. Sperry Rand Corp.*, 680 F.2d 1225, 1226–27 (8th Cir. 1982)) (finding no abuse of discretion even though both named plaintiffs objected and 790 of approximately 3,000 members objected). The fact that neither of the named plaintiffs opted out, coupled with the fact that less than .0008 percent of the entire class opted out, suggests the settlement is favorable to what most members believe their claims are worth. *See Marshall*, 787 F.3d at 513. Moreover, out of approximately fourteen million class members, only five objections have been received to date, all of which are either frivolous or lack merit. *See infra* § IV. Given the lack of genuine opposition to the settlement, this factor favors approval of the settlement.

### 5.  Additional Factors

The Court may also consider other factors, including (1) "procedural fairness to ensure the settlement is not the product of fraud or collusion," (2) "[t]he experience and opinion of counsel on both sides," (3) "the settlement's timing, including whether discovery proceeded to the point where all parties were fully aware of the merits," (4) "whether a settlement resulted from arm's length negotiations," and (5) "whether a skilled mediator was involved." *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*,

---

[5] 105 objectors out of the class of 14,179,650 equal approximately 0.00074%.

631 F. Supp. 2d 1151, 1156 (D. Minn. 2009) (citations omitted). Consideration of these supplemental factors further supports a finding that the settlement is fair, reasonable, and adequate.

First, there is no indication that the settlement is procedurally unfair or the product of fraud. Notice of proposed class action settlement need only satisfy broad reasonableness standards imposed by due process, i.e., it must be reasonably calculated to apprise interested parties of the pendency of action and afford them an opportunity to present their objections. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (citing *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950)). The Court has already determined that the notice complies with the due process requirements of Rule 23(c)(2)(b). (ECF No. 400, at 10). The notice in this case alerted the recipients that they were members of a pending class action, that a settlement had been proposed, and that they had the right to state their objections in a fairness hearing. *See Petrovic*, 200 F.3d at 1153.

After a direct notice consisting of emails to class members' last known email address, and postcards mailed to any class member whose email addresses were unsuccessful, over 92 percent of the 14,179,650 class members sent direct notice did not have their notice subsequently returned as undeliverable. There was also a second email notice campaign to class members whose email notice was not returned as undeliverable but who had not yet filed claim forms, reminding them of the claim deadline. In addition to this direct notice campaign, the settlement agreement provided supplemental notice through an internet-based, multi-media publication notice program that included social

media, search advertising, and media outreach. This publication notice program delivered over 87 million opportunities for class members to click on the notice and view the settlement website. Finally, available in each of these notice platforms was access to a settlement website and a toll-free telephone number for more information regarding the settlement. All told, class members were notified by email, U.S. mail, online social media, and national publication. *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) (finding notice sufficient, even if not extensive or thorough, where each class member was notified by mail and notice was printed in national publication). The Court concludes the notice constituted the best practicable notice, was more than reasonable, and gave due, adequate, and sufficient notice to all individuals entitled to receive notice. Further, the notice was reasonably calculated to advise class members of the litigation, their right to object to the settlement, and their right to appear at the final approval hearing. Thus, the notice fully satisfied the requirements of Fed. R. Civ. P. 23 and due process, making this factor weigh in favor of approval.

Second, courts give "great weight" and are entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement. *See Uponor Corp.*, 2015 WL 5255280, at *6 (citing *Welsh v. Gardebring*, 667 F.Supp 1284, 1295 (D. Minn. 1987)). In this case, counsel for plaintiffs and defendants are well-seasoned in complex litigation, with significant resources and class action experience, and both sides have already approved of the settlement. *See infra* § III(A)(4). This factor weighs in favor of approval.

Third, there is every indication that the parties were fully aware of the merits. *See In re UnitedHealth*, 631 F. Supp. 2d at 1156 (citation omitted) ("A court may consider the settlement's timing, including whether discovery proceeded to the point where all parties were fully aware of the merits."). In this case, the matter was settled after completion of extensive fact and expert discovery, multiple rounds of dispositive motions, and the case had reached a trial-ready stage. This factor weighs in favor of approval.

Fourth and finally, the settlement resulted from arm's length negotiations and was the product of three rounds of mediation, a factor that weighs in favor of approval. *See id.* (citation omitted) ("[A] court may consider whether a settlement resulted from arm's length negotiations, and whether a skilled mediator was involved."). As discussed above, arm's length negotiations and an absence of collusion is reasonably inferred in light of the fact that the adversarial process of this litigation has been vigorous during the course of the dispute, spanning several years and hundreds of court filings, with adversarial motions pending even at the time of settlement. Additionally, the parties participated in three rounds of mediation, with the final settlement being reached through the assistance of an experienced, independent mediator. Where sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption of validity of the settlement. *Id.* at 1158. Thus, this factor weighs in favor of approval.

Based on the foregoing, this Court recommends that the final settlement be approved as fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2).

**B.     Motion for An Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards**

With the final approval of the class certification and the settlement, the Court must also consider the propriety of the attorney's fees, reimbursement of costs, and service awards for class representatives. Plaintiff's counsel requests attorney fees in the amount of 33 1/3 percent of the settlement fund, reimbursement of costs and expenses in the amount of $738,605.19 from the settlement fund, and service awards for the named plaintiffs in the amount of $10,000 each from the settlement fund. (ECF No. 407). For the reasons discussed below, this Court finds that these requests are fair and reasonable, and recommends that the motion be granted.

**1.     Attorney's Fees**

"An award of attorney fees is committed to the sound discretion of the district court." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (citing *Petrovic*, 200 F.3d at 1157; Fed. R. Civ. P. 23(h)). "A routine calculation of fees involves the common-fund doctrine, which is based on a percentage of the common fund recovered." *In re Xcel*, 364 F. Supp. 2d at 991 (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (awarding attorney's fees of 36% from a $3.5 million common fund)); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") (citations omitted). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in

a common-fund case is not only approved, but also 'well established.'" *In re Xcel*, 364 F.

Supp. 2d at 991 (quoting *Petrovic*, 200 F.3d at 1157).

The key issue is whether the desired percentage is reasonable. *Petrovic*, 200 F.3d

at 1157 (citation omitted). The Eighth Circuit has not laid out factors that a district court

must consider when determining whether a percentage of the common fund is reasonable,

but this District has relied on factors set forth by other Circuits, including the following:

> (1) the benefit conferred on the class; (2) the risk to which plaintiffs'
> counsel was exposed; (3) the difficulty and novelty of the legal and factual
> issues of the case; (4) the skill of the lawyers, both plaintiffs' and
> defendants'; (5) the time and labor involved; (6) the reaction of the class;
> and (7) the comparison between the requested attorney fee percentage and
> percentages awarded in similar cases.

*Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1062 (D. Minn. 2010) (citing *In

re Xcel*, 364 F. Supp 2d at 993)). Many of the factors overlap, and not all of the

individual factors will apply in every case, affording the Court wide discretion in the

weight to assign each factor. *Yarrington*, 697 F. Supp. 2d at 1062.

**a.      *Benefit to the Class***

First, this Court recognizes that the settlement confers a clear benefit onto the

class—counsel obtained a $60 million dollar cash settlement, providing a substantial

benefit to the class. In negotiating the settlement, counsel assessed the probability of

success on the merits against the risks of establishing liability and damages and

maintaining the class action through trial and appeal. Absent settlement, this case

(pending since 2011) would continue to generate vigorously disputed issues of law and

fact. Even after the class was certified and the settlement was preliminarily approved,

both sides had pending motions and Defendants were likely to contest liability, causation, and damages at trial. Additionally, class members will receive settlement benefits faster than they would receive awards obtained after trial and a likely appeal. Moreover, class members who submit timely and otherwise valid claims are projected to receive more than their out-of-pocket loss: the price of the download insurance was between $4.99 and $16.99, with class members who submit a valid claim entitled to $50 per purchase. By itself, the cash settlement is beneficial to the class, but weighed against the inherent risks of trial, this Court finds that the $60 million cash settlement provides a substantial and immediate benefit to the class. *See id.*

### b.    *Counsel's Exposure to Risk*

Second, Plaintiffs' counsel, in taking this case on a contingent fee basis, was exposed to significant risk, fronting the cost of litigation and bringing the case to a trial-ready state without any guarantee of eventually prevailing. *See id.* (quoting *In re Xcel*, 364 F. Supp. 2d at 994) ("Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees."). The procedural history of the case exemplifies the significant risk undertaken by counsel. Counsel faced considerable obstacles to the advancement of the case, surviving motions for summary judgment, certification of the class, and preliminary approval of the settlement. Given the numerous issues of law and fact, substantial preparation was undertaken spanning several years that involved the presentation of several witnesses and getting the case to a trial-ready stage with motions pending at the time of settlement, all of which was prepared with no assurance of a favorable outcome. *Yarrington*, 697 F. Supp. 2d at 1062. In sum, this

Court finds that significant risk was undertaken by Plaintiffs' counsel which supports the reasonableness of the 33 1/3 percent attorney fees award.

### c.      *Complexity of the Factual and Legal Issues*

Third, there is every indication that the legal and factual issues are complex. The process and scope of discovery in this case is indicative of the issues' complexity, coupled with the multiple rounds of dispositive and non-dispositive motions filed by all parties. Plaintiffs' counsel successfully defended against motions to dismiss and engaged in extensive discovery, including the review of nearly two million pages of documents and taking and defending over twenty fact and expert depositions. Additionally, the discovery process itself included several contested discovery disputes. Moreover, Plaintiff's counsel certified a nationwide class applying laws of two different states, heightening the complexity of the factual and legal issues presented. *See id.* This factor weighs in favor of the fees requested by counsel.

### d.      *Quality of Representation*

The skill and extensive experience of counsel in complex litigation is relevant in determining fair compensation, *see In re Xcel*, 364 F. Supp. 2d at 995, and courts have repeatedly recognized that the quality of the opposition faced by plaintiffs' counsel should also be taken into consideration. *See Yarrington*, 697 F. Supp. 2d at 1063 (reasoning that defendants' attorneys "consist of multiple well-respected and capable defense firms" which "consistently challenged plaintiffs throughout the litigation" supported the class counsel's request for fees). Here, on both sides, each of the firms has extensive experience and expertise in complex class actions, including consumer actions.

In pursuing this litigation vigorously for five years, Plaintiffs' counsel have advanced and fully protected the interests of all members of the class and have successfully navigated the complex legal and factual issues presented. *Id.* And there can be no doubt that Defendants' counsel represented their clients skillfully and zealously throughout this litigation. Counsel for all parties exhibited great skill in advocating on behalf of their clients and bringing this case to a fair and reasonable resolution. *Id.* The quality of the representation provided by both Plaintiffs' and Defendants' counsel is another factor that supports the reasonableness of the requested fees.

        **e.**    ***Time and Labor Involved***

Since this litigation began, Plaintiffs' counsel has expended nearly 20,000 hours to litigate and resolve this dispute, exhibited diligence and efficiency throughout the litigation, resulting in a favorable result for the class. (*See* Decl. of Andrew N. Friedman Supp. Mot. Att'y Fees, Ex. A, ECF No. 409) (hereinafter "Second Friedman Decl.") (detailing the scope of the time and labor involved in this case)). This effort consisted of conducting an extensive factual investigation into the alleged fraud; drafting two complaints; reviewing and analyzing over 575,000 documents; taking fifteen fact depositions of current or former Symantec and Digital River employees and depositions of four expert witnesses for the Defendants; defending depositions of three expert witnesses for the Plaintiffs; interviewing and preparing Plaintiffs' expert witnesses; successfully opposing Defendants' motions to dismiss, motions for summary judgement, and motions to exclude certain of Plaintiffs' expert witnesses' testimony; successfully moving for certification of a nationwide class applying two different states' laws;

successfully limiting the scope of Defendants' experts' testimony; preparing for and participating in a mock jury trial with the assistance of a jury consultant; preparing for trial, including preparing jury instructions, verdict forms, exhibits, *voir dire*, deposition video and transcript designations, and motions *in limine*; and engaging in settlement negotiations over the course of four years on three separate occasions. (Second Friedman Decl. ¶ 2). In light of this effort, Plaintiffs' counsel moved the case along expeditiously and made every effort to limit duplicative efforts. *See Yarrington*, 697 F. Supp. 2d at 1063. This Court finds that the time and effort expended by Plaintiffs' counsel was reasonable and supports the request for fees.

### f.    *Reaction of the Class*

The amount of opposition to the settlement is miniscule by any reasonable measure. Out of a class of nearly fourteen million, only five objections were filed, with neither named Plaintiff objecting. While the Court has a duty to the silent majority as well as the vocal minority, this Court does not believe that five objections—all of which are either frivolous, without merit, or untimely filed—out of a class of over fourteen million warrants disapproval of the settlement in this case. *See In re Wireless*, 396 F.3d at 933 (citing *Petrovic*, 200 F.3d at 1152). This Court concludes that the settlement class supports Plaintiffs' counsel's request for attorney's fees of 33 1/3 percent of the settlement fund.

### g.    *Consistency of the Award with other Cases*

The Eighth Circuit has not set a specific benchmark to analyze the reasonableness of attorney's fees under the percentage-of-the-fund method. *Yarrington*, 697 F. Supp. 2d

at 1064. In this District, however, courts have frequently awarded attorney fees between 25 and 36 percent of a common fund in class actions. *Id.* (quoting *In re U.S. Bancorp*, 291 F.3d at 1038) (affirming a fee award representing 36 percent of the settlement fund as reasonable); *see also In re Xcel*, 364 F. Supp. 2d at 998 (collecting cases demonstrating that this district routinely approved fee awards of 33 percent); *EEOC v. Fairbault Foods, Inc.*, Case No. 07-cv-3976 (RHK/AJB), 2008 WL 879999, at *4 (D. Minn. Mar. 28, 2008) (approving a fee award of approximately 30 percent of the settlement fund); *Carlson v. C.H. Robinson Worldwide, Inc.*, Case No. 02-cv-3780 (JNE/JJG), 2006 WL 2671105, at *8 (D. Minn. Sept. 18, 2006) (approving a fee award representing 35 1/2 percent of the settlement fund). This Court finds that an attorney fee award of 33 1/3 percent of the settlement fund is within the range established by other cases in this District.

### h. *Validating Reasonableness Using the "Lodestar" Approach*

Courts may verify the reasonableness of the percentage-of-the-fund award by calculating the fee under a "lodestar" approach—totaling the hours worked, multiplying them by a typical hourly fee, and then multiplying that amount by a "multiplier" that takes into account "the contingent nature of success, and . . . the quality of the attorney's work." *Petrovic*, 200 F.3d at 1157; *Jorstad v. IDS Realty Trust*, 643 F.3d 1305, 1312–14 (8th Cir. 1981). Multipliers can range from two to five. *See, e.g.*, *In re St. Paul Travelers Sec. Litig.*, Case No. 14-cv-3801 (JRT/FLN), 2006 WL 1116118, at *1 (D. Minn. Apr. 25, 2006) (using a multiplier of 3.9). Using the "lodestar" approach to double-check the

result of the percentage-of-the-fund method, this Court detects no indication here that the award is overly generous.

Plaintiffs indicate that the number of hours worked multiplied by their customary hourly rate is approximately $10,009,873.75. (Second Friedman Decl. Ex. A ¶ 8). To reach $20 million—the amount (without interest) that would be awarded under the percentage-of-the-fund method—would require a multiplier of less than two, which is below the range of multipliers commonly accepted in other cases. *See, e.g.*, *Yarrington*, 697 F. Supp. 2d at 1076 (awarding a fee representing a 2.26 multiplier); *In re Xcel*, 364 F. Supp. 2d at 999 (awarding a fee representing a 4.7 multiplier). Moreover, this hypothetical multiplier does not factor in the caliber of Plaintiff's counsel's work in moving this case from initial complaint through settlement. Given the quality and consistency of Plaintiffs' counsel's work over several years, it is not impossible to think that Plaintiff's counsel could have tried to request a fee resulting in a higher multiplier. *See, e.g.*, *Yarrington*, 697 F. Supp. 2d at 1076 (awarding a fee representing higher multiplier where counsel worked fewer hours than those worked in this case). Put another way, with the percentage-of-the-fund method, Plaintiffs' counsel has agreed to a total amount *less* than what might have been argued for under the lodestar method.

In sum, the percentage-of-the-award award compares favorably to the lodestar method, and this Court finds that a cross-check using the lodestar method confirms that Plaintiffs' counsel's request for 33 1/3 percent of the settlement is a reasonable attorney's fee award. Accordingly, this Court recommends granting Plaintiffs' motion for attorney's fees in the amount of 33 1/3 percent of the settlement fund.

## 2.    Costs and Expenses

Courts generally allow plaintiffs' counsel in a class action to be reimbursed for costs and expenses out of the settlement fund, so long as those costs and expenses are reasonable and relevant to the litigation. *See Yarrington*, 697 F. Supp. 2d at 1067. As set forth in the declarations, Plaintiffs' counsel has incurred substantial out-of-pocket expenses totaling $738,605.19. (Second Friedman Decl. Ex. A ¶ 9). As reflected in the Declaration, these expenses included, *inter alia*, court fees, service of process fees, expert fees, costs of maintaining a database for the over 575,000 documents produced in discovery, computerized legal and factual research, mediation costs, travel expenses, photocopying, long distance telephone and facsimile charges, postage and delivery expenses, and filing fees. (Second Friedman Decl. Ex. B; ECF Nos. 409–12). All of these costs and expenses were billed separately by Plaintiffs' counsel, with no guarantee they would ultimately be recovered. This Court finds that such costs are reasonable and reimbursable. *See In re Xcel*, 364 F. Supp. 2d at 1000 (finding that expenses of photocopying, postage, messenger services, document depository, telephone and facsimile charges, filing and witness fees, computer-assisted legal research, expert fees and consultants, and meal, hotel, and transportation charges for out-of-town travel are proper in a class-action litigation); *Yarrington*, 697 F. Supp. 2d at 1068.

## 3.    Service Awards

The Settlement Agreement provides for payment to each named Plaintiff of $10,000. (First Friedman Decl. ¶ 76). Pursuant to the Settlement Agreement, up to $7,500 of the service awards are to be paid by Defendants outside of the settlement fund, with

any remaining award coming out of the settlement fund. (First Friedman Decl. ¶ 76). Courts in this District routinely grant service awards for named plaintiffs. *See, e.g.*, *Yarrington*, 697 F. Supp. 2d at 1068 (upholding service awards and recognizing that "unlike unnamed Class Members who will enjoy the benefits of the Settlement without taking on any significant role, the Named Plaintiffs [make] significant efforts on behalf of the Settlement Class and [participate] actively in the litigation"); *Zillhaver v. UnitedHealth Group, Inc.*, 646 F. Supp. 2d 1075, 1085 (D. Minn. 2009). In determining whether a service award is appropriate, courts consider the following factors: "actions plaintiff[s] took to protect the class's interests, [the] degree to which the class has benefited from those actions, and [the] amount of time and effort [the named] plaintiff[s] expended in pursuing litigation." *Zillhaver*, 646 F. Supp. 2d at 1085 (quoting *Koenig v. U.S. Bank*, 291 F.3d 1035, 1038 (8th Cir. 2001)).

In this case, service awards of $10,000 are warranted. The named Plaintiffs participated in interviews, assisted with discovery, were deposed, participated in conferences, and met with attorneys throughout the litigation process that spanned over five years. (*See* First Friedman Decl. ¶ 75). The efforts of the named Plaintiffs, their willingness to litigate and pursue their representative claims, and the nature of their claims have resulted in a settlement that will benefit all class members. *See Yarrington*, 697 F. Supp. 2d at 1069. Moreover, the amount requested here is modest in relation to the settlement fund, and this award is in line with the service awards in other class actions. *See Zillhaver*, 646 F. Supp. 2d at 1085 (awarding two lead plaintiffs $15,000 each from a settlement fund of $17 million); *In re Xcel*, 364 F. Supp. 2d at 1000 (awarding $100,000

to be split between eight lead plaintiffs). In light of their efforts undertaken to obtain the favorable result for the class, this Court finds that the $10,000 service awards are warranted. *Cf. Yarrington*, 697 F. Supp. 2d at 1069 (citations omitted) ("[I]ncentive awards . . . promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits.").

### C.    Objections

If adjudged on the basis of the number of objections or requests for exclusion from its coverage, the settlement has been well-received. As detailed above, the class's reaction to the settlement has been positive. Out of approximately 14 million class members, only 105 requests for exclusion have been received and only five objections have been raised, (Obj. of Mark Chiles, ECF No. 401; Obj. of Steven Pavlina, ECF No. 402; Obj. of Erin C. Caligiuri, ECF No. 416; Obj. of Michelle Van De Voorde, ECF No. 415; Obj. of Erma J. Johnson, ECF No. 431) (collectively, the "Objectors"). This minimal level of opposition strongly weighs in favor of approval of the settlement. *See Marshall*, 787 F.2d at 513; *Van Horn*, 840 F.2d at 604 (approving a settlement with 180 of 400 class members objecting); *Elliot*, 680 F.2d at 1226–27 (finding no abuse of discretion in granting final approval of a settlement even though both named plaintiffs objected and 790 of approximately 3,000 members objected); *see also supra* §§ II(D), III(A)(6). Generally, the objections can be grouped into several categories. Some Objectors allege that the Settlement Agreement provides inadequate or otherwise unfair relief, and some allege that the Settlement Agreement has an inadequate or otherwise

unfair notice and/or exclusion process. Others claim that settlements in general are philosophically wrong.

To begin with, this Court notes that each of the objections fail to provide information required by the Court's preliminary approval order and for that reason alone could be barred from consideration. *See In re UnitedHealth*, 631 F. Supp. 2d at 1158 n.6 (refusing to "consider [the objection's] merits" where objector failed to follow proper procedures for lodging an objection). Each of the objections in this case is deficient in some way. (*See* ECF No. 400, at 4–5) (outlining several disclosure requirements for an effective objection). For example, none of the Objectors identifies the number of class action settlements they have objected to in the last three years, (*see passim*  Chiles Obj.; Pavlina Obj.; Caligiuri Obj.; Van De Voorde Obj.; Johnson Obj.); three of the objections provide neither the address and email address used to purchase Download Insurance nor the approximate date the Download Insurance was purchased, (*see* Chiles Obj.; Pavlina Obj.; Caligiuri Obj.); and another failed to file the objection by the deadline, (*see* Johnson Obj.). For these reasons alone each of the objections could be denied.

Moreover, this Court notes that some of the Objectors in this case warrant at least a modicum of skepticism. For example, the attorney representing Objector Caligiuri, Brent Vullings of the Vullings Law Group, has recently filed objections in at least four other cases and has demonstrated tactics that were deemed so suspicious as to sway courts to grant requests to conduct discovery into the value of his claims, and in other cases to prompt motions for sanctions for filing frivolous claims. *See, e.g.*, *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626 (E.D. Pa. 2015) (representing Objector Morrison);

*Kolinek v. Walgreens Co.*, Case No. 12-C-4806. 2015 WL 7450759 (N.D. Ill. Nov. 23, 2015) (representing Objector Streight); *Allen v. JP Morgan Chase Bank, N.A.*, Memo. Opinion and Order Granting Final Approval, Case No. 1:13-cv-08285 (N.D. Ill. Sept. 4, 2015) (representing Objector Carlsen); *Chaudhri v. Osram Sylvania, Inc.*, Case No. 2:11-cv-4405 (MCA), Final Approval Order and Judgment (D.N.J. March 26, 2015) (representing Objector Morrison). Similarly, there is some evidence that Objector Van De Voorde has filed objections in at least two other lawsuits of which she is plainly not a class member. *See Bates v. Kashi Co.*, Case No. 3:11-cv-1967 (S.D. Cal. Aug. 1, 2014); *Skold et al. v. Intel Corp. et al.*, Case No. 1-05-CV-039231 (Cal. Super. Ct., Cnty. Of Santa Clara 2005). It appears that these two Objectors are either serial objectors themselves or are represented by counsel who are themselves serial objectors. Courts routinely reject such attempts to interfere with class action settlements based on questionable motives. *See, e.g.*, *In re UnitedHealth*, 643 F. Supp. 2d at 1108–09 ("The remoras are loose again" with the Court "emphatically" denying their objections); *Snell v. Allianz Life Ins. Co. of N. Am.*, Case No. 97-cv-2784 (RLE), 2000 WL 1336640, at *9 (D. Minn. Sept. 8, 2000) (referring to "professional objectors" as "a pariah to the functionality of class action lawsuits . . . .").

Despite the vociferous objections, this Court notes that none of the Objectors appeared at the hearing on January 19, 2016 to present their concerns more fully. (ECF No. 428). This Court, however, has closely examined the concerns of the Objectors. *See In re Wireless*, 396 F.3d at 933 ("The district court has a duty to the silent majority as well as the vocal minority.") (citing *Petrovic*, 200 F.3d at 1152). Based on the following

analysis, this Court does not believe that any of the concerns raised in the five objections warrant disapproval of the settlement in this case.

### 1.      Adequacy of the Relief

The Objectors' first argument is that the class action settlement provides inadequate or otherwise unfair relief. The Objectors make several contentions, including that the service awards for the named Plaintiffs are excessive and unfair, (Caligiuri Obj., at 1–3; Johnson Obj., at 1, ECF No. 431); that the attorneys' fees are excessive and unfair, (Chiles Obj., at 1; Van De Voorde Obj., at 5–7, ECF No. 415; Caligiuri Obj., at 5–6); that the settlement provides inadequate injunctive relief, (Caligiuri Obj., at 2); that the settlement contains an overbroad release of various state court claims, (Caligiuri Obj., at 3); and that the *cy pres* recipient of funds leftover in the settlement fund does not benefit the class, (Van De Voorde Obj., at 7; Caligiuri Obj., at 5). This Court concludes that the Objectors have failed to establish that the settlement is inadequate or unfair.

Objector Caligiuri argues that service awards are "excessive and unfair to the class [because] . . . [i]f class representatives and their attorneys routinely expect the Court to award thousands of dollars in awards on top of their share of the settlement benefits, class representatives may be tempted to accept suboptimal settlements . . . ." (Caligiuri Obj., at 2). Somewhat relatedly, as best as this Court is able to tell, Objector Johnson argues that service awards are unfair because she too should be entitled to a $10,000 service award, even if not a named plaintiff. (Johnson Obj., at 1).

First, courts routinely recognize and approve awards for class representatives. *Zillhaver*, 646 F. Supp. 2d at 1085. As discussed above, the class representatives were the

named principal catalysts to achieving the beneficial result for the class and actively participated in the litigation for nearly five years, including sitting for depositions and assisting in responding to multiple discovery requests. As a result of their efforts, class members who submitted valid claims will in all probability recover more than 100 percent of their total out of pocket damages. The service awards are commensurate with the class representatives' efforts and the benefit to the class as a result of those efforts.

Here, there is no evidence that either Objectors Caligiuri or Johnson participated in any of the litigation beyond filing their objections. Additionally, both Objectors completely ignore the benefit conferred upon the class because of the named Plaintiffs' efforts. Neither Objector offers any persuasive justification to the alleged unfairness of rewarding the named Plaintiffs for their time and energy offered to the litigation of this matter, with no guarantee of success, over the course of several years, so that a class member may likely receive the benefit of more than 100 percent of their out-of-pocket loss, with no limit to the number of valid claims on which they may collect. Neither Objector adequately explains how this could somehow be the result of a suboptimal settlement. Indeed, Objector Johnson herself stands to collect substantially more than her out of pocket loss because in her own objection she claims to have made a "grand total" of 23 downloads of the Download Insurance. (Johnson Obj., at 2). In sum, Objectors' opposition to the service awards as somehow unfair is without merit.

Next, contrary to the arguments of the Objectors, the fees and costs sought by Plaintiffs' counsel are not excessive or unfair. In his objection, Mark Chiles makes a "common sense motion not supported by any form of evidence" to the fees as "excessive

and a windfall." (Chiles Obj., at 1). Objector Van De Voorde argues the fees are unreasonable because "the results achieved do not warrant a one-third fee award; and . . . the fee award is not based on the actual benefits to the Class." (Van De Voorde Obj., at 5–6). Objector Caligiuri echoes these concerns by alleging "there is no indication how much will be paid out under the settlement and no way to determine how the requested fees compare to that number," and, therefore, "there is no explanation . . . why class counsel should recover such a high percentage." (Caligiuri Obj., at 5–6).

Here, the Objectors' arguments ignore the fact that the requested compensation is well within the range of awards in this Circuit and District commonly approved in hard-fought, complex actions such as this one, whether calculated as a percentage of the fund or in relation to Plaintiffs' Counsel's lodestar. *See Petrovic*, 200 F.3d at 1157 ("It is well established in this circuit that a district court may use the 'percentage of the fund' methodology to evaluate attorney fees in a common-fund settlement."); *Yarrington*, 697 F. Supp. 2d at 1061; *see also In re U.S. Bancorp Litig.*, 291 F.3d at 1038 (finding "no abuse of discretion in the district court's awarding 36% to class counsel who obtained significant monetary relief on behalf of the class"); *In re Green Tree Fin. Corp. Stock Litig.*, Case Nos. 97-cv-2666, 97-cv-2679 (JRT/RLE), 2004 WL 23335196, at *5 (D. Minn. Dec. 18, 2003) (awarding 33 1/3 percent of the settlement amount in fees as "fair and reasonable"); *Jensen v. Minn. Dep't of Human Servs.*, Case No. 09-cv-1775 (DWF/FLN), 2011 WL 6178845, at *2 (D. Minn. Dec. 5, 2011) ("The Court finds that a one-third contingent fee is a fair and reasonable fee considering the complexity of the issues and the substantial efforts of Settlement Class Counsel in this matter, and

considering the significant benefits the Settlement affords to the Class . . . ."). As stated earlier in this Report and Recommendation, Courts in this District have routinely observed that the range of percentage awards in common fund cases most typically ranges from 25 percent to 36 percent. *See Yarrington*, 697 F. Supp. 2d at 1061. Accordingly, the findings of this Court coupled with overwhelming precedent within this Circuit wholly discard the objections to the requested fees and costs.

Objector Caligiuri also asserts that the settlement award provides inadequate injunctive relief. (Caligiuri Obj., at 2). This claim is equally without merit. To begin with, injunctive relief is not a requirement for adequate or reasonable class action settlements. *See generally In re Wireless*, 396 F.3d at 932 (stating that the determination of the adequacy, fairness, and reasonableness of a class action settlement involves a weighing of four factors: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement"); *see also* Fed. R. Civ. P. 23. Additionally, to claim that the settlement affords inadequate injunctive relief completely ignores the reality that, as a direct result of this litigation, Defendants have not made the software at issue available for sale since on or about March 2011. Moreover, it is not unlikely that the settlement will likewise serve as a deterrent with regard to certain types of digital consumer practices in the future.

Next, Objector Caligiuri argues that the settlement is inadequate because the settlement includes a release of various state court claims not pled in this case and "does not adequately compensate Class Members." (Caligiuri Obj., at 3). This, too, is

unconvincing. First, Objector Caligiuri has failed to demonstrate, or even mention, how a legal remedy would be available under another state statute which is not afforded by the settlement terms of this case. *See In re Uphonor*, 716 F.3d at 1064. Had class members sued individually under other state laws, it is doubtful they would have received as much as or greater than the award made available to them in this Settlement Agreement, making it difficult for the Objectors to argue that the award here is somehow prejudicial to class members. Additionally, the Objectors offer no reason why class members could not have simply "opted out of the class and instead chosen to pursue their claims separately under [various state] law[s]." *Id.* Accordingly, this Court finds that the release of additional state law claims under the settlement in no way limits the recovery of class members and provides no basis for withholding final approval of the settlement. Without settlement of the state claims, the settlement fund might well have been smaller or there may have been no resolution of the case at all, but continued protracted litigation with no guarantee of an outcome one way or another.

Finally, Objectors argue that the *cy pres* recipient does not benefit the class. (Van De Voorde Obj., at 7; Caligiuri Obj., at 5). This is also unpersuasive. *See In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1067 (8th Cir. 2015) (stating that a *cy pres* recipient is appropriate because the distribution is "for the next best use . . . for indirect class benefit" and "consistent with the nature of the underlying action and with judicial function"). The Objectors ignore the fact that the *cy pres* recipient here, Electronic Frontier Foundation, is a global nonprofit whose mission is to defend consumer civil liberties in the digital world, including digital consumer protection. *See*

*LaGarde v. Support.com, Inc.*, 2013 WL 1994703, at *4 (N.D. Cal. May 13, 2013) ("EFF focuses on protecting technology consumers and advanc[ing] their digital rights [and] intends to use the *cy pres* funds to continue the important work of building a better digital future for consumers, particularly with regards to limiting the harm of lopsided terms of service agreements, surfacing inexplicit company policies . . . ."). Not only would *cy pres* distribution encourage indirect class benefit by discouraging unsavory digital consumer practices, but any *cy pres* distribution would likely be minimal, consisting only of uncashed checks and any funds remaining if a second distribution to the class would pay less than $2 to each approved claimant. In sum, this Court finds that the designated *cy pres* recipient is appropriate.

### 2.    Adequacy of the Procedure

Objectors next argue, generally, that the settlement notice and objection processes are inadequate or otherwise unfair. Objectors assert that the settlement notice process failed to comply with Rule 23, (Van De Voorde Obj., at 1–5; Caligiuri Obj., at 3–5); that the objection process was unclear and otherwise burdensome, (Caligiuri Obj., at 6–8); that the exclusion process was unreasonably burdensome, (Caligiuri Obj,. at 8); and that the claim process was unreasonably burdensome, (Van De Voorde Obj., at 4–5). This Court does not agree.

Valid notice of a settlement agreement "may consist of a very general description" of settlement terms, *In re Uphonor*, 16 F.3d at 1065 (quoting *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 122 (8th Cir. 1975)), and email notice when combined with other forms of notice constitutes the best practicable notice under the circumstances.

*Zaun v. Al Vento Inc.*, Case No. 11-cv-2024 (PAM/TNL), 2013 WL 236508, at *2 (D. Minn. Jan 17, 2013) (finding notice adequate and timely where the settlement administrator sent "notices to all e-mail addresses in [defendant's] customer email data, . . . published in two national publications, . . . displayed on [defendant's] Facebook page, . . . and also appeared on each fan's Facebook page.").

To begin with, the Court has already approved the notice program at issue as the "best notice practicable under the circumstances as well as valid, due, and sufficient notice to all persons entitled thereto" and held that the program "complies fully with Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution." (ECF No. 400, at 10); s*ee also In re Zurn Pex Plumbing Prod. Liab. Litig.*, Case No. 08-cv-1958 (ADM/AJB), 2013 WL 716088, at *1–2 (D. Minn. Feb. 27, 2013) (granting final approval where "the parties carried out the notice program" pursuant to the preliminary approval order and "hired an experienced consulting firm to design and implement the plan"). Furthermore, as described above, the notice program approved by the Court included direct notice programs via email and regular mail, indirect notice programs available for several weeks via several online forums, and a supplemental notice program that reminded any class members who had not yet responded to the primary notice of the class action. Each class member received a notice stating that they have been identified as a class member entitled to receive a share of the settlement fund. The notice provided a link to the settlement website where class members could access complete notice information and a claim form, the opt-out procedure, as well as a toll-free telephone number class members could call with questions about the settlement

and/or claim forms. This notice was not only adequate, but it was neither confusing nor misleading.

Objector Caligiuri also argues that the objection deadline is unclear. (Caligiuri Obj., at 6). This Court does not agree. The objection deadline is clear from the preliminary approval order. (ECF No. 400, at 8–9). The deadline for objections (thirty days before the final approval hearing) would have been December 20, 2015, but for the fact that December 20, 2015, fell on a Sunday. Therefore, written objections were accepted for an additional business day. Objector Caligiuri fails to explain how potential objectors would be misled or in any way prejudiced by being granted an extra day to prepare their exceptions. Indeed, she fails to make any viable assertion at all beyond a conclusory claim of unreasonable burden.

Objector Caligiuri next argues that the objection process is unduly burdensome. (Caligiuri Obj., at 6–8). First she alleges the information required to file an objection is "irrelevant." (Caligiuri Obj., at 8). She then argues that the objection process is unduly burdensome because it cannot be done over the phone or by email. (Caligiuri Obj., at 6–8). Both of these claims are without merit. Objector Caligiuri ignores the fact that courts often utilize these disclosure requirements. Additionally, there is nothing unreasonable about requiring class members to mail in an opt-out form, as the cost of a stamp is minimal compared to the relative cost of pursuing litigation on one's own outside of the class action. Moreover, if a class member does not want to be a part of the settlement, he or she can take no action, incurring no cost and bearing no burden.

### 3.      Class Actions Generally

Objectors' final contentions fall into the realm of philosophical complaints: that all class actions are "useless" and "serve no purpose." (Pavlina Obj., at 1). Despite Objector Pavlina's personal beliefs about the merits of class actions generally, (Pavlina Obj., at 1), courts and the Federal Rules of Civil Procedure recognize class actions as a legitimate part of the United States' litigation system. *See* Fed. R. Civ. P. 23. While this Court respects philosophical differences and the inherent value of contending schools of thought, a single objector or even five objectors out of a class of over 14 million people lodging philosophical frustration about the class action mechanism diminishes nothing from the overall merits of the class settlement in this case.

Upon careful consideration of the merits of the five objections and the total number of objections received in light of the size of the class, this Court recommends denying the objections filed in this case.

[Continued on next page.]

## III.    CONCLUSION

Based on the above and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.    Plaintiffs' Motion for Final Approval of Settlement, (ECF No. 403), be **GRANTED**.

2.    Plaintiffs' Motion for An Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards, (ECF No. 407), be **GRANTED** as follows:

      a.    Attorney's fees in the amount of 33 1/3 of the settlement fund;

      b.    Reimbursement of costs and expenses in the amount of $738,605.19; and

      c.    Service awards to the named plaintiffs in the amount of $10,000 each.

3.    All objections, (ECF Nos. 401, 402, 415, 416, 431), be **DENIED**.

Dated: April 4, 2016

                                                  *s/ Tony N. Leung*
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        District of Minnesota

                                        *Khoday et al. v. Symantec Corp et al.*
                                        Case No. 11-cv-180 (JRT/TNL)

## <u>NOTICE</u>

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All

objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.